Jason D. Cassady (Texas Bar #24045625)
Alexis F. Mosser (Texas Bar #24070675)
**CALDWELL CASSADY & CURRY**
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201
jcassady@caldwellcc.com
amosser@caldwellcc.com

J. Mark Gibb (Utah Bar #5702)
Lyndon R. Bradshaw (Utah Bar #15097)
**DURHAM JONES & PINEGAR, P.C.**
111 S. Main Street, Suite 2400
P.O. Box 450
Salt Lake City, UT 84111
mgibb@djplaw.com
lbradshaw@djplaw.com

*Attorneys for Plaintiffs*

Brent O. Hatch (5715)
Lara A. Swensen (8493)
HATCH, JAMES & DODGE, P.C.

John M. Desmarais (*admitted pro hac vice*)
Michael P. Stadnick (*admitted pro hac vice*)
Ameet A. Modi (*admitted pro hac vice*)
Peter C. Magic (*admitted pro hac vice*)
Wesley L. White (*admitted pro hac vice*)
Priyanka R. Dev (*admitted pro hac vice*)
Michael R. Rhodes (*admitted pro hac vice*)
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone: (212) 351-3400

*Attorneys for Defendant Apple Inc.*

---

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| nCAP LICENSING, LLC, nCAP TELECOMMUNICATIONS LLC, nCAP MEDICAL, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | **PLAINTIFF nCAP'S AND DEFENDANT APPLE'S JOINT MOTION FOR ENTRY OF A PROTECTIVE ORDER**<br><br>**JURY TRIAL DEMANDED**<br><br><u>**ORAL ARGUMENT REQUESTED**</u><br><br>Case No.: 2:17-cv-00905<br><br>Judge:  Robert J. Shelby<br><br>Magistrate Judge:  Brooke C. Wells |

# TABLE OF CONTENTS

**Page**

I.  THE BASIS FOR THE JOINT MOTION, AND SPECIFIC RELIEF SOUGHT ..............1

II.  PLAINTIFF NCAP'S INTRODUCTION ........................................................................2

III.  DEFENDANT APPLE'S INTRODUCTION....................................................................7

IV.  CAD FILES .....................................................................................................................12

    A.  nCAP's Statement Regarding CAD Files ...........................................................17

        1.  Secure, Neutral Third-Party Vendor Offers Balances Parties' Needs.......................................................................................................18

        2.  Identified Components Too Voluminous for Apple's Printing Limitations .............................................................................................20

        3.  Derived Materials Are Properly Allowed and Attorney Work-Product ..................................................................................................21

        4.  Access to CAD Files at Trial Necessary and Fair.....................................24

    B.  Apple's Statement Regarding Source Code........................................................26

        1.  Having Apple's Outside Counsel Host The Source Code Review Computer Is Appropriate And No Good Cause Exists To Deviate From That Approach Here. ........................................................................26

        2.  Apple's Proposed Limits On Printing Are Reasonable. ............................30

        3.  No Good Cause Exists To Allow For Creation Of "Derived Material" On The Review Computer.........................................................32

        4.  Proposed Provision Regarding Trial Access Is Premature And Unnecessary .............................................................................................35

V.  PROSECUTION BAR......................................................................................................36

    A.  nCAP's Statement on Attorney Practice Restrictions...........................................37

        1.  No Support of Acquisition Bar Which Inhibits Legitimate Attorney-Client Relations. ..........................................................................38

    2.    Prosecution Bar Unnecessarily Inhibits Valid Amendments....................40

B.    Apple's Statement Regarding The Prosecution Bar ...............................43

    1.    The Proposed Acquisition Bar Is Narrowly Tailored To Mitigate
          Risk Of Inadvertent Use Of Confidential Information. ............................44

    2.    Plaintiff nCap's Proposed Ethical Wall Is Inadequate To Protect
          Apple Against Misuse Of Confidential Information In Drafting and
          Amending Claims Of The Patent-In-Suit. .................................................46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Labs of Texas, LLC v. Samsung Elec. Co., Ltd.*,
  C.A. No. 1-12-CV-557, 2013 WL 12147667 (E.D. Tex. Oct. 29, 2013) .................. 28, 30

*Apple Inc. v. Samsung Elecs. Co.*,
  No. 11-cv-1846, 2011 U.S. Dist. LEXIS 103139 (N.D. Cal. Sept. 13, 2011) ...... 17, 19, 28

*Drone Techs., Inc. v. Parrot S.A.*,
  838 F.3d 1283 (Fed. Cir. 2016)..................................................................... 28

*Dynetix Design Sols., Inc. v. Synopsys, Inc.*,
  No. C-11-05973, 2012 WL 1232105 (N.D. Cal. Apr. 12, 2012)............................... 29, 30

*EPL Holdings, LLC v. Apple Inc.*,
  No. C-12-04306, 2013 WL 2181584 (N.D. Cal. 2013) ............................................... 39, 44

*Guitar Apprentice, Inc. v. Ubisoft, Inc.*,
  No. 2:13-cv-02903, 2014 WL 12769613 (D. Tenn. Nov. 6, 2014) ..................... 28, 29, 30

*In re Deutsche Bank Trust Co. Americas*,
  605 F.3d 1373 (Fed. Cir. 2010)................................................................... passim

*In re Trustees of Boston Univ. Patent Cases*,
  Civ. A. No. 12-11935, 2013 WL 12324364 (D. Mass. Nov. 15, 2013) .................... 44, 46

*Inventor Holdings, LLC v. Wal-Mart Stores Inc.*,
  Civ. A. No. 1:13-cv-00096, 2014 WL 4370320 (D. Del. Aug. 27, 2014)....................... 47

*Kelora Sys., LLC v. Target Corp.*,
  2011 WL 6000759 (N.D. Cal. Aug. 29, 2011) ................................................. 35

*Koninklijke Philips N.V. v. iGuzzini Lighting USA*, Ltd.,
  311 F.R.D. 80 (S.D.N.Y. 2015) ............................................................... 39, 45

*Pall Corp. v. Entegris, Inc.*,
  655 F.Supp.2d 169 (E.D.N.Y.2008) ............................................................... 42

*Polycom, Inc. v. Codian Ltd.*,
  No. 2:05CV520, 2007 WL 194588 (E.D. Tex. Jan. 22, 2007) ........................................ 29

*PPC Broadband, Inc. v. Times Fiber Commc'ns, Inc.*,
  No. 5:13–cv–0460, 2014 WL 859111 (N.D.N.Y. Mar. 5, 2014) ...................................... 42

*Prism Techs., LLC v. Adobe Sys., Inc.*,
  No. 8:10CV220, 2011 WL 5523389 (D. Neb. Nov. 14, 2011) ................................... 30, 31

*Rensselaer Polytechnic Inst. v. Apple Inc.*,
  No. 1:13-CV-0633, 2014 WL 1871866 (N.D.N.Y. May 8, 2014) ................................... 31

*Shared Memory Graphics, LLC v. Apple, Inc.*,
  No. C-10-2475, 2010 WL 4704420 (N.D. Cal. Nov. 12, 2010) ...................................... 48

*Slot Speaker Technologies, Inc. v. Apple Inc.*,
  No. 13-CV-01161 (N.D. Cal. June 16, 2017) ................................................. 18, 21, 28, 33

*Slot Speaker Technologies, Inc. v. Apple Inc.*,
  No. 13-CV-01161 (N.D. Cal. June 8, 2017) ................................................... 17, 21, 28, 33

*Slot Speaker Technologies, Inc. v. Apple Inc.*,
  No. 13-CV-01161, 2018 WL 1581985 (N.D. Cal. Mar. 27, 2018) ................................. 33

*Smartflash LLC and Smartflash Technologies Limited v. Apple Inc.*,
  Case 6:13-cv-00447-JRG Doc. 176 (July 10, 2014) ...................................................... 24

*ST Sales Tech. Holdings, LLC v. Daimler Chrysler Co., LLC*,
  Civ. A. No. 6:07-CV-346, 2008 WL 5634214 (E.D. Tex. Mar. 14, 2008) ..................... 45

*Truswal Sys. Corp. v. Hydro–Air Eng'g, Inc.*,
  813 F.2d 1207 (Fed. Cir. 1987) ............................................................................... 3, 5, 11

*U.S. Steel Corp. v. U.S.*,
  730 F.2d 1465 (Fed. Cir. 1984) ................................................................................... 38, 39

*Unwired Planet LLC v. Apple Inc.*,
  No. 3:12-CV-00505, 2013 WL 1501489 (D. Nev. Apr. 11, 2013) ................ 31, 39, 44, 46

*Versata Software, Inc. v. Callidus Software Inc.*,
  Civ. No. 12-931, 2014 WL 1117804 (D. Del. Mar. 12, 2014) ........................................ 47

*VirnetX, Inc., et al. v. Apple Inc.*,
  Case 6:12-cv-00855-RWS Doc. 55 (June 24, 2013) ...................................................... 24

*Xerox Corp. v. Google, Inc.*,
  270 F.R.D. 182 (D. Del. 2010) ..................................................................................... 42

iv

**Statutes**

35 U.S.C. 316(d)(3) ........................................................................................................ 6

**Other Authorities**

FEDERAL COURTS LAW REVIEW [Vol. 6, 2012] .......................................................... 5

**Rules**

Fed. R. Civ. P. 26(b)(3)(B) ........................................................................................... 24

Fed. R. Civ. P. 26(c) ..................................................................................................... 3

**Regulations**

37 C.F.R. § 42.121(a) (2) ............................................................................................. 42

## I.      THE BASIS FOR THE JOINT MOTION, AND SPECIFIC RELIEF SOUGHT

The parties jointly move[1] for entry of a Protective Order Regarding the Disclosure and Use of Discovery Materials.  The parties agree on all provisions except in two areas:  (1) the treatment of Computer Aided Design ("CAD") files;[2] and (2) the bar on acquiring and prosecuting patents and patent applications related to antenna technology.

The CAD files relate to the nearly 40 accused products.  Generally, a CAD file is a 3D digital blueprint of a product (*e.g.*, iPhone) and its components.  nCAP does not dispute Apple's position that CAD files are extremely sensitive and valuable, but nCAP and Apple are unable to agree on certain limits as to how and where nCAP may review those files.

nCAP and Apple are also unable to agree on the scope of the bar on the acquisition and prosecution of patents or patent applications relating to antenna technology.  The parties disagree on whether attorneys at nCAP's outside counsel, who are walled off from Apple's confidential information, may be involved in drafting or amending claims of the patent-in-suit in post-grant proceedings, including *Inter Partes* Review ("IPR") before the U.S. Patent and Trademark Office ("PTO").  The Parties further dispute whether counsel for nCAP may advise clients on the acquisition of antenna-related patents until a period ending 18 months after the final resolution of this litigation.

---

[1] nCAP argues that the Court can easily decline to review any of these provisions, and order the parties to abide by its Standard Protective Order, but in the interest of professional courtesy, nCAP has attempted to negotiate a heightened protective order, at Apple's request.

[2] At this time no files other than CAD files have been identified for disclosure by Apple.  Should Apple identify additional types of files, the terms of this protective order would also apply to those files.  But the provisions negotiated in this protective order are tailored to CAD files, as opposed to source code which is defined as "a computer program in its original programming language (such as FORTRAN or C) before translation into object code usually by a compiler."  "source code."  Merriam-Webster Online Dictionary. https://www.merriam-webster.com/dictionary/source%20code (June 7, 2018).

1

A version of the Proposed Protective Order that shows the disputed areas using brackets and coloring to identify language proposed by either party (and opposed by the other) is attached as Exhibit A ("Redlined Proposed Protective Order").  Apple's proposed language is in red; nCAP's in blue.  In the remainder of this submission, each party provides their view as to why their proposed sections are appropriate, and the other side's proposed sections are inappropriate.

## II.    PLAINTIFF NCAP'S INTRODUCTION

nCAP believes the Party's interests are adequately protected by the Court's Standard Protective Order.  While nCAP has negotiated these terms in good faith, Apple has continually refused to permit nCAP to access the CAD files, even though the local rules prevent a refusal to comply with a discovery request because a protective order has not been entered. DUCivR 26-2(a).  Further, during negotiations of this draft protective order, nCAP even agreed to be bound by the heightened standards proposed by Apple, so that nCAP could review the CAD files. Apple still refused.

Apple does not dispute that these files are discoverable, and that it must provide access to nCAP's outside counsel.  nCAP is now facing the prospect of filing its Final Infringement Contentions without reviewing the CAD files.  Nonetheless, to minimize disputes before the Court, it has attempted to negotiate an additional protective order per Apple's request.  nCAP has agreed to several additional provisions, but it cannot agree to Apple's remaining requests.

Apple seeks to limit the scope of the representation that Plaintiff's counsel may provide to nCAP as well as any other past, present, or future clients for an extended period of time. Specifically, Apple seeks to prohibit Caldwell Cassady Curry attorneys whom have had access to confidential information in this case from advising its clients regarding acquisition of patents that

have some similarity to the patent in suit.  Apple also seeks to prevent Caldwell Cassady Curry attorneys whom have not even seen Apple's confidential information from participating in the claim amendment process in post grant proceedings.  Apple has not shown good cause for this limitation on attorney practice.  See Fed. R. Civ. P. 26(c); *Truswal Sys. Corp. v. Hydro–Air Eng'g, Inc.*, 813 F.2d 1207, 1209–10 (Fed. Cir. 1987) (providing for protective orders upon a showing of "good cause").

      In addition, Apple seeks to impose strict limits on discovery related to its CAD files. nCAP has agreed to a standard CAD protective order similar to one that has governed Apple in prior cases involving CAD files, but Apple has insisted on treating the CAD files as source code subject to much stricter restrictions.  Apple has cited no case law supporting such a position. Apple asserts that it possesses various schematics in the form of CAD files, but Apple has been reluctant to provide more information regarding the scope and nature of the files resulting in an impasse in the negotiations.  Specifically, Apple has refused to answer threshold questions in the negotiation of this heightened protective order, such as:

      Does Apple intend to produce any true source code?  If so, what is the relevance of that code?  If not, why are source code provisions necessary?

      Is Apple planning on producing HDL or RTL files?  If so, what components are those files for? What is the relevance of those files?  If not, why are source code provisions necessary?

      What is the volume of source code, HDL, RTL, and CAD files that Apple intends to produce? Is there not some less onerous way to produce these, such as by producing PDFs of the pertinent portions of the files?

      Apple asserts that these questions are irrelevant.  But if these questions are irrelevant, then the Court's Standard Protective Order is also adequate to meet Apple's needs.  The only reason nCAP has engaged in these negotiations is because nCAP is sensitive to Apple's

concerns, and further is relying on Apple's truthful disclosure about what sorts of files are at issue to determine appropriate protections.

Apple also asserts that nCAP mischaracterizes its questions, and Apple offers as an example "nCAP never asked about "true" source code".  Both statements are untrue.  In an email on April 16, 2018, A. Mosser wrote to P. Magic, "Third, **you have not disclosed that there is any relevant source code aside from CAD files.**  We believe that negotiation of any source-code specific files should be delayed, pending the disclosure of the utility of those negotiations." nCAP repeatedly endeavored to determine the nature and scope of the files Apple intended to place on its source code computer, and Apple did nothing but obfuscate or refuse to answer. Even here, before the Court, Apple appears to argue that the issue of the types of files was not critical to nCAP in negotiating these provisions.  nCAP has narrowly tailored its requests to the type of files Apple is offering, and likewise agreed to protections which rationally balance the interests of both sides.

Apple has not shown good cause for requiring those files to be maintained by Apple versus a neutral third-party vendor. During the negotiations of these provisions Apple has continually refused nCAP access to the CAD files.  Now, Apple further seeks to implement restrictive provisions which require travel by nCAP's attorneys and experts to New York city, draconian provisions regarding how and when the CAD files can be accessed, and limit the ability of anyone who reviews the files to engage in subsequent work involving antennas.  But Apple has failed to meet its burden to demonstrate that there is good cause to justify the proposed restrictions are necessary.

"[T]he overly protective order is the product of either practitioners who (innocently) do not understand [software] and therefore do not appreciate what they have wrought, or practitioners who (less innocently) understand full well the nature of computer software and have devised restrictions specifically intended to be maximally inconvenient, impractical, and expensive to the opposing party." FEDERAL COURTS LAW REVIEW [Vol. 6, 2012]. Apple has not provided any evidentiary basis or articulated any legal reason why the CAD files at issue require heightened protection beyond that provided by a secure, neutral third-party vendor. In telephone calls, counsel for Apple indicates that those files include machine tolerances, exploded views, and other assembly details. nCAP agrees that this information merits protection, but Apple has failed to meet its burden to show there is good cause for the more onerous protections it suggests, instead of those offered by nCAP.

The extra provisions for CAD files appear to be unnecessary based upon the information provided by Apple, and do not increase the security of its files. Apple's suggested restrictions will not prevent malfeasors from accessing the disputed materials. Nor has Apple provided any indication that a secure, neutral third-party vendor would be any less than reliable in maintaining the secrecy of any disclosed files. Without some evidence that these heightened protections are required, Apple is not entitled to these provisions in the protective order. *Truswal Sys. Corp.* 813 F.2d, 1209–10 (requiring a showing of good cause to support a protective order)

Apple asserts that it has a number of relevant files—described by Apple as "source code"—that are only reviewable on a source code computer. The files appear to be primarily Computer Aided Design ("CAD") files. nCAP requests that the CAD files be placed on an encrypted Review Computer, which is hosted by nCAP in its source code review room, or by a

third-party neutral party to ensure the files are accessible to nCAP, since Apple has already failed to provide access to those files under the terms of the protective order.

nCAP further requests the right to make "Derived Materials" from the CAD files which will not be useable as design documents, but merely as exhibits.  The CAD files themselves are indisputably sensitive due to their detailed nature.  Derived Materials such as "fly-by" movies or graphics which illustrate relative position of components—but not engineering tolerances or assembly instructions—do not contain the same sensitive information as the CAD files themselves.  nCAP should be permitted to create Derived Materials which are not Bates numbered since they are not properly CAD files or source code.

Finally, nCAP believes that its attorneys should not be subject to a prosecution bar. Apple has offered no evidence demonstrating that nCAP's litigation attorneys are involved in competitive decisionmaking to support a prosecution bar. *In re Deutsche Bank Tr. Co. Americas*, 605 F.3d 1373, 1379 (Fed.  Cir. 2010).  nCAP retains outside patent prosecution counsel, aside from its litigation counsel.  nCAP's outside patent prosecution counsel does not have access to any of the materials disclosed by Apple in this case, and outside patent prosecution counsel offices in another state.

nCAP seeks a narrowly crafted provision that allows its litigation attorneys to work on amending or prosecuting claims only within the scope of ***post grant proceedings.***  Post grant proceedings, and specifically *inter partes* review which is the most likely venue where this issue might arise,  "…may not enlarge the scope of the claims of the patent or introduce new matter…" 35 U.S.C 316(d)(3).  Any fears regarding targeted attacks on Apple's technology based on the disclosed materials are overblown.  The scope of the issued claims exists

independent of any materials disclosed by Apple.  Any amendments to the claims of the Patents-in-Suit would be the same scope or narrower than the original claims.  Apple has offered no evidence that nCAP narrowing the scope of its patents supports a prosecution bar in this case. nCAP requests oral argument on this matter.

## III.    DEFENDANT APPLE'S INTRODUCTION

Apple seeks reasonable protections for its confidential information that courts have acknowledged are appropriate to balance the need for discovery against the need to protect against inadvertent disclosure and misuse of confidential information.

Regarding source code, the parties agree that CAD files are extremely sensitive and valuable 3D digital blueprints of products and components that include detailed non-visual information such as trade secret manufacturing steps, and should be made available for review rather than produced as copies to the opposing party.  Given the extremely sensitive and valuable nature of those files, Apple seeks certain limits on how and where nCAP may review those files, balancing the need to protect Apple against inadvertent disclosure of that information with any need by nCAP to review those files:  (1) the review computer should be located at the offices of Apple's outside counsel, not a third party neutral; (2) reasonable limits on printing from the CAD files should exist to avoid a "print now, review at home" approach; and (3) nCAP should not be permitted to use the CAD review computer as a workstation to create new media (and particularly not without Bates numbering such media and keeping it secret) when it could just as easily photograph and make demonstratives of the actual products.  As explained in Apple's sections below, those protections are supported by ample case law and the ESI Order in this case.

Plaintiff nCAP suggests that Apple's outside counsel should not host the review computer, and that instead Apple should hand over control of a review computer with CAD files *for nearly every iPhone, iPad, and Watch (and many other products) Apple has made* to a third party neutral.[3]   No good reason exists to take that approach.   Good cause exists here to have Apple's outside counsel host the review computer for the exact same reasons courts have found good cause to exist for a producing party's outside counsel to host source code review computers in so many other cases:  the material is extremely sensitive and valuable, and the reasons to take it out of the defendant's control and supervision don't appropriately balance risk of loss or inadvertent disclosure.   The files will be accessible to nCAP's counsel,[4] and third parties cannot adequately guarantee security of the information.[5]   Plaintiff nCAP references two protective orders from other cases that utilized a third party neutral, but the mere fact that nCAP cites two courts nationwide as having taken that approach does not mean it is necessary or appropriate

---

[3]  Incredibly, nCAP also casually suggests (without ever previously raising the issue) that Apple's CAD files for nearly every iPhone, iPad, Watch, and other products should potentially be located at "nCAP in its source code review room."   As explained in Apple's argument section below, where parties have even suggested such an approach, courts have rejected the idea of handing over the "keys to the kingdom" to the opposing party or its lawyers.

[4]  Plaintiff states that "Apple has already failed to provide access to those files under the terms of the protective order," but the protective order to which nCAP refers has not been entered by the Court and is the very subject of this motion for entry of a protective order.

[5]  Indeed, the specific neutral third party vendor suggested by nCAP has reportedly lost such information or was the victim of theft.  *See, e.g.*, Tom Espiner, *Iron Mountain loses backup tapes again*, ZDNet (May 3, 2006), https://www.zdnet.com/article/iron-mountain-loses-backup-tapes-again/; Associated Press, *Iron Mountain, IBM Facing Data Loss*, Boston Globe (March 30, 2012), https://www.bostonglobe.com/business/2012/03/30/iron-mountain-ibm-facing-data-loss/iScbKmxgzsKCkeP0W2bXSK/story.html; Courtney Perkes, *Employees suspected of stealing, melting old X-rays files for silver*, The Orange County Register (Aug. 15, 2014), https://www.ocregister.com/2014/08/15/employees-suspected-of-stealing-melting-old-x-rays-files-for-silver/; Medicare Web, *Patient Records Missing from Iron Mountain Facility* (Sept. 1, 2016), https://revenuecycleadvisor.com/news-analysis/patient-records-missing-iron-mountain-facility.

here.  And those cases involved far fewer accused products (and accused product lines), and hence, a far lower volume of sensitive information being put at risk and to handle, account for, and secure.

Plaintiff's other two arguments regarding CAD files are equally unfounded.  For example, nCAP argues that no printing limits should exist.  But a complete lack of printing limits simply fosters a "print now, review later" approach, which is an end-run around the security procedures and contrary to the purpose of utilizing a review computer, rather than production, to review CAD files.  Plaintiff nCAP has pointed its allegations at 22 components (at most) in its initial infringement contentions, easily covered by Apple's proposed 250 printed page limit.

Furthermore, nCAP has failed to demonstrate that it should be permitted to create movies and simulations using the CAD review computer.  The special circumstances where one court (in *Slot Speaker*) allowed such conduct—*i.e.,* the need to show a specific path of audio waves as they flowed through 3D space in order to prove infringement—simply are not present here.  Nor has nCAP even alleged anything similar in its initial infringement contentions.[6]  And if nCAP is permitted to make such materials using the review computer, then those materials should be Bates-labeled per the ESI Order and produced to both sides.[7]

As for the acquisition bar, Apple seeks a provision that would prevent anyone from either side who views confidential information in this case from being involved with any acquisition of

---

[6]  Confusingly, nCAP argues that the materials somehow will be both work product privileged and trial exhibits.  They cannot be both.

[7]  The questions about source code that nCAP claims to have posed to Apple over email are:  (1) irrelevant, because they go to whether the parties intend to produce different kinds of source code, not what type of protection is appropriate for source code (the latter is what the protective order concerns); and (2) mischaracterized (*e.g.*, nCAP never asked about "true" source code).  Apple has repeatedly dealt with such irrelevant and premature inquiries throughout this litigation.

patents relating to antenna design, functionality, or operation until 18 months after final resolution of this case.  That prohibition is intended to minimize the likelihood of any potential strategic leveraging of knowledge of the confidential workings of either side's products or other confidential information to home in on patents that either side or its representatives may want to acquire or advise others to acquire (*e.g.*, in order to assert claims against the other side).  As explained below, courts have recognized that ample good cause exists to impose an acquisition bar on outside counsel for the parties (and anyone else who views confidential information).  To the extent that nCAP relies on *Deutsche Bank* as providing a standard for imposing an acquisition bar, it does not.  That case pertains to patent prosecution bars, discussed below.

As for the bar regarding drafting and amending patent claims, the parties disagree on whether attorneys at nCAP's outside counsel who have not seen Apple confidential information may be involved in drafting or amending claims of the patent-in-suit in post-grant proceedings, including IPRs.  Plaintiff nCAP seeks to do so as an exception to the agreed provision that attorneys in this case can also work on IPRs but ***cannot*** be involved with drafting or amending claims.  The net result of the exception nCAP seeks is that attorneys from its outside counsel who have not seen Apple confidential information could work on the same IPR as those who have, and engage in strategy discussions with the latter attorneys about which theories to pursue, and how not to conflict with the infringement positions taken by nCAP in the district court, and then, ***with that knowledge***, work on drafting and amending claims of the patent-in-suit.

The obvious risk to Apple in allowing such an exception is that the attorneys who may draft and amend claims of the patent-in-suit will be fully in tune with how to sharpen the patent claims to support nCAP's infringement allegations, based on IPR strategy discussions with those

attorneys familiar with the details of Apple's products (even if the confidential information is never explicitly discussed).  Although Apple does not bear the burden under *Deutsche Bank* to show good cause for or against an exception to the agreed prosecution bar, Apple has met its burden to "show that the information designated to trigger the bar, the scope of activities prohibited by the bar, the duration of the bar, and the subject matter covered by the bar reasonably reflect the risk presented by the disclosure of proprietary competitive information." *In re Deutsche Bank Tr. Co. Americas*, 605 F.3d 1373, 1381 (Fed. Cir. 2010).  Specifically, it is undisputed that the information at issue here is confidential technical information, the scope of activity at issue is "drafting or amending claims," and the parties have agreed upon the relevant time period for the bar (conclusion of the litigation plus 18 months).

Plaintiff nCAP misunderstands *Deutsche Bank*, which requires that **the party seeking an exemption from a patent prosecution bar** (here, nCAP) show on a counsel-by-counsel basis the desired activity does not involve competitive decisionmaking related to the subject matter of the litigation and the potential restriction on nCAP's choice of counsel outweighs the potential injury to Apple.  *Id.*  *Deutsche Bank* further stated that "strategically drafting or amending claims"—the activity in which nCAP wishes its outside counsel to be free to engage—is considered competitive decisionmaking.  *Id.*  Notably, it appears that nCap's position here is merely lawyer debate not addressing actual hardship, as nCAP concedes that it regularly retains a separate law firm from litigation counsel to practice before the Patent Office, mitigating any alleged pain regarding choice of counsel.[8]

---

[8]  The other case cited by nCAP in its introduction—*Truswal Sys. Corp.*—in inapposite because it pertained to quashing a subpoena issued to a nonparty and did not address any of the present disputes between the parties.  *See Truswal Sys. Corp.*, 813 F.2d at 1208-09.

Plaintiff nCAP suggests that Apple's proposed prosecution bar is unwarranted because any amendments to the claims of the patent-in-suit would be of the same scope or narrower than the original claims. That distinction is of no consequence. As discussed below, the ability to use confidential information gleaned in litigation to narrow claims to preserve infringement, while at the same time avoiding invalidity, presents an improper use of confidential information to gain a huge tactical advantage and is the height of gamesmanship—which is why numerous courts have ordered prosecution bars like the one sought here by Apple.

## IV.   CAD FILES

The parties dispute:  (1) whether Apple's outside counsel, rather than a third party, should maintain possession of the CAD file review computer; (2) whether the Protective Order should include numeric limits on printing of images from CAD files; (3) whether nCAP should be permitted to make Derived Material (such as movies and simulations) from the CAD files it reviews, and whether such Derived Material should be produced to both sides with production numbering (like all other material in the case); and (4) whether Apple should be required to make the CAD files available in Salt Lake City during the trial in this case.

The disputed provisions regarding CAD files are Sections 11(a), 11(c)(iv), 11(c)(v), 11(c)(xii), and 11(c)(xiv)-(xvii).  For reference, those sections are reprinted here.

[Black is agreed language, Red is Apple proposed, Blue is nCap proposed]

**11(a):** Any Source Code[9] that is produced by Plaintiff[10] shall be made available for inspection in electronic format at the Dallas office of its Outside Counsel, Caldwell Cassady & Curry, or any other location mutually agreed by the Parties.  Any Source Code that is produced by Apple Inc. will be made available for inspection at the New York City office of its Outside Counsel, Desmarais LLP, or any other location of a Third Party Neutral, mutually agreed by the Parties.  Source Code will be made available for inspection between the hours of 8 a.m. and 6 p.m. on business days (i.e., weekdays that are not Federal holidays), although the Parties will be reasonable in accommodating reasonable requests to conduct inspections at other times.  One week prior to the beginning of trial and continuing through the end of trial, the Producing Party shall make its source code available for inspection at a location in the city of the trial.  One week prior to the beginning of trial and continuing through the end of trial, the Receiving Party only need provide three (3) hours' notice for the inspection of Source Code.

**11(c)(iv):**  The Producing Party [or Third Party Neutral] may visually monitor the activities of the Receiving Party's representatives during any Source Code review, but only to ensure that no unauthorized electronic records of the Source Code are being created or transmitted in any way.  The Producing Party [or Third Party Neutral] may not videotape or audiotape the activities of the Receiving Party's representatives in the source code review room or any designated breakout room for a reviewer during any Source Code review.

---

[9] nCAP notes that the use of "source code" herein is as a stand-in for CAD files.  Apple has not disclosed that it intends to produce any other files.
[10] nCAP notes that it does not believe that it has any source code which would be relevant in this case.  However, nCAP's subsequent suggestions are drafted to be neutral as to the producing party.

**11(c)(v):**   No copies of all or any portion of the Source Code may leave the room in which the Source Code is inspected except as otherwise provided herein.  Further, no other written or electronic record of the Source Code is permitted except as otherwise provided herein. The Producing Party shall make available a laser printer with commercially reasonable printing speeds for on-site printing during inspection of the Source Code.  The Receiving Party may print limited portions of the Source Code only when necessary to prepare court filings or pleadings or other papers (including a testifying expert's expert report), or for depositions or trial.  Any printed portion that consists of more than ten (10) pages of a continuous block of Source Code shall be presumed to be excessive, and the burden shall be on the Receiving Party to demonstrate the need for such a printed copy.  The Receiving Party may print out no more than 250 pages total.[11]  The Receiving Party shall not print Source Code in order to review blocks of Source Code elsewhere in the first instance, i.e., as an alternative to reviewing that Source Code electronically on the Source Code Computer, as the Parties acknowledge and agree that the purpose of the protections herein would be frustrated by printing portions of code for review and analysis elsewhere.  Printing is permitted only when necessary to prepare court filings or pleadings or other papers (including a testifying expert's expert report), or for depositions or trial.  Upon printing any such portions of Source Code, the printed pages shall be collected by the Producing Party [or Third Party Neutral].  The Producing Party [or Third Party Neutral] shall Bates number, copy, and label "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY - SOURCE CODE" any pages printed by the Receiving Party, and deliver it to the Producing Party. . . .

---

[11] nCAP does not believe a page limitation is appropriate.

**11(c)(xii):**  For depositions, outside counsel for the Receiving Party may bring one printed copy of Source Code.  Except for the Receiving Party's outside counsel's copy of Source Code, the Receiving Party shall not bring copies of any printed Source Code.  Rather, if requested by the Receiving Party at least [2] [14] days in advance of the deposition, the Producing Party will provide a computer at the deposition containing [all of its source code available for inspection] [a copy of each page of source code previously Bates numbered by the Producing Party, as well as a printer for printing such Bates numbered source code pages solely for use at the deposition]. . . .

**Sections 11(c)(xiv)-(xvii) (suggested by nCAP in full, and opposed by Apple).**

**11(c)(xiv):**  Notwithstanding the foregoing, the reviewing party may use the 3D CAD files to create Permitted Derived Material, which shall include: still images (either in color or grayscale), moving images (either in color or grayscale), simulation or measurement data describing or illustrating the behavior of sound or radio waves, and other test results derived from, but not incorporating, the native 3D CAD files. For purpose of example, a JPEG image or moving picture file (e.g. MPEG file) of the interior of a shape captured using 3D CAD software operating on the native 3D CAD files qualifies as Permitted Derived Material because these files do not incorporate any portion of any native 3D CAD file.  The reviewing party shall be permitted to prepare Permitted Derived Material from the 3D CAD files. The Permitted Derived Material may be printed on an attached printer or identified for removal by being stored on a secured directory accessible only by the reviewing party and the neutral custodian. The reviewing party may not take these materials from the facilities of the neutral custodian.

**11(c)(xv):**  The neutral custodian shall be responsible for verifying that any materials that were printed or identified for removal by the reviewing party constitute Permitted Derived Material. After review, the neutral custodian will transfer in a secure manner all material qualifying as Permitted Derived Material to the possession of the reviewing party outside the confines of the review facility. If the neutral custodian believes that any material that was printed or identified for removal does not qualify as Permitted Derived Material it shall notify both parties that it believes that certain items are not Permitted Derived Material and identify the basis for that conclusion. Those items will not be transferred to the reviewing party.  Any materials received by the reviewing party from the neutral custodian shall be treated as material designated by the providing party as "CONFIDENTIAL - ATTORNEYS' EYES ONLY." To the extent that any of this material is printed it shall bear this written designation.

**11(c)(xvi):**  Subject to the process for verification that printed or identified materials constitute Permitted Derived Material described above, the neutral custodian shall not provide to the producing party any information about the identification or content of any Permitted Derived Material created by the reviewing party.

**11(c)(xvii):**  The parties shall each be responsible for half of the costs and fees of the neutral custodian. Apple understands that Siemens NX is generally suitable for viewing, displaying and capturing still images for the 3D CAD native files that it will produce; however, the selection of software is within the reviewing party's sole discretion. The reviewing party will bear the cost of whatever software it chooses to install on the review computer.

### A. nCAP's Statement Regarding CAD Files

The dispute in this case is how to permit nCAP's review of Apple's CAD files, while respecting Apple's legitimate need for security. While the parties are mostly in accord, the provisions that Apple proposes here are directed towards the protection of source code. Although both source code and CAD files are reviewable on a computer, they are intrinsically different, and the protections applied to the one should not be wholesale or thoughtlessly applied to the other.

CAD files are like a set of instructions for assembly of other components which exist in the physical world. While the CAD files include details about assembly, and possibly manufacturing, processes, those CAD files are meaningless without a number of other components. In other words, possessing CAD files is like possessing the instructions for a Lego kit—without the Lego blocks themselves, you can't build anything. Similarly, the CAD files for an iPhone do not make an iPhone. To make an iPhone you might require the CAD files, but you also need all of the parts, raw materials, specialized tools, factories, machines, and skilled workers.

The cases that Apple relies upon do not relate to CAD files. The cases Apple relies upon relate to source code. While both are viewed on a computer, their similarities end there. CAD files should be treated differently by the Court. Apple has dealt with CAD file review issues in past cases. *See Apple Inc. v. Samsung Elecs. Co.*, No. 11-cv-1846, 2011 U.S. Dist. LEXIS 103139, at *2, *5 (N.D. Cal. Sept. 13, 2011); Ex. C, *Slot Speaker Technologies, Inc. v. Apple Inc.*, No. 13-CV-01161 (N.D. Cal. June 8, 2017) (Minute Order regarding CAD files, requiring parties to submit a stipulated amendment to the Protective Order); Ex. D *Slot Speaker*

17

*Technologies, Inc. v. Apple Inc.*, No. 13-CV-01161 (N.D. Cal. June 16, 2017).  (Stipulated

Amendment To Protective Order).  nCAP requests that the Court enter an order consistent with

these CAD file provisions rather than attempting to impose inapplicable source code provisions

in this case.

1.      **Secure, Neutral Third-Party Vendor Offers Balances Parties' Needs**

nCAP has genuine, ongoing concerns about locating the files at Apple's offices in New

York.  During the meet and confer process, nCAP has requested access to the CAD review

computer at Apple's outside counsel's office.  Apple refused because it could not accommodate

the visit.[12]  Even when nCAP agreed—during the pendency of negotiating this Protective

Order—to abide by Apple's terms, Apple still declined to permit nCAP to access the files.

Apple does not dispute that these files are discoverable, and that it must provide access to

nCAP's outside counsel.  Apple refused to grant nCAP access because the Court has not yet

entered a protective order specifically governing the CAD files.  Ex. H (email chain between

parties with initial request for access and Apple's continuing refusal).  ***But the local rules***

***prevent a refusal to comply with a discovery request because a protective order has not been***

***entered***. DUCivR 26-2(a).  And the Court's Standard Protective Order ("SPO") is already in

place and it covers the sensitive technical information sought. SPO ¶ 2.(b). nCAP is now facing

the prospect of filing its Final Infringement Contentions ***without reviewing the CAD files***.  This

---

[12] nCAP gave Apple notice on April 19, in accordance with section 11(b) of the protective order, that it intended to review the CAD files at the offices of Desmarais LLP in New York on May 11. Apple did not object to this request, or indicate that ongoing negotiations of the protective order prevented such a review.  Instead, only after a request for confirmation from nCAP, Apple admitted in an email to counsel for nCAP on May 7, that it would not have a CAD review computer ready on the noticed dates.

is extremely prejudicial to nCAP's prosecution of its claims against Apple.  While nCAP has attempted to be respectful of Apple's security needs, by negotiating protections *above and beyond the Standard Protective Order*, Apple has refused to make any compromise to even allow nCAP's limited review of the files.

    While there is still some time for nCAP to obtain access to these files, this sort of gamesmanship in the days before a key deposition, or expert reports, or trial could be extremely prejudicial.  Moreover, the problem with Apple controlling access to this computer is that its counsel would be able to see exactly what files and portions of files nCAP's attorneys and experts have focused their review on.  This sort of intrusion into core work product is inappropriate and unnecessary.  Moreover, courts reviewing the restrictions suggested by Apple have already determined that nCAP's concerns are well-founded.  *Apple Inc. v. Samsung Elecs. Co., No. 11-cv-1846, 2011 U.S. Dist. LEXIS 103139, at *2, *5* (noting that Samsung had "reasonably complained" about conditions such as "locating the inspection at the offices of Apple's outside counsel, limiting the inspection to the offices' regular business hours, securing the inspection by the fulltime presence of an Apple paralegal, and restricting file printing to only those images identified to Apple so that Apple may perform the printing").

    Locating Apple's files with a secure, neutral, third-party vendor poses no risk to Apple above locating its files at its own attorneys' offices.  nCAP does not dispute that Apple is entitled to secure its files.  But Apple has not shown that there is any heightened risk to maintaining its files with a neutral third-party vendor as opposed to the offices of its attorneys.  Apple has not offered any evidence that its attorneys' offices are any more secure than the offices of nCAP's attorneys.  Nor has Apple offered any evidence that a secure site with a third-party vendor could

19

not also offer ample security.  Secure, neutral, third-party vendors already exist and offer these services, as software escrowing or under the umbrella of various litigation-related services.

nCAP suggested using one of these services previously, but Apple raised concerns regarding the security of that vendor.  However, rather than offer alternative software escrow vendors, Apple simply continues to argue that its offices, in New York, are the only appropriate place to review these files.  Apple has offered no evidence why an attorneys' office—arguably no different than any other attorneys' office—offers the heightened security it requires.  Placing the files with a secure, neutral, third-party vendor poses no risk to the security of Apple's information and appropriately balances the interests of nCAP in having access to the materials unhampered by counsel for Apple's schedule, office hours, or other restrictions.

## 2. Identified Components Too Voluminous for Apple's Printing Limitations

nCAP does not intend to haphazardly collect information from the CAD review computer, but Apple's proposed page limit is not reasonable.  Apple notes that there are approximately 40 Accused Instrumentalities, and in its recent Supplement to its Interrogatory Responses No. 2, Apple identified approximately ***218 components*** which are "antenna-related." Apple asserts that nCAP has pointed its allegations at "22 components" but has offered, in discovery, nearly ten times that many.  nCAP is forced to assume that all of the components identified by Apple are relevant.  nCAP must therefor examine all 218 components, and understand their relevance.  Printing at least that many pages to review with experts and use at depositions is not inappropriate, but reasonable in light of the discovery process.

In light of these numbers, limiting nCAP to 250 pages in light of these numbers is unreasonable.  That does not even permit nCAP enough pages of printing to print one page for

each Accused Instrumentality, and one page for each antenna-related component that Apple has

identified.  This sort of limit does not permit nCAP to collect any evidence relating to the

interrelation of components, the operation of components in the larger framework of the devices,

or compare the applications of materials to the various antenna-related components.  Apple has

identified no good cause—other than complaints about alleged excessive printing—to justify this

arbitrary limit.  Indeed, in light of the number of components identified by Apple, these limits

are untethered to the needs of the case.  Allowing nCAP to print more than 250 pages permits

nCAP to appropriately examine each component identified by Apple, and acquire evidence

which is necessary for the prosecution of its claims.

### 3.    Derived Materials Are Properly Allowed and Attorney Work-Product

nCAP asserts that it should be permitted to make Derived Materials from the CAD files

Apple is offering.  Apple was required to permit this in other cases. Ex. C, *Slot Speaker*

*Technologies, Inc. v. Apple Inc.*, No. 13-CV-01161 (N.D. Cal. June 8, 2017) (Minute Order

regarding CAD files, requiring parties to submit a stipulated amendment to the Protective Order);

Ex. D *Slot Speaker Technologies, Inc. v. Apple Inc.*, No. 13-CV-01161 (N.D. Cal. June 16, 2017)

(Stipulated Amendment To Protective Order).

Apple's chief complaints to the Derived Materials provision appear to be 1) nCAP is

already permitted to take snapshots of CAD drawings and 2) that it cannot conceive of why

nCAP might need the Derived Materials to try its case, when it could simply videotape the

disassembly of the Accused Instrumentalities.  But these arguments are unpersuasive.  Most

importantly—although identified second, videotaping a disassembly of an Accused

Instrumentality is not the same as creating a video based upon the Cad files.  Apple states

repeatedly the sentiment that "The information contained in CAD files, particularly the exact steps Apple uses for manufacturing, cannot be derived from any 2D drawings **or product disassembly**."  Even Apple's own expert states this:  "That information, particularly the exact steps Apple uses for manufacturing, **cannot be derived from any 2D drawings or product disassembly**."  The 2D information, or product disassembly, *is no substitute* for the Derived Materials from the CAD files.  This is exactly the point of creating "fly-by" movies, still graphics, or other Derived Materials from the CAD files.

Apple argues that nCAP should be prohibited from including information regarding engineering tolerances or manufacturing steps in its Derived Materials.  But this argument is both unclear and unpersuasive.  It is unclear because nCAP has not been permitted to view the CAD files, and does not understand what information is implicated.  The argument is unpersuasive because the protections Apple seeks are already provided by the Court's Standard Protective Order.

While CAD files are inordinately complex and often opaque to a layperson, they can be used to show assembly, how components interact, and potentially the propagation of radiowaves (i.e. signals transmitted and received by the antennas).  These are exactly the issues, here.  What materials are applied to the antennas?  Where are the antennas in relation to other components?  Does propagation change if a current component—for instance an antenna enhancer—is removed?  If an antenna enhancer is performing two roles (for instance as an adhesive and as an antenna enhancer) what is the affect on the Accused Instrumentality if it is removed?  These questions are answered utilizing the CAD files.  Disassembling an iPhone, requiring suction cups, heat sources, prying tools, etc, is not the same as a clean, clear, well-labeled "fly by"

22

disassembly video. It is hugely prejudicial to nCAP to assert that nCAP cannot make Derived Materials, where Apple has complete access to create its own evidence.

Additionally, Apple complains that Apple should not bear the burden of the cost of creating Derived Materials. But nCAP is not requesting that Apple bear the cost of *creating* Derived Materials. Apple should share in the cost of *storing* those materials with a neutral, third-party vendor, but storage does not implicate any other costs to Apple. While the review computer should have whatever associated CAD files, proprietary CAD software, etc. that is necessary for viewing the files, nCAP will bear the cost of producing its own Derived Materials.

Apple further admits that "CAD files disclose…infinitely-adjustable view angles and cross-sectional views…" Thus the parties are not operating in a world where there is a discrete amount of source code available, which can be identified by line number. Rather, it is as though nCAP has the ability to take videos of the insides of the Accused Devices—without the destruction and debris of disassembling them. Apple controls nCAP's access to some of the best evidence of infringement, but that evidence is ***transformed*** when nCAP's counsel or experts creates Derived Material.

This Derived Material is curated by nCAP's counsel. This curated product is not source code, but attorney work product and attorney impressions. Apple, in responding to this argument, states "Confusingly, nCAP argues that the materials somehow will be both work product privileged and trial exhibits. They cannot be both." But this confusion is manufactured. Every draft brief, every theory jotted down, every edit to any document that will subsequently be produced or filed is work product. The work product privilege does not lift until nCAP intentionally discloses the work product to the Court and to Apple. Apple's counterargument

that it will not monitor nCAP's searches is cold comfort if nCAP is required to Bates number and produce whatever Derived Materials or printouts it makes.

Apple further argues that "[t]he ESI Order requires ESI to be produced with production numbering."  But that has no relevance to this discussion.  Of course, the ESI Order requires Bates numbering—those documents are coming from Apple to nCAP in a batch.  Apple will not know which documents nCAP flags as of interest, because nCAP is not required to tell Apple that information.

Consequently, the Derived Materials created by nCAP will not properly be "source code" but truly attorney work product as nCAP prepares its case.  Requiring nCAP to disclose attorney impressions and work product is inappropriate, and unsupported by any case law.  Fed. R. Civ. P. 26(b)(3)(B) (courts "…must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.").

### 4.     Access to CAD Files at Trial Necessary and Fair

This is a common provision that has governed cases involving Apple's source code. *VirnetX, Inc., et al. v. Apple Inc.*, Case 6:12-cv-00855-RWS Doc. 55, at 15 (June 24, 2013) (requiring source code computer to be made available on-site one week before trial and through trial, and only requiring three hours notice for access to the source code computer), Ex. F. *Smartflash LLC and Smartflash Technologies Limited v. Apple Inc.*, Case 6:13-cv-00447-JRG Doc. 176 (July 10, 2014) (requiring source code computer to be made available on-site one week before trial and through trial, and only requiring four hours notice for access to the source code computer), Ex. G.

24

This provision is critical for ensuring that Apple does not obtain a tactical advantage against nCAP in this case due to the asymmetry of information.  Moreover, counsel for nCAP recently relied upon this provision in another case against Apple, and counsel for Apple.  In response to testimony elicited by counsel for Apple—the same law firm as is presently counsel for Apple, counsel for nCAP—representing another client—provided notice and inspected the source code implicated in the testimony.  Without this provision, counsel for nCAP cannot respond to arguments and theories raised by live witness testimony.

In the absence of this provision, if Apple an witness makes some false or misleading statement that can only be disproven using CAD evidence, nCAP would be forced to either rely on materials that might not be directly on point because they were collected from the computer before the witness testified, or it would need to fly an attorney or expert to New York City in the middle of trial to hopefully collect the materials and then request that the witness be re-called later in the trial.  Apple has offered no good cause to support this provision, and this sort of gamesmanship is entirely unnecessary and unfair.

Prohibiting nCAP's access the CAD files at trial and forcing nCAP to abide by Apple's provisions creates a strangely bifurcated system, under which Apple has nCAP's trial theories printed and Bates numbered months in advance, but nCAP must wait and see what Apple has flagged as of interest.  Apple has not, nor will it, offer to Bates number and produce every file or Derived Material it intends to use.  Thus Apple remains firmly in control of the evidence, and nCAP's theories, under Apple's proposed protective order.

**B.      Apple's Statement Regarding Source Code**

CAD files are extremely sensitive information, as nCap acknowledges, and Apple seeks

protections against inadvertent disclosure balanced against any need for review of those files, by:

(1) hosting the review computer at Apple's outside counsel's office; (2) setting limits on

printing; and (3) not allowing use of the review machine as a workstation for creating "derived

materials," for which no need exists in this case and for which Plaintiff won't agree to Bates

label such files per the ESI Order.

> **1.      Having Apple's Outside Counsel Host The Source Code Review
> Computer Is Appropriate And No Good Cause Exists To Deviate From
> That Approach Here.**

The parties dispute whether nCAP should review CAD files, if relevant to this case, at the

offices of Apple's outside counsel or at the offices of a third party neutral.[13]   CAD files are

extremely sensitive and confidential information.   CAD files are 3D interactive models that

Apple engineers use to create detailed three-dimensional layouts of physical components, such as

circuitry and other hardware.   Ex. B (Gomez Decl.) ¶ 3.   In essence, a CAD file is a digital

blueprint of a product (*e.g.*, iPhone) and its components.   *Id.* ¶ 5.   CAD files disclose dimensions,

tolerances, material thicknesses, infinitely-adjustable view angles and cross-sectional views, and

---

[13]      Although nCap alleges it "gave Apple notice . . . in accordance with section 11(b) of the
protective order, that it intended to review the CAD files," no such protective order exists.   Indeed,
the parties have brought the present motion to the Court to enter a protective order and resolve
certain disputes.   Moreover, as part of negotiations between the parties on the protective order and
ESI, Apple told nCAP months ago that source code (and nCap knew Apple's position that source
code included CAD files) should only be produced after the additional protections regarding source
code being negotiated in the Proposed Protective Order (Ex. A) were in place, and nCAP never
disputed that statement.   Ex. E, Email from Apple to nCap (Dec. 12, 2017, 09:10 AM) ("To the
extent source code is an issue in this case, production of source code should occur only after the
additional protections that the parties are presently negotiating for source code in the PO are in
place.").

exact interconnections of component assemblies that would be extremely difficult to discern by reverse engineering the products. *Id.* Additionally, within each CAD file, there is a module that contains detailed information on materials, assembly instructions, and the exact order in which each component should be assembled into the product during manufacturing. *Id.* In short, the CAD files contain extremely confidential information that could enable a competitor to understand, reproduce, and build upon the proprietary research and analysis behind Apple's products.

The harm to Apple of inadvertent disclosure of such a comprehensive blueprint, including the possibility of misuse, or overly broad disclosures, to any competitor would be extreme. *Id.* ¶ 7. For example, the CAD files contain the exact manufacturing steps in the particular order Apple specifies them in order to build the products; this information embodies significant proprietary trade secrets that allow Apple to make products better designed than those of its competitors. *Id.* Even within Apple, access to CAD files is significantly restricted. *Id.* ¶ 9. Given that the implicated CAD files cover ***essentially every iPhone, iPad, and Apple Watch (and several other products) from the past several years***, Apple has ample good cause to host the review machine at its outside counsel's office, rather than anywhere else.

Apple seeks to accommodate nCAP as much as possible, while allowing Apple to maintain control of the files in a secure review environment. By providing nCAP's outside counsel and experts access at the offices of Apple's outside counsel, nCAP's counsel can review the CAD files and print images or snapshots of the 3D models of the product components. This appropriately balances the need to protect such extremely confidential information with nCAP's need to review such files. *See, e.g.*, *Drone Techs., Inc. v. Parrot S.A.*, 838 F.3d 1283, 1300 n.13

(Fed. Cir. 2016) (source code poses a heightened risk of harm to the producing party from misuse or inadvertent disclosure); *Affinity Labs of Texas, LLC v. Samsung Elec. Co., Ltd.*, C.A. No. 1-12-CV-557, 2013 WL 12147667, at *2 (E.D. Tex. Oct. 29, 2013) ("Given the highly confidential nature of source code, Defendants are justified in not wanting the source code housed anywhere other than their outside counsels' offices."); *Guitar Apprentice, Inc. v. Ubisoft, Inc.*, No. 2:13-cv-02903, 2014 WL 12769613, at *4 (D. Tenn. Nov. 6, 2014) (agreeing that source code should be maintained at the office of the producing party's outside counsel).

When the parties conferred, nCAP's rationale for why Apple should turn over the review computer and review process to a third party neutral was that two other courts had adopted that approach to resolve disputes in those cases about whether and how CAD files should be made available for review. *See Apple Inc. v. Samsung Elecs. Co.*, No. 11-cv-1846, 2011 U.S. Dist. LEXIS 103139, at *2, *5 (N.D. Cal. Sept. 13, 2011); Ex. C, *Slot Speaker Technologies, Inc. v. Apple Inc.*, No. 13-CV-01161 (N.D. Cal. June 8, 2017) (Minute Order regarding CAD files, requiring parties to submit a stipulated amendment to the Protective Order); Ex. D *Slot Speaker Technologies, Inc. v. Apple Inc.*, No. 13-CV-01161 (N.D. Cal. June 16, 2017) (Stipulated Amendment To Protective Order). However, nCAP has identified no actual need for that approach in this case, as opposed to reviewing the CAD files at the offices of Apple's outside counsel. Those cases involved different circumstances and were case specific. For example, far fewer accused products (and accused product lines) were at issue there than this case. Nor does any need exist in this case to involve and grant access to yet another non-Apple party. Plaintiff nCAP can review and print from the CAD files at the offices of Apple's outside counsel just as it could at the offices of a third party.

Plaintiff nCAP's proposal simply increases the risk to Apple without any proportional and corresponding need of nCAP.  And as noted in Apple's Introduction section above, the third party that nCap proposed has reportedly suffered from security flaws.[14]  The *Samsung* case cited by nCAP fails to justify nCAP's request to host the CAD files with a third party to alleviate the "inconvenience" of being limited to the regular business hours of Apple's outside counsel.  *See Guitar Apprentice*, 2014 WL 12769613, at *4 (rejecting Plaintiff's argument that "[t]he requesting party's expert would only be able to view the source code during the producing party's counsel's business hours," finding "that the sensitivity of the source code should be protected over relatively minor inconveniences to the receiving party").

Courts have consistently found arguments like nCap's to be inappropriate.  *See, e.g.*, *Polycom, Inc. v. Codian Ltd.*, No. 2:05CV520, 2007 WL 194588, at *4 (E.D. Tex. Jan. 22, 2007) ("The Court also finds unpersuasive Plaintiffs' argument that the current system [(hosting Defendants' electronic source code in Defendants' counsel's office)] creates an intrusion into Plaintiffs' work product because Defendants would know which counsel and/or experts were

---

[14]   nCAP's complaint that if Apple's counsel hosts the review computer, then Apple's counsel would be able to see what files and portions of files nCAP's attorneys and experts have focused their review on rings hollow because an agreed provision of the Proposed Protective Order expressly states that the producing party "may not videotape or audiotape the activities of the Receiving Party's representatives in the source code review room or any designated breakout room for a reviewer during any Source Code review."  Ex. A § 11(c)(iv); *see also Dynetix Design Sols., Inc. v. Synopsys, Inc.*, No. C-11-05973, 2012 WL 1232105, at *3 (N.D. Cal. Apr. 12, 2012) (rejecting as unfounded Plaintiff's argument that source code review at the producing party's outside counsel's offices encroached upon its work product privileges where the Model Protective Order included a provision that allowed the producing party to "visually monitor the activities of the Receiving Party's representatives during any source code review, but only to ensure that there is no unauthorized recording, copying, or transmission of the source code," and "it would be a violation of the protective order," subject to sanctions, for opposing counsel to monitor receiving party's searches).

reviewing the code and any sections they choose to print."); *Affinity Labs*, 2013 WL 12147667, at *2 ("Given the highly confidential nature of source code, Defendants are justified in not wanting the source code housed anywhere other than their outside counsels' offices."); *Prism Techs., LLC v. Adobe Sys., Inc.*, No. 8:10CV220, 2011 WL 5523389, at *1 (D. Neb. Nov. 14, 2011) (finding that "the relinquishment of an electronic copy [of the defendants' source code], solely at the location of plaintiffs' counsel or other approved expert, would unduly risk defendants' hard-fought confidentiality of this investment"); *Guitar Apprentice*, 2014 WL 12769613, at *4 (finding "that it would be inappropriate to allow [Defendant's] source code to be housed at [Plaintiff's counsel's offices]" and agreeing that the source code should be maintained at the office of the producing party's outside office); *Dynetix Design Sols., Inc. v. Synopsys, Inc.*, No. C-11-05973, 2012 WL 1232105, at *3 (N.D. Cal. Apr. 12, 2012) (rejecting Plaintiff's provision that Defendant's source code be delivered on a flash memory drive or external hard drive to receiving party's counsel of record, finding that while it might "be more difficult to manage the case if [receiving party] must review source code at opposing counsel's offices" the court was "not convinced that this would significantly prejudice [Plaintiff's] presentation"), *mandamus denied*, 473 F. App'x 896 (Fed. Cir. 2012).

## 2.    Apple's Proposed Limits On Printing Are Reasonable.

The parties dispute whether any limits should exist on the number of snapshots of CAD files nCAP may print.  Apple proposes a presumptive cap of 250 pages total and no more than 10 pages of a continuous block of source code.[15]  Plaintiff nCAP's proposal to forego specific limits

---

[15]  The latter would not apply to CAD files, as they do not have traditional blocks of code, but would apply to other types of source code, if at all relevant to this case.

entirely[16] would circumvent the agreed purpose of the review process, which is to allow the reviewing party to review the CAD files in the review room and print select portions needed for its case, but not to print such a large number of pages such that the reviewing party could essentially conduct the review offsite and/or increase the risk of inadvertent disclosure.  That is "good cause" for imposing reasonable limits.

Courts have recognized that imposing limits on the number of printed pages of source code reasonably balances the risk of inadvertent disclosure of source code against the patentee's need for creating prints of specific code.  *See, e.g.*, *Prism Techs.*, 2011 WL 5523389, at *1 (finding "that unlimited printing of defendants' source code, . . . solely at the location of plaintiffs' counsel or other approved expert, would unduly risk defendants' hard-fought confidentiality of this investment"); *Unwired Planet LLC v. Apple Inc.*, No. 3:12-CV-00505, 2013 WL 1501489, at *7 (D. Nev. Apr. 11, 2013); *Rensselaer Polytechnic Inst. v. Apple Inc.*, No. 1:13-CV-0633, 2014 WL 1871866, at *3 (N.D.N.Y. May 8, 2014).

Plaintiff nCAP argues that it should not be subject to presumptive printing limits because they would allegedly prevent nCAP from printing one page for each Accused Instrumentality plus 218 components "related to" antennas.  First, nCAP has not accused 218 components of infringing.  Instead, nCAP provided claim charts in its initial infringement contentions for 22 products (at most) and 22 components (at most).  Second, nCAP ignores the fact that Apple has produced ample still-image drawings of the accused components (including the "conductive adhesive tape" that Apple has used in its prior art products for the same application since well before nCAP's patent and yet is now accused of infringement), and even non-accused antenna

---

[16]  Notably, nCAP has proposed no limit on printing of source code.

components.  Third, nCAP ignores the fact that Apple's proposed printing limits are merely

presumptive and, per agreed sections of the Proposed Protective Order, nCAP can seek to extend

the limit if the need arises.  *See* Ex. A § 11(c)(5).

> ### 3.     No Good Cause Exists To Allow For Creation Of "Derived Material" On The Review Computer.

The parties dispute whether nCAP should be permitted to use CAD files on the review

machine to create other materials.  *See* Ex. A §§ 11(c)(xiv)-(xvii).  For example, nCAP proposed

the following:

> Notwithstanding the foregoing, the reviewing party may use the 3D CAD files to create Permitted Derived Material, which shall include: still images (either in color or grayscale), moving images (either in color or grayscale), simulation or measurement data describing or illustrating the behavior of sound or radio waves, and other test results derived from, but not incorporating, the native 3D CAD files.  For purpose of example, a JPEG image or moving picture file (e.g. MPEG file) of the interior of a shape captured using 3D CAD software operating on the native 3D CAD files qualifies as Permitted Derived Material because these files do not incorporate any portion of any native 3D CAD file.  The reviewing party shall be permitted to prepare Permitted Derived Material from the 3D CAD files.

Ex. A, § 11(c)(xiv).  Those provisions are unnecessary and inappropriate.

Those provisions are unnecessary because other provisions in the Proposed Protective

Order already allow a reviewer to print snapshots of the 3D renderings in the CAD files.  *See* Ex.

A, § 11(c)(v) ("The Producing Party shall make available a laser printer with commercially

reasonable printing speeds for on-site printing during inspection of the Source Code.").

Moreover, Apple has produced still-image drawings of the accused components and antenna

components, and those images provide the "shape" (and many other attributes) of those

components.

Moreover, those provisions are inappropriate because nCAP has not offered a justification for using Apple proprietary CAD files for creating movies or simulations (relating to sound waves, radio waves, or anything else).  Nothing limits nCAP from creating its own movies or simulations—indeed, nCAP could make "movies" of the actual accused products—but nCAP should not be allowed to foist on Apple the cost and burden of assisting it in creating its demonstratives.[17]

Plaintiff nCAP complains on the one hand that the 2D drawings Apple already produced to nCAP are no substitute for the proposed Derived Materials because they do not contain information about manufacturing steps, but puzzlingly nCap also represents that any Derived Materials will ***not*** include engineering tolerances or manufacturing steps.  At a minimum, if the Court allows nCAP to create Derived Materials, it should prohibit nCAP from including information regarding engineering tolerances or manufacturing steps in any such materials.

Ultimately, nCAP points to the fact that the above provision appeared in a single Protective Order that another court ordered in resolving a dispute regarding CAD files.  *See* Ex. C; Ex. D.  But in that case, whether "sound waves from the speaker driver unit [traveled] along a 'straight path'" was central to the issue of infringement.  *Slot Speaker Technologies, Inc. v. Apple Inc.*, No. 13-CV-01161, 2018 WL 1581985, at *2 (N.D. Cal. Mar. 27, 2018).  Here, there is no similar special circumstance—*i.e.*, the need to show active depiction (movement of sound), as opposed to a static element (antenna).  And although nCap argues that "the issue[]" here is "Does propagation change if a current component . . . is removed?," nCAP's initial infringement

---

[17] Plaintiff nCAP has not disputed that if a third party neutral is involved, nCAP should pay half of the costs and fees of the neutral third party, consistent with the order in *Slot Speaker*.  *See* Ex. A § 11(c)(xvii).

contentions do not even mention the propagation of waves, let alone as a key issue of any kind. Nor did nCAP identify any similar issue in this case when the parties met and conferred.

The parties further dispute whether—if the Protective Order permits nCAP to capture movies or simulations from the CAD files—nCAP should be permitted to take such Derived Material from the review room *without* producing it in this case with a production number. Plaintiff nCAP seeks that approach to prevent Apple from ever seeing the created Derived Material. No justification exists to treat such material differently from still images printed from the CAD files, which both sides have agreed should be given a production number and produced.[18] The ESI Order requires ESI to be produced with production numbering. And that is the process nCAP agreed to for capturing portions of CAD files and all other source code for printing, as is typical for production of portions of source code from a review computer. *See* Ex. A § 11(c)(v) ("Upon printing any such portions of Source Code, the printed pages shall be . . . Bates number[ed] . . . .").

Nor has nCap provided any justification for departing from those rules. Indeed, nCAP cited not even one case in which a court deemed it appropriate to print material from a source code computer without applying production numbers. Plaintiff argues that the material should not be Bates numbered and produced because it would be attorney work product, but at the same time, nCap argues that the material will be an "exhibit." And given the extremely confidential nature of the CAD files, there is even less justification for allowing materials that capture

---

[18] Indeed, the ESI Order entered in this case requires that "each document image contain a footer with a sequentially ascending production number," (Doc. No. 58 § 4(F)), and nCAP has never objected to having production numbers applied to diagrams of components Apple has already produced.

portions of the CAD files to leave the review room without being produced with a production number to track their existence.  To the extent nCAP intends to represent at trial that an exhibit was created from a produced Apple CAD file, it would need to be identified by a Bates number to be able to test the claims as accurate.

### 4.      Proposed Provision Regarding Trial Access Is Premature And Unnecessary

Finally, the parties dispute whether the Protective Order should require Apple to move its CAD review computers to Salt Lake City during trial and make the review room available to nCAP's reviewers on 3 hours' notice.  *See* Ex. A § 11(a).  The pre-trial order will govern trial logistics, and nCAP has provided no justification to deviate from that process in this case. Moreover, the process that nCAP proposes would take place well beyond the discovery deadlines for nCAP to complete any review of CAD files or any other source code.  *See Kelora Sys., LLC v. Target Corp.*, 2011 WL 6000759, at *1, *4-5 (N.D. Cal. Aug. 29, 2011) (finding Plaintiff's proposal that Defendants' source code be made available for inspection within twenty miles of the trial location unnecessary and burdensome "because fact discovery will be over long before trial begins and thus no inspections will take place anywhere during the trial").  Plaintiff nCAP's proposal essentially would allow it to extend discovery with respect to CAD files through trial, and disrupt the trial preparations of Apple, despite the ample time for it to complete that process prior to the scheduled close of discovery.

Plaintiff fails to respond substantively to Apple's positions.  Instead, nCAP argues that the provision is appropriate because it existed in another case and nCAP's counsel found it convenient.  But that rationale, as well as the specter offered by nCAP that a witness might make a false or misleading statement that can only be addressed by a fresh review of CAD files, simply

fails to address the legitimate reasons—including the fact that discovery will have long been

closed—why such a provision should not be included in the Protective Order.

## V.    PROSECUTION BAR

The parties dispute two provisions of the "Prosecution Bar" section of the Proposed

Protective Order.  *See* Ex. A § 6(b).  The disputed provisions are reprinted here for convenience:

**6(b):**  Patent Prosecution Bar.  Absent the written consent of the Producing Party, any

person on behalf of the Receiving Party who receives one or more items designated

"CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "CONFIDENTIAL – ATTORNEYS'

EYES ONLY – SOURCE CODE" by a Producing Party shall not be involved, directly or

indirectly, in any of the following activities:  (i) advising on, consulting on, preparing,

prosecuting, drafting, editing, and/or amending of patent applications, specifications, claims,

and/or responses to office actions, or otherwise affecting the scope of claims in patents or patent

applications relating to the functionality, operation, and design of antennas and antenna-related

components, materials, and applications (generally or as described in any patent in suit), before

any foreign or domestic agency, including the United States Patent and Trademark Office; and

[APPLE REQUESTS]:  (ii) the acquisition of patents (including patent applications), or the

rights to any such patents or patent applications with the right to sublicense, relating to the

functionality, operation, and design of  antennas and antenna-related components, materials, and

applications (generally or as described in any patent in suit).[19]  These prohibitions are not

---

[19] nCAP believes this provision is unnecessary. If the Court adopts Apple's requested language, nCAP asks that the Court tailor the limitation more narrowly.  Apple has not offered evidence regarding the functionality or operation of any antennas or antenna-related components.  Nor has Apple offered any evidence of antenna applications, which implicate a software component.

intended to and shall not preclude counsel from participating in proceedings on behalf of a Party challenging the validity of any patent. These prohibitions shall begin when access to "CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE" materials are first received by the affected individual, and shall end one and a half (1.5) years after the final resolution of this action (whether by settlement or otherwise), including all appeals. The Parties agree that this Prosecution Bar does not prevent Outside Counsel from participating in any reexamination, *inter partes* review, or other post-grant review proceedings involving the Patent-in-Suit except that Outside Counsel shall not draft or assist in the drafting of any claim or amendment to any claim of the Patent-in-Suit before expiration of the Prosecution Bar as defined above. [nCAP REQUESTS] The Parties further agree that Caldwell Cassady & Curry P.C. may establish an ethical wall, and attorneys from Caldwell Cassady & Curry P.C. who have not accessed or reviewed Defendants' Designated Material may participate in any reexamination, inter partes review, or other post-grant proceedings involving the Patents-in-Suit for all purposes, including drafting and amending claims.[20]

### A.     nCAP's Statement on Attorney Practice Restrictions

Whether a protective order should include a patent prosecution bar is a matter governed by Federal Circuit law. *In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1378 (Fed. Cir. 2010). Apple must establish there is good cause for including a patent prosecution bar. *Id.* "Whether an unacceptable opportunity for inadvertent disclosure exists ... must be determined ... by the facts on a counsel-by-counsel basis." Id. (citing *U.S. Steel Corp. v. U.S.*, 730 F.2d 1465,

---

[20] Apple believes this provision is inappropriate.

1468 (Fed. Cir. 1984)).  Apple misunderstands the nature of prosecution bars.  nCAP's

willingness to negotiate does not assume that there is good cause for a prosecution bar.  Indeed,

nCAP believes the Court's Standard Protective Order adequately addresses Apple's concerns.

The fact that nCAP has negotiated in good faith does not relieve Apple of the burden of showing

there is good cause for a prosecution bar, especially one as restrictive as Apple proposes.  A

review of Utah's

Apple proposes that nCAP's counsel, Caldwell Cassady & Curry, be prevented from

advising its current or potential clients on certain patent acquisitions because it has previously

represented Apple's adversaries.  That is not a showing of good cause.  The fact that Apple

would prefer not to face Caldwell Cassady & Curry is no reason for the Court to limit the scope

of representation that the firm can provide to clients.  The bar suggested by Apple harms

Caldwell Cassady & Curry, and therefor also harms its client.  The risk that Apple suggests are

too attenuated, and the bars Apple suggests should not be permitted.  *Copy Protection, LLC v.

Netflix, Inc.,* Case No. DED-1-14-cv-00365, Doc. 28 (Dec. 16, 2014) ("The attenuated risks

identified by Defendant do not justify imposition of a bar that could severely harm Plaintiff's

counsel (and, therefore, Plaintiffs).").

### 1.   No Support of Acquisition Bar Which Inhibits Legitimate Attorney-Client Relations.

While some cases have found prosecution bars appropriate, and Caldwell Cassady &

Curry's clients have consented to prosecution bars in previous cases, its clients have not

consented to an acquisition bar.  Even the cases cited by Apple do not support its proposal which

imposed narrowly tailored bars based on the specific attorneys and clients involved.  As a

threshold matter, Apple fails to evaluate the risks on a counsel-by-counsel basis.  *Koninklijke*

38

*Philips N.V. v. iGuzzini Lighting USA*, Ltd., 311 F.R.D. 80, 82 (S.D.N.Y. 2015) (citing *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984) (determining risk of inadvertent disclosure must be evaluated on a counsel-by-counsel basis)).

Neither the facts here, nor the cases relied upon by Apple, support the sort of acquisition bar that Apple proposes.  The bar would even prohibit nCAP from opining on the *validity* of an antenna-related patent, which would be a question normally within counsel for nCAP's business. *EPL Holdings, LLC v. Apple Inc.*, No. C-12-04306 JST JSC, 2013 WL 2181584, at *4 (N.D. Cal. May 20, 2013) (agreeing with plaintiff that Apple's provision "…goes too far in that it bars counsel from advising clients on non-business matters that arise during patent acquisition, such as validity and standing.").

The *Unwired Planet* Court found a limited acquisition bar appropriate where Unwired, *a non-practicing entity*, used only a single law firm for its patent acquisition and patent litigation activities.  *Unwired Planet LLC v. Apple Inc.*, 2013 WL 1501489 at *3, 7 (D. Nev. Apr.11, 2013) (finding patent acquisition bar appropriate where Unwired—a non-practicing entity—used only a single law firm for its patent acquisition and patent litigation activities).  But even in the *Unwired Plante* case, the Court did not prevent the law firm, but rather individual counsel at the law firm, from engaging in litigation versus acquisition counsel.  *Id.*  This scenario is distinct. First, nCAP practices its own patents, as it disclosed to Apple in discovery and stated in its pleadings.  Second, nCAP has not acquired any patent applications, nor does it plan to do so. Third, Apple has admitted its true goal:  to prevent nCAP's attorneys from representing other clients against Apple.  Apple states that "Such a provision is not only reasonable, but particularly warranted here, given nCAP's outside counsel's history of repeatedly representing parties suing

39

Apple."  Thus, nCAP's counsel is not involved in this type of advising for nCAP.  Consequently,

the same risk as in *Unwired Planet* does not exist here, and thus there is no good cause to support

this provision.

If the Court does adopt Apple's provision, nCAP requests that the Court narrow the

language of the acquisition bar to only relate to the patents-in-suit and the 21 components Apple

asserts are accused.  This sort of narrow acquisition bar is supported by decisions in other courts.

*University of Virginia Patent Foundation v. General Electric Company d/b/a GE Healthcare*,

Case 3:14-cv-00051-NKM-JCH, *10 (June 11, 2015) (finding the bar could extend to patent-in-

suit and the accused infringing instrumentalities, "but it may not extend to "the field of magnetic

resonance imaging," as that would greatly exceed the patents-in-suit.").

## 2.    Prosecution Bar Unnecessarily Inhibits Valid Amendments

Apple puts the cart before the horse in assuming that it has no burden to show the

necessity of its prosecution bar.  The Court's Standard Protective Order protects Apple's

interests.  nCAP, for purposes of accommodating Apple's concerns and professional courtesy,

has engaged in negotiating a protective order.  But the prosecution bar Apple suggests as part of

that protective order is not supported by evidence that it is necessary Apple.  Further, even after

establishing the necessity of the bar, Apple—as the proponent of the bar—must still prove that

the information at issue is "the kind of information that will trigger the bar is relevant to the

preparation and prosecution of patent applications before the PTO."  *American GNC*

*Corporation v. LG Electronics Inc. et al*, Case No. 3-17-cv-01090, Order on Disputed Joint

Motion for Protective Order, [ECF No. 47 ] (Oct. 23, 2017) (quoting *Deutsche* Bank, 605 F.3d

1373, 1381.  A general allegation that confidential information will be disclosed is insufficient.

"A bar whose subject matter depends only upon a party's classification of what information it considers confidential lacks the requisite specificity to comply with this directive." *University of Virginia Patent Foundation v. General Electric Company d/b/a GE Healthcare*, No. 3-14-cv-00051, at *15 (Va.W.D.  Nov. 20, 2015)(citing *Opperman v. Path, Inc.*, No. 13cv453, 2013 WL 5643334, at *2 (N.D. Cal. Oct. 15, 2013)).

With regard to the IPR amendment bar, Apple seeks to restrict the practice of attorneys at this firm even if they do not even have access to Apple's confidential material.  These sorts of bars, particularly in the scope of reexaminations (or inter parties review) are not supported.  *See Ameranth, Inc. v. Pizza Hut, Inc.*, 2012 WL 528248, at *6 ("[A] review of cases directly discussing a prosecution bar applied to reexamination finds near unanimous support against extending the bar to cover reexamination[.]") (citing *Pall Corp. v. Entegris, Inc.*, 655 F. Supp. 2d 169, 173 (E.D.N.Y. 2008); *NeXedge, LLC v. Freescale Semiconductor, Inc.*, 820 F. Supp. 2d at 1044; Xerox Corp. v. Google, Inc., 270 F.R.D. at 185; *Vasudevan Software, Inc. v. Int'l Bus. Machines Corp.*, No. C09-05897 RS HRL, 2010 WL 3629830, at *4 (N.D. Cal. Sept. 14, 2010) (Lloyd, J.) (unpublished)).

This general exclusion of IPR practice form prosecution bars is legitimate, since claims in reexamination proceedings can only be narrowed: "[N]o product that did not infringe a patent before reexamination could ever infringe that patent following reexamination." *Xerox Corp. v. Google, Inc.*, 270 F.R.D. at 184.  The idea that nCAP could "sharpen the patent claims to support nCAP's infringement allegations" completely ignores how patent law works.  nCAP cannot change what the patent covers, any more than Apple can change whether it actually infringes or not.  Alterations to the words of the patent claims do not broaden their scope.

41

As an initial matter, Apple has not demonstrated that this provision is necessary given that it has not even filed any IPRs.  Regardless, Apple offers no evidence that an ethical wall is inappropriate in this case.  In effect, Apple seeks to impute knowledge from some attorneys to the firm as a whole to force nCAP to hire a separate law firm if it decides to amend its claims.  But this sort of restriction is not justified by any arguments Apple has offered.  *PPC Broadband, Inc. v. Times Fiber Commc'ns, Inc.*, No. 5:13–cv–0460, 2014 WL 859111, at *3 (N.D.N.Y. Mar. 5, 2014) ("It is not enough to identify a general risk that confidential information disclosed during litigation may influence counsel's representation of a party before the PTO.").  In other words, Apple seeks to impose a strict financial penalty if nCAP were to decide to respond to an IPR with a claim amendment.  This is particularly inappropriate given that claim amendments in IPRs may only be used to *narrow* claims, not expand them to cover some additional infringement based on a misuse of protected information.  37 C.F.R. § 42.121(a) (2) (allowing for denial of amendments which seek to enlarge the scope of the claims or introduce new subject matter);

Apple contends that this provision is necessary lest an attorney with knowledge of nCAP's infringement theories work on a claim amendment narrowly tailored to target Apple's products and avoid prior art.  But courts have rejected this argument, based on the narrow scope of permissible amendments and the inability to add materials not already in the specification. *Xerox Corp. v. Google, Inc*., 270 F.R.D. 182, 184-85 (D. Del. 2010) ("…to the extent additional details are added to a claim in reexamination to distinguish it from the prior art, those details must already exist in the original patent's specification."); *see also Pall Corp. v. Entegris, Inc.*, 655 F.Supp.2d 169, 173 (E.D.N.Y.2008) ("[U]nlike prosecution of an initial patent application, the Patent Act expressly curtails the scope of reexamination, prohibiting any claim amendment

that would enlarge the scope of the initial patent").  Simply put, Apple is trying to erect procedural and economic barriers to gain a tactical advantage.  That is not good cause for a restriction on attorney practice.

### B.     Apple's Statement Regarding The Prosecution Bar

Apple's proposed provisions regarding an acquisition bar and the involvement of certain attorneys at nCAP's outside counsel in drafting and amending claims of the patent-in-suit are in no way directed specifically at nCAP's outside counsel, but instead are reasonable and narrowly tailored to the express purpose of mitigating the risk of inadvertent disclosure or misuse of confidential information disclosed during litigation.  Tellingly, nCap has argued that it retains outside patent prosecution counsel, aside from its litigation counsel; therefore, the proposed restriction would have no material effect on nCAP.  Apple respectfully requests that the Court enter an order consistent with these objectives.

Plaintiff nCap fundamentally misunderstands the relevant legal framework, insisting that Apple has failed to "evaluate the risks on a counsel-by-counsel basis."  First, the acquisition bar is tailored only to those individuals who have received confidential, highly confidential, or source code information—*i.e.*, it is limited on a counsel by counsel basis.  Second, under controlling Federal Circuit law, nCap, as the proponent of an exception (ethical wall allowing some of its attorneys to draft/amend claims in an IPR) to the overarching agreed bar on prosecuting patents, has the burden to prove the exception is warranted on a counsel by counsel basis.  *Deutsche Bank*, 605 F.3d at 1381.  Plaintiff has failed to do so.

1.      **The Proposed Acquisition Bar Is Narrowly Tailored To Mitigate Risk Of Inadvertent Use Of Confidential Information.**

Individuals who receive highly confidential or source code information in this case should not be permitted to be involved directly or indirectly with the acquisition of patents and applications relating to the functionality, operation, and design of antennas and antenna-related components, materials, and applications.  Courts have found good cause to impose such narrowly tailored "acquisition bars" appropriate "to mitigate the risk of inadvertent use of confidential information learned in litigation."  *See, e.g.*, *EPL Holdings, LLC v. Apple Inc.*, No. C-12-04306, 2013 WL 2181584, at *4 (N.D. Cal. 2013); *Unwired Planet*, 2013 WL 1501489, at *7; *In re Trustees of Boston Univ. Patent Cases*, Civ. A. No. 12-11935, 2013 WL 12324364, at *3 (D. Mass. Nov. 15, 2013).  Such a provision is not only reasonable, but particularly warranted here, given nCAP's outside counsel's history of repeatedly representing parties suing Apple.

Despite nCAP's assertion to the contrary, the cases cited by Apple support the proposed provision directed to preventing nCAP's outside counsel from using confidential information disclosed in this case to bolster its strategic decisionmaking (on behalf of any client, not just nCAP) with respect to the acquisition of patents (*e.g.*, for subsequent cases against Apple).  The courts in *Unwired Planet* and *EPL* both adopted such bars.  *See, e.g.*, *EPL Holdings*, 2013 WL 2181584, at *4; *Unwired Planet LLC*, 2013 WL 1501489, at *3.  Neither rested its decision on whether the plaintiff was merely a patent holding company or was actively acquiring patents.  And nCap has cited no case law that would support its view that counsel for a company that (allegedly) practices its own patents should not be subject to an acquisition bar.  Indeed, nCAP cited not even one case that deemed an acquisition bar inappropriate.

nCAP asserts in a self-serving statement that "nCAP has not acquired any patent applications, nor does it plan to do so," but that clearly could change at any time.  nCAP also contends that the Court should simply forego protections and limitations on counsel advising on acquisitions because its outside counsel does not advise *nCAP* on patent acquisitions.  That is no reason to forego an acquisition bar because:  (1) again, that could change at any time; and (2) it wholly fails to address whether nCAP's outside counsel advises its *other clients* on the acquisition of patents.  Courts have imposed acquisition bars for that very reason.  *See, e.g.*, *ST Sales Tech. Holdings, LLC v. Daimler Chrysler Co., LLC*, Civ. A. No. 6:07-CV-346, 2008 WL 5634214, at *5 (E.D. Tex. Mar. 14, 2008) (finding outside counsel to be a competitive decisionmaker and entering protective order screening from access to confidential material where outside counsel was "in position to seek out and propose the purchase of patents that read on activities known from . . . involvement in confidential discovery during prior lawsuits, and then seek to enforce those patents against the same Defendants").

Instead, nCAP fundamentally mischaracterizes the burden of proof for a party seeking the imposition of patent acquisition bars.  Plaintiff nCAP's cited cases calling for a "counsel-by-counsel" evaluation of risks of inadvertent disclosure address the question of in-house or retained counsel's *access* to confidential information and/or patent prosecution bars, and not the imposition of patent acquisition bars.  *See Koninklijke*, 311 F.R.D. at 82-83.  Here, it is undisputed that each attorney working on this litigation has access to the confidential information of the other side.

Finally, nCAP's argument that an acquisition bar must include an exemption for advising clients on the validity of patents to be acquired goes against the weight of the case law.  *See, e.g.*,

45

*Unwired Planet LLC*, 2013 WL 1501489, at *3; *Trustees of Boston Univ.*, 2013 WL 12324364, at *3. Counsel for nCAP should not be permitted to advise a client to avoid a particular patent (for validity reasons) because they **now know based on Apple confidential information** that certain Apple products sold at certain dates included specific materials, etc., down to the make and model and composition, which could render invalid whatever patent they are advising clients to avoid acquiring.

<blockquote>

**2.      Plaintiff nCap's Proposed Ethical Wall Is Inadequate To Protect Apple Against Misuse Of Confidential Information In Drafting and Amending Claims Of The Patent-In-Suit.**

</blockquote>

The parties disagree on whether nCAP's outside counsel may establish an ethical wall that would allow attorneys at nCAP's outside counsel who have "not accessed or reviewed" Apple confidential information from this case to be involved in drafting or amending claims of the patent-in-suit in an IPR (*e.g.*, so as to tailor those claims to more closely map to Apple's products). The parties agree that outside counsel who ***have*** seen confidential information in this case may work on IPRs regarding the patent-in-suit, but ***cannot*** have any involvement with drafting or amending claims in those IPRs. *See* Ex. A § 6(b). The result of nCAP's requested ethical wall provision, therefore, would be to allow walled and non-walled attorneys from nCAP's outside counsel to work on ***the same IPR*** regarding the patent-in-suit, with the only difference between those walled and non-walled attorneys being that the former can ***also*** work on drafting and amending claims of the patent-in-suit.

No dispute exists that an IPR regarding a patent that is also asserted in litigation requires a patentee to make strategic decisions about which arguments to advance in the IPR to preserve patent validity, while trying to avoid conflicting with the patentee's infringement arguments in

the district court based on the design of the accused products.  As a result, nCAP's provision would permit a walled attorney to jointly work on such strategy with non-walled attorneys in the IPR, and then, ***with an understanding of which theories of claim scope matter for nCAP's infringement allegations in the district court***, work on drafting and amending claims of the patent-in-suit.

Courts have recognized that IPR counsel cannot realistically section off such an understanding before working on drafting and amending the claims.  *See, e.g.*, *Deutsche Bank*, 605 F.3d at 1378 ("[I]t is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so."); *cf. Inventor Holdings, LLC v. Wal-Mart Stores Inc.*, Civ. A. No. 1:13-cv-00096, 2014 WL 4370320, at *2-3 (D. Del. Aug. 27, 2014) (citing *Versata Software, Inc. v. Callidus Software Inc.*, Civ. No. 12-931, 2014 WL 1117804, at *1-2 (D. Del. Mar. 12, 2014) ("allowing a 'limited' prosecution bar exemption regarding 'all reexaminations, inter partes reviews, and any other post-grant review proceeding,' while also imposing "a strict prohibition of consultation between attorneys designated to participate in review proceedings and attorneys who view highly confidential source code in the context of litigation")).  Thus, allowing an exception to the prosecution bar based on an ethical wall as proposed by nCAP would not adequately protect Apple against the risk that nCAP's counsel will be able to draft or amend claims of the patent-in-suit to better map to Apple's products based, essentially, on Apple's confidential information.  Nor would the proposed bar unduly hamstring nCap, which, according to its own statements, retains a separate law firm for patent prosecution matters.

Moreover, the fact that nCap would not be able to broaden patent claims in post-issuance proceedings does not alleviate the risk of using Apple confidential information to strategically narrow the claims to avoid prior art while maintaining the best possible scope for infringement allegations because "a patent owner may well choose to restructure claims in a manner informed by the alleged infringer's confidential information gleaned from litigation." *Shared Memory Graphics, LLC v. Apple, Inc.*, No. C-10-2475, 2010 WL 4704420, at *3 (N.D. Cal. Nov. 12, 2010).

Dated: June 15, 2018                                    Respectfully submitted,


*/s/ Jason D. Cassady*                          By:    */s/ Brent O. Hatch*
Bradley W. Caldwell                                    Brent O. Hatch (5715)
Texas State Bar No. 24040630                           bhatch@hjdlaw.com
Email:  bcaldwell@caldwellcc.com                       Lara A. Swensen (8493)
Jason D. Cassady                                       Lswensen@hjdlaw.com
Texas State Bar No. 24045625                           HATCH, JAMES & DODGE, P.C.
Email:  jcassady@caldwellcc.com                        10 West Broadway, Suite 400
John Austin Curry                                      Salt Lake City, UT 84101
Texas State Bar No. 24059636                           Telephone: (801) 363-6363
Email:  acurry@caldwellcc.com                          Facsimile: (801) 363-6666
Justin Nemunaitis
Email :  jnemunaitis@caldwellcc.com                    OF COUNSEL:
Alexis F. Mosser
Texas State Bar No. 24070675                           John M. Desmarais (*admitted pro hac vice*)
Email: amosser@caldwellcc.com                          Michael P. Stadnick (*admitted pro hac vice*)
**CALDWELL CASSADY & CURRY**                           Ameet A. Modi (*admitted pro hac vice*)
2101 Cedar Springs Road, Suite 1000                    Peter C. Magic (*admitted pro hac vice*)
Dallas, Texas 75201                                    Wesley L. White (*admitted pro hac vice*)
Telephone: (214) 888-4848                              Priyanka R. Dev (*admitted pro hac vice*)
Facsimile: (214) 888-4849                              Michael R. Rhodes (*admitted pro hac vice*)
                                                       DESMARAIS LLP
                                                       230 Park Avenue
**DURHAM JONES & PINEGAR, P.C.**                       New York, NY 10169
J. Mark Gibb                                           Telephone: (212) 351-3400
Lyndon R. Bradshaw
                                                       *Attorneys for Defendant Apple Inc.*
*Attorneys for Plaintiffs*


49