Brent O. Hatch (5715)
bhatch@hjdlaw.com
Lara A. Swensen (8493)
Lswensen@hjdlaw.com
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, UT 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

John M. Desmarais (*admitted pro hac vice*)
jdesmarais@desmaraisllp.com
Michael P. Stadnick (*admitted pro hac vice*)
mstadnick@desmaraisllp.com
Ameet A. Modi (*admitted pro hac vice*)
amodi@desmaraisllp.com
Peter C. Magic (*admitted pro hac vice*)
pmagic@desmaraisllp.com
Jeffrey S. Seddon (*admitted pro hac vice*)
jseddon@desmaraisllp.com
William D Findlay (*admitted pro hac vice*)
wfindlay@desmaraisllp.com
Wesley L. White (*admitted pro hac vice*)
wwhite@desmaraisllp.com
Priyanka R. Dev (*admitted pro hac vice*)
pdev@desmaraisllp.com
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone: (212) 351-3400

*Attorneys for Defendant Apple Inc.*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| nCAP LICENSING, LLC, nCAP TELECOMMUNICATIONS LLC, nCAP MEDICAL, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | **DEFENDANT APPLE INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**<br><br>**FILED UNDER SEAL**<br><br>**JURY TRIAL DEMANDED**<br><br>Case No.: 2:17-cv-00905<br><br>Judge:  Robert J. Shelby<br><br>Magistrate Judge:  Brooke C. Wells |

## TABLE OF CONTENTS

TABLE OF CONTENTS .............................................................................................. ii

I.      INTRODUCTION ............................................................................................. 1

II.     RESPONSE TO nCAP'S TECHNOLOGY TUTORIAL .................................... 4

III.    ARGUMENT ..................................................................................................... 5

        A.      Agreed Claim Constructions ................................................................. 5

        B.      Claims 12-15:  "wherein a nonconductive material is disposed between the antenna enhancer element and the at least one of the radiating or receiving antenna" ................................................................................................ 5

        C.      All Claims:  The Term "conductive particles dispersed in a binder so that at least a majority of the conductive particles are *adjacent to*, but do not touch, one another" Is Indefinite. ........................................................... 10

                1.      The Specification Provides No Guidance As To How Close Particles Must Be To Provide Any "Necessary" Amount Of Capacitance For "Adjacency." ......................................................... 12

                2.      The Specification Fails To Provide Meaningful Guidance Regarding "Adjacent," Let Alone Provide The "Objective Boundaries" Required By Federal Circuit Law. ............................ 13

                3.      "Adjacent" In The Context Of Electromagnetic Properties Of Conductive Particles Does Not Have A "Common" Meaning "Easily Understood By A Lay Jury," Is Subjective, And The Cases Cited By nCAP Fail To Support nCAP's Argument. .......... 15

        D.      Claims 12-15:  The Terms "antenna enhancer" And "antenna enhancer element" Are Indefinite. .................................................................... 20

                1.      Nothing In The Intrinsic Record Or The Art Provides Sufficient Guidance Regarding The Types And Degree Of "Enhancement" Covered By The Claims. ..................................................... 22

                2.      The Cases Cited By nCAP Support Apple's Position Because They All Included Terms Directed To A Specific Characteristic. ........... 25

IV.     CONCLUSION .............................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Accentra, Inc. v. Staples*,
    500 F. App'x 922 (Fed. Cir. 2013) ................................................................ 18

*ADC Telecommunications, Inc. v. Switchcraft, Inc.*,
    No. Civ. 04-1590, 2005 WL 2206115 (D. Minn. Sept. 9, 2005) ..................... 19

*Alberta Telecomms. Research Ctr. v. AT&T Corp.*,
    No. 09-3883, 2012 WL 3990540 (D.N.J. Sept. 10, 2012) .............................. 25

*Allergan v. Teva Pharm. USA, Inc.*,
    No. 2:15-cv-1455, 2016 WL 7210837 (E.D. Tex. Dec. 13, 2016) .................. 25

*Amgen Inc. v. Chugai Pharm. Co., Ltd.*,
    927 F.2d 1200 (Fed Cir. 1991) ..................................................................... 20

*Andrulis Pharm Corp. v. Celgene Corp.*,
    No. CV 13-1644, 2015 WL 3978578 (D. Del. June 26, 2015) ....................... 14

*Ballard Med. Prods. v. Allegiance Healthcare Corp.*,
    268 F.3d 1352 (Fed. Cir. 2001) ...................................................................... 8

*Biosig Instr., Inc. v. Nautilus, Inc.*,
    783 F.3d 1374 (Fed. Cir. 2015) ........................................................... 3, 18, 19

*Chem Separation Tech. v. United States*,
    51 Fed. Cl. 771 (Fed. Cl. 2002) ..................................................................... 18

*Componex Corp. v. Elecs. for Imaging, Inc.*,
    No. 13-cv-384, 2014 WL 3556064 (W.D.Wis. July 18, 2014) .................... 1, 10

*Computer Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008) .................................................................. 5, 9

*Digital Biometrics, Inc. v. Identix, Inc.*,
    149 F.3d 1335 (Fed. Cir. 1998) .................................................................. 1, 7

*Exmark Manufacturing Co. Inc. v. Briggs & Stratton Power Products Group, LLC*,
    No. 8:10-cv-187, 2015 WL 12697086 (D. Neb. July 28, 2015) ..................... 19

*Exxon Research v. Eng'g Co.*,
    265 F.3d 1371 (Fed. Cir. 2001) ..................................................................... 25

*Free Motion Fitness, Inc. v. Cybex Intern., Inc.*,
    423 F.3d 1343 (Fed. Cir. 2005)................................................................ 19

*Halliburton Energy Svcs, Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008).......................................................... 14, 15

*Icon Health & Fitness, Inc. v. Polar Electro Oy*,
    656 F. App'x 1008 (Fed. Cir. 2016) ....................................................... 15

*In re Neurografix ('360) Patent Litig.*,
    201 F. Supp. 3d 206 (D. Mass. Aug. 19, 2016) ..................................... 19

*In re Walter*,
    698 F. App'x 1022 (Fed. Cir. 2017) ....................................................... 17

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
    No. 2017-2434, 2018 WL 4201163 (Fed. Cir. Sept. 4, 2018) ................. 23

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014)................................................ 13, 14, 21

*Invitrogen v. Biocrest Mfg.*,
    424 F.3d 1374 (Fed. Cir. 2005)............................................................. 25

*Koninklijke Philips N.V. v. Zoll Med. Corp.*,
    656 F. App'x 504 (Fed. Cir. 2016) ......................................................... 20

*Magna Electronics v. TRW Auto. Holding*,
    Nos. 1:12-cv-654, 1:13-cv-324, 2015 WL 11401855 (W.D. Mich. Apr. 28, 2015)......... 25

*Medrad, Inc. v. MRI Devices Corp.*,
    401 F.3d 1313 (Fed. Cir. 2005)............................................................... 9

*N. Am. Container, Inc. v. Plastipak Packaging, Inc.*,
    415 F.3d 1335 (Fed. Cir. 2005)............................................................... 8

*O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)............................................................. 17

*Otsuka Pharm. Co. v. Torrent Pharm. Ltd, Inc.*,
    151 F. Supp. 3d 525 (D.N.J. Nov. 16, 2015) ......................................... 20

*Teleflex Inc. v. Ficosa N. A. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002)............................................................... 6

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    789 F. 3d 1335 (Fed. Cir. 2015)......................................................................... 20

*Watts v. XL Sys., Inc.*,
    232 F.3d 877 (Fed. Cir. 2000)............................................................................. 8

*Wi-LAN USA, Inc. v. Apple Inc.*,
    830 F.3d 1374 (Fed. Cir. 2016)........................................................................... 8

*Young v. Lumenis*,
    492 F.3d 1336 (Fed. Cir. 2007)......................................................................... 18

## I.     INTRODUCTION

Plaintiff nCAP claims to have invented antennas and "antenna enhancers" made out of a material in which conductive particles are dispersed in a binder and not touching one another.[1] During patent prosecution, when faced with prior art disclosing conductive particles dispersed in a binder that were electrically connected to ground, nCAP told the Patent Office that its "antenna enhancer" was nonetheless patenable because it was electrically isolated from ground.  The argument nCAP now offers—that it cannot be held to that representation because the wording of the "antenna enhancer" claim that issued describes electrical isolation (via a non-conductive material) from an antenna, but is simply silent about isolation from ground—is legally irrelevant because nCAP never argued to the Patent Office that its proffered distinction over the art was limited to just one, but not other, antenna enhancer claims.  *See Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347–48 (Fed. Cir. 1998) (prosecution history disclaimer applies with equal force when considering similar language in similar claims).

First, settled authority requires that nCAP be held to its disclaimer, whether or not it explicitly memorialized the disclaimer in its claims.  Indeed, the purpose of holding patentees to representations they made during prosecution is to ensure patentees cannot sidestep the consequences of their statements to the Patent Office by carefully phrasing the text of the claims to later deny such disclaimers.  *See Componex Corp. v. Elecs. for Imaging, Inc.*, No. 13-cv-384, 2014 WL 3556064, *6 (W.D.Wis. July 18, 2014) ("[T]he whole point of prosecution history

---

[1]  In fact, as one of the named inventors recently testified—despite nCAP's implication that it invented a novel material with special nanoparticle properties— ████████████████████ ████████████████████████████████████ Ex. 1 (Hernandez Tr.) at 23-27, 69, 73-74, 139-41, 209-10.  All exhibits are attached to the declaration of Priyanka R. Dev, filed concurrently.

estoppel is to prevent what Componex is seeking to do here: ignore the actual context in which the prosecutor and the examiner used the terms that were later reduced to the language of the issued patent.") (citation omitted).

Additionally, nCAP's argument that Apple's construction would read out an embodiment is incorrect—both the disclaimer and Apple's construction pertain to the claimed "antenna enhancer," whereas the embodiment to which nCAP points in its brief (Figure 2 of the patent) relates to an "antenna" (not antenna enhancer). Apple's proposed construction requiring that the antenna enhancer element be "electrically isolated from ground" properly credits clear statements that nCAP made to the Patent Office about what its invention *is not*—an "antenna enhancer" electrically connected to ground.

Second, nCAP fails to explain how skilled artisans could understand the spacing required for particles to be considered "adjacent" *in a way that satisfies the claimed "radiating antenna element" and "antenna enhancer element[s]."* Appx00022-23 ('071 Pat., cols. 20:49-53, 22:1-14). Indeed, nCAP seems at a loss to explain the range of distances that might count as "adjacent" under the asserted claims—it never identifies such a range in its briefing, nor provides any in the the specification. Is it therefore unsurprising that, in its Opening Brief, nCAP specified only a desired *result*: "*[w]hat is desired* is for the majority of the particles to be near each-other, but not touching, so that the material has properties of a capacitor." Doc. 129 at 16.

In its brief, nCAP likewise cites to unsupported aspirational teachings in the specification as to the spacing of particles—that the material can "efficiently" radiate electromagnetic radiation into space, will have an "effective amount" of particles, and that the material may have an electrical resistance of 3-17 ohms. But none of that information satisfies the definiteness requirement for

2

patentability because: (1) the patent never explains the amount of space between particles that would provide "efficiency"; (2) a bare reference to an "effective amount" of particles provides no guidance for skilled artisans to understand with reasonable certainty the distances that could yield an "effective" material; and (3) nCAP does not admit that the asserted claims are limited to materials with 3-17 ohms of resistance.

The cases cited by nCAP concerning indefiniteness pertain to technologies where microscopic differences in distance between objects would not impact whether particles count as "adjacent" or not. Instead, those cases address technologies where any layperson would understand what it means to be "adjacent." *See Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1382 (Fed. Cir. 2015) ("[T]he degree of precision necessary for adequate claims is a function of the nature of the subject matter."). For the same reason, nCAP's argument that "adjacent" is "easily understood by a lay jury" is incorrect. Lay jurors are not familiar with how the difference between, say, 0.01 millimeters and 0.0001 millimeteres in spacing—taking into account the specific particle material (among thousands of options) and the possibility of intervening particles—might cross the line between "adjacency" and "non-adjacency" in the context of the claims. The term "adjacent" is thus indefinite in the context of the patent-in-suit.

Third, as to the "antenna enhancer" terms, nCAP feints at the *degree* of enhancement, while ignoring the fatal flaw that its patent fails to explain what "enhancement" means in the first place. Even if the specification provided some guidance as to the degree of enhancement required (and it does not), Apple's expert, Dr. van der Weide, explained that "antenna enhancer"—without reference to a specific antenna characteristic to be enhanced—is not a term of art, and "[w]hat it means to 'enhance' an antenna could have *virtually infinite potential meanings to one of skill in*

*the art unless defined by the inventor*."  A11-A12 (VDW Decl.) ¶¶ 34-35.[2]  Every alteration to an antenna design may improve one specific characteristic (*e.g.*, total radiated power) while diminishing other specific characteristics (*e.g.*, directionality and bandwidth), making a determination of whether each antenna design is an "enhanced antenna" a purely subjective assessment.  Indeed, nCAP never argues that its specification, or the relevant art, provides a definition.  In fact,  the cases cited by nCAP actually support finding indefiniteness:  they indicate that a term is not indefinite when the claim identifies *a specific characteristic* to be enhanced.  By contrast, the asserted claims never identify a specific characteristic to be enhanced.

## II.    RESPONSE TO nCAP'S TECHNOLOGY TUTORIAL

Plaintiff nCAP's "Technology Tutorial" contains numerous unsupported and inaccurate statements.  For example, nCAP states, with no support whatsoever, that the claimed inventions include "antennas [that] are particularly useful for today's modern consumer electronics because they allow small antenna components to perform more effectively than conventional antennas." Doc. 129 at 1.  In addition, nCAP states that its "material could be placed inside the housing of a mobile device that already contains a conventional antenna" and the "modified mobile device may be able to transmit a more powerful signal, or it may be able to transmit a comparable signal using less battery power," citing a YouTube video that fails to provide support for that claim.  *Id.* at 4. nCAP also cites a portion of the specification (at cols. 13:55-14:10) that does not describe placing material inside the housing of a mobile device.  *Id.*

---

[2] The declaration of Dr. Daniel van der Weide ("VDW Decl.") is located in the Appedix to Apple's Opening brief (Doc. 133-1) at A1-A53.

Finally, in describing its theory that particles in the claimed material act as "micro-capacitors," nCAP conflictingly states that between capacitors, "*[n]o current actually flows* through the dialectric" but also that "*there is a flow of charge or 'charging current' across the material* [*i.e.*, through the dielectric between particles] as the capacitors charge and discharge." *Id.* at 5. Evidently, nCAP misunderstands the principles behind its own purported invention.

## III.    ARGUMENT

### A.    Agreed Claim Constructions

The parties have agreed to Apple's proposed constructions for the following claim terms. Apple set forth in its Opening Brief the reasons why those constructions are appropriate.

| Term | Agreed Construction |
|---|---|
| antenna | a transducer used to transmit or receive electromagnetic radiation by converting electromagnetic radiation into electrical signals and vice versa |
| radiating antenna element | an element of the antenna that transmits electromagnetic radiation |

### B.    Claims 12-15:  "wherein a nonconductive material is disposed between the antenna enhancer element and the at least one of the radiating or receiving antenna"

| nCAP | Apple |
|---|---|
| No construction necessary | wherein a nonconductive material rendering the antenna enhancer element electrically isolated from ground is disposed between the antenna enhancer element and the at least one of the radiating or receiving antenna |

Plaintiff nCAP's overarching argument that Apple seeks to "import[] a new limitation into the claim language" (Doc. 129 at 9) reflects a fundamental misunderstanding of the law regarding prosecution history disclaimer.  That doctrine does not pertain to importing new limitations into claims, but rather to preventing a patentee from disavowing its representations to the Patent Office (and thus the public) concerning how its invention differs from the prior art.  *See Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374–1375 (Fed. Cir. 2008) ("The doctrine of

prosecution disclaimer protects the public's reliance on definitive statements made during
prosecution by precluding patentees from recapturing through claim interpretation specific
meanings clearly and unmistakably disclaimed during prosecution.") (quotation removed).

Here, nCAP told the Patent Office that the antenna enhancer in the prior art was
"electrically connected to ground," whereas "Applicant's claimed antenna enhancer is electrically
isolated." *See* Appx000139. Indeed, nCAP, not Apple, seeks to alter the scope of the claims by
disavowing its former representations to the Patent Office.[3] To the contrary, nCAP should be held
to its disclaimer regarding the term "antenna enhancer," which admittedly cannot cover an antenna
enhancer element electrically connected to ground. *See* Doc. 133 (Apple Opening Br.) at 11-15.

In that regard, nCAP does not deny that: (1) on October 24, 2014, the Patent Office rejected
all of nCAP's "antenna enhancer" claims in view of the "Aisenbrey" reference; and (2) nCAP
responded by adding a new "antenna enhancer" claim (then-numbered 38, which issued later as
claim 12), arguing that nCAP's "antenna enhancer" was distinct because the Aisenbrey reference
disclosed an antenna enhancer that was "electrically connected to ground," whereas nCAP's
"'antenna enhancer element' is electrically isolated." *See* Doc. 133 (Apple Opening Br.) at 11-15
(citing Appx00130; Appx00139 (01-26-15 Remarks)). nCAP never argued to the Patent Office
that its distinction applied to a subset of its antenna enhancer claims, or that its newly-added
antenna enhancer claim covered antenna enhancers electrically connected to ground.

Nonetheless, nCAP now argues that disclaimer should not apply because:

- the specific "antenna enhancer" claim that was rejected by the Patent Office was not
  the exact same claim as the "antenna enhancer" claim that ultimately issued, and

---

[3] Thus, nCAP mischaracterizes Apple as seeking to commit the "cardinal sin" of patent law (Doc. 129 at 9). In fact, the case cited by nCAP—*Teleflex Inc. v. Ficosa N. A. Corp.*, 299 F.3d 1313 (Fed. Cir. 2002)—had nothing to do with prosecution history disclaimer.

> nCAP's brief statement in prosecution regarding the specific "antenna enhancer" claim that ultimately issued did not state that the disclaimer applied to that claim, too;

- holding nCAP to its disclaimer would exclude from the issued "antenna enhancer" claims one of the embodiments disclosed in the specification; and

- the language of the issued "antenna enhancer" claims does not memorialize the disclaimer.

Doc. 129 at 9-12. But none of nCAP's arguments provide a legitimate basis for the Court to conclude that disclaimer does not apply because: (1) "[a]bsent qualifying language in the remarks"—and there is none here—"arguments made to obtain the allowance of one claim are relevant to interpreting other claims in the same patent" (*Digital Biometrics,* 149 F.3d at 1347–48); (2) the embodiment to which nCAP points is an embodiment of using the particle material as an antenna, ***not*** as an "antenna enhancer" (a dispict category of claims in the patent); and (3) the fact that the antenna enhancer claim itself does not memorialize the disclaimer is precisely the reason for applying the doctrine of prosecution history disclaimer.

First, nCAP wishes to undo its bargain with the public by arguing that one "antenna enhancer" claim that it added (issued claim 12, then-numbered as 38 in prosecution) at the same time it made its disclaimer does not include the same exact limitation as another "antenna enhancer" claim (then-numbered as 13) rejected by the Patent Office. Doc. 129 at 11. The later-added antenna enhancer claim, says nCAP, required that "a non-conductive material is disposed between the antenna enhancer element and the at least one of the radiating or receiving antenna." *See* Doc. 133 (Apple Opening Br.) at 13 (citing Appx00133-34).

But any differences between the two "antenna enhancer" claims are irrelevant because nCAP did not distinguish issued claim 12 from the disclaimer. Doc. 133 at 14 (showing nCAP's remarks); *see Digital Biometrics,* 149 F.3d at 1347 ("Absent qualifying language in the remarks,

arguments made to obtain the allowance of one claim are relevant to interpreting other claims in the same patent."); *Watts v. XL Sys., Inc.*, 232 F.3d 877, 883–84 (Fed. Cir. 2000); *Wi-LAN USA, Inc. v. Apple Inc.*, 830 F.3d 1374, 1390–91 (Fed. Cir. 2016); *Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1360–61 (Fed. Cir. 2001). Indeed, nCAP told the Patent Office that the newly-added antenna enhancer claim "recites subject matter related to ***claim 13*** [the first antenna enhancer claim]." Appx00143 (01-26-15 Remarks at 19) (emphasis added). nCAP's very next sentence to the PTO—"***[t]hus,*** the arguments set forth above with respect to claim 1 may be applicable to claim 38"—indicates that nCAP knew that its newly-added antenna enhancer claim would not cover the scope it had disclaimed, *i.e.*, an enhancer electrically connected to ground.[4] *Id.* (emphasis added).

Next, nCAP's argument that invoking disclaimer would impermissibly exclude "some embodiments" from the specification is legally and factually erroneous. The argument is legally erroneous because when a patentee has disavowed claim scope that would cover embodiments disclosed in a specification, no requirement exists that the claim be construed to embrace such embodiments. *See N. Am. Container, Inc. v. Plastipak Packaging, Inc.,* 415 F.3d 1335, 1345–46 (Fed. Cir. 2005).[5] Indeed, the portion of the specification to which nCAP refers regarding utilizing

---

[4] The reference to "claim 1" in that statement appears to be a typo, given the leading "thus" connecting it to the previous sentence—which stated that the new claim "recites subject matter related to claim 13"—and the fact that the new claim was highly similar to claim 13 and not similar to claim 1 (which pertained to an antenna, not an antenna enhancer). *See, e.g.*, Doc. 129 at 10-11 ("Claim 1 related to an 'antenna system,' [and] claim 13 related to an 'antenna enhancer system' . . . ."). nCAP's statements are strikingly similar to the statements in *Wi-LAN* where the patentee stated that "this same argument [distinguishing certain prior art] also applies to claim 2 [which contained a similar but unidentical term]." *See Wi-LAN*, 830 F.3d at 1391.
[5] The *Medrad* case cited by nCAP (Doc. 129 at 10) had nothing to do with prosecution history disclaimer or its interplay with principles of construction pertaining to excluding embodiments.

"the substrate . . . as a ground plane" was present in the patent application when nCAP told the Patent Office that the antenna enhancer element is electrically isolated from ground. *See* nCAP Brief at 10; Appx00037 (11-22-11 Amend. (Specification), at 12) ¶ 56.

Moreover, nCAP's argument is factually erroneous because the embodiment to which nCAP points pertains to Figure 2 of the asserted patent. *See* Doc. 129 at 10 (referring to "substrate 210," which is a component of Figure 2, serving as a ground plane). According to the specification, Figure 2 depicts an antenna—*not* an "antenna enhancer." The specification discusses Figure 2 under the heading "conductive particle based *antenna,*" and describes it as "illustrat[ing] a conductive particle based *antenna,*" while at the same time describing other figures (*e.g.*, Figs. 4, 5, 6) as illustrating a "conductive particle based antenna *enhancer*." *See* Appx00013 (col. 2:42-57); Appx00015-16 cols. 6:49, 7:26-28). Thus, the "antenna" embodiment discussed by nCAP has no bearing on disclaimer regarding its "antenna *enhancer"* claims (12-15).

Next, nCAP argues that because the literal wording of the "antenna enhancer" claims does not memorialize the disclaimed scope (*i.e.*, lack of electrical connection to ground), the claims should not be limited consistent with nCAP's disclaimer (*see* Doc. 129 at 9). That argument, again, reflects nCAP's misunderstanding of the purpose of prosecution history disclaimer, which attaches only where a patentee *failed* to memorialize disclaimed scope in the words of the claims. *See Computer Docking*, 519 F.3d at 1374–75. For the same reason, nCAP's argument that "[t]he fact that the inventors knew how to limit claim 12 to require electrical isolation, but expressly chose not to do so, confirms that it would be error for the Court to import this limitation into claim

---

*See* 401 F.3d 1313, 1320 (Fed. Cir. 2005). The cases cited by nCAP regarding lack of an express definition of the disputed claim limitation are equally irrelevant because Apple is not arguing that an express definition in the specification is the support for its construction. *See* Doc. 129 at 10.

12" is legally incorrect.  *See* Doc. 129 at 11.  Prosecution history disclaimer exists to prevent patentees from using the very excuse that nCAP now offers to avoid its disavowal.  *See Componex*, 2014 WL 3556064 at *6.

Thus, the correct construction of "wherein a nonconductive material is disposed between the antenna enhancer element and the at least one of the radiating or receiving antenna" is "wherein a nonconductive material rendering the antenna enhancer element electrically isolated from ground is disposed between the antenna enhancer element and the at least one of the radiating or receiving antenna."

## C.    All Claims:  The Term "conductive particles dispersed in a binder so that at least a majority of the conductive particles are *adjacent to*, but do not touch, one another" Is Indefinite.

As described in detail in Apple's Opening Brief, the above term is indefinite because it fails to teach one of skill in the art with reasonable certainty the scope of the claimed invention, *e.g.*, the minimum, maximum, or approximate range of distances that must separate the claimed particles in order to practice the claims, or how those distances vary relative to the nearly infinite combinations of particles and binders that allegedly can be used in the claimed inventions.  As Apple's expert, Dr. Daniel van der Weide, explained, the term "adjacent" in the context of electrical engineering and antenna materials has no established meaning and would be subjective in the absence of specific guidance regarding distances between particles.  A8-A9 (VDW Decl.) ¶¶ 19-22.

Notably, nCAP concedes that "adjacent" is a term of degree, not a term with a known meaning in the electrical engineering arts, yet does not even attempt to define "adjacent."  *See* Doc. 129 at 15-16.  And nCAP concedes that the "amount" and "proximity" of particles "necessary

to achieve the desired results" is "relative and variable" based on size, etc. *Id.* at 16. Further, nCAP does not argue that limits exist on how far apart particles can be and still be "adjacent." Even an inventor of the patent-in-suit could not provide a specific distance or range of distances that falls within the scope of the claims. *See* Ex. 1 (Hernandez Tr.) at 108-09, 286-87.

Yet, nCAP still argues that "adjacent" is not indefinite for three reasons: (1) skilled artisans would simply know how far apart to space particles based on the notion that "[w]hat is desired is for the majority of the particles to be near each-other, but not touching, so that the material has properties of a capacitor"; (2) the specification provides guidance on "the proximity of the conductive particles" by stating that the material should "efficiently propogate" radiation and include an "effective amount" of particles; and (3) "adjacent" is "a common English word, easily understood by a lay jury." Doc. 129 at 15-16. However, none of those arguments provides a basis for establishing that skilled artisans would have reasonable certainty about the scope of "adjacent" within the claims, because the claim fails to describe "capacitance" as a requirement (indeed, the specification offers "quantum theory" as an alternative theory for how the particles interact), or associate "capacitance" with "adjacency" in any way meaningful to assess distances between particles. Rather, the alleged "guidance" in the specification is itself vague, subjective, and not even linked to any distances between particles, and provides a lay jury with no guidance concerning the boundaries of "adjacency" in the context of microscopic particles, where proximity is allegedly crucial to creating particular electromagnetic or "quantum" effects.

1.      **The Specification Provides No Guidance As To How Close Particles Must Be To Provide Any "Necessary" Amount Of Capacitance For "Adjacency."**

nCAP's belated argument that "capacitance"—a term absent from the asserted claims—provides the hallmark for the claimed "adjacency" (*i.e.* that capacitance between some number of particles among the billions of particles in a given conductive particle-based material "is desired") fails to show that skilled artisans would have been able to ascertain with reasonable certainty whether particles were "adjacent" to each other within the meaning of the claims. No such "capacitance" requirement can be teased out of the specification, and even if it could, such a requirement would not provide reasonable certainty as to what distances qualify as "adjacent."

The specification never states that capacitance is "desired," let alone required—it merely speculates that "***without intending to be limiting***," "it is believed that . . . radiation may pass [between conductive particles] via ***at least one*** of capacitive and inductive coupling." Appx00015 ('071 Pat., col. 6:15-26). Indeed, the very next paragraph of the specification offers an ***alternative*** hypothesis, albeit again "without intending to be limiting": "***quantum theory*** at the atomic level" (about as meaningful a disclosure as "physics and stuff"). Appx00015 ('071 Pat., col. 6:27-33). Moreover, nCAP undermines its own argument by also stating in its brief that capacitance "could at least ***partially*** explain" how the material works. Doc. 129 at 5 (emphasis added).

Worse, the specification never explains what amount of capacitance would possibly be required to practice the claims, or how to know whether any given two particles out of the potentially billions of particles (which the specification asserts could be of ***any*** shape, ***any*** size, and ***any*** conductive material, situated in ***any*** binder) possess the requisite capacitance. As Dr. van der Weide explained in conjunction with Apple's Opening brief, "capacitive and inductive

coupling can occur at *infinite variety of distances* and strengths depending on numerous factors, and that description [in the specification] provides no guidance as to what distance between the particles is required or what degree of capacitive or inductive coupling is necessary to practice the invention." A10 (VDW Decl.) ¶ 27 (emphasis added). Even Mr. Hernandez, a named inventor, testifying with the patent-in-suit in front of him, could not say what capacitance would be required to show that conductive particles are "adjacent, but not touching," as required by its claims. *See* Ex. 1 at 106 ("Q: You don't know how much capacitance it would have to have to be close enough that it would be adjacent to, but not touching, one another? A: Correct."), 102-114, 237.[6]

2. **The Specification Fails To Provide Meaningful Guidance Regarding "Adjacent," Let Alone Provide The "Objective Boundaries" Required By Federal Circuit Law.**

The specification fails to provide any objective boundaries that would guide a skilled artisan to reasonably ascertain whether any two particles would qualify as adjacent (a term of degree) within the scope of the claims. *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371–74 (Fed. Cir. 2014) (when a specification fails to provide "objective boundaries" for terms of degree, those terms will render a claim indefinite). Disclosure that the material can "efficiently propagate" radiation and should include an "effective amount" of particles (*see* Appx00015, at col. 6:5-14, 6:20-26) does not set objective boundaries. As one of the named inventors confirmed, the specification never explains what qualifies as "efficient" propagation, what formula will yield an

---

[6] Indeed, nCAP has argued that distances of "less than a micron" and 1.5 millimeters (a *1,500* fold increase over a micron) both allow for capacitance. *See* Ex. 6 (nCAP's response to Apple's Interrogatory 24) at 7 (asserting that distances between particles in an alleged embodiment were "less than a micron"); Ex. 7 (nCAP's June 14, 2018 Inf. Contentions, Ex. A (iPhones)) at p. 328 (showing 1.5mm in an illustration of capacitance).

"effective amount" of particles, or the metric by which either is measured.  *See* Ex. 1 (Hernandez Tr.) at 116.

Indeed, whether a material or an antenna is efficient will depend upon the purpose and environment (*i.e.*, variable external factors) in which it is used.  *See id*. at 59-60 ("the environment" and "lots of factors" affect whether an antenna is efficient), 116-121, 127-28.  But whether a material falls within the scope of the claims cannot turn upon the purpose and environment in which the material is used.  *See Halliburton Energy Svcs, Inc. v. M-I LLC*, 514 F.3d 1244, 1254–55 (Fed. Cir. 2008) ("[A] construction that results in an artisan not knowing . . . whether a particular composition standing alone is within the claim scope or not [is] the epitome of indefiniteness.") (quotation omitted).  Moreover, courts have held variations of the term "effective amount" to be indefinite.  *See, e.g., Andrulis Pharm Corp. v. Celgene Corp.*, No. CV 13-1644, 2015 WL 3978578, *3–4 (D. Del. June 26, 2015).  And if the requisite proximity of the particles were "relative and variable," as nCAP contends, skilled artisans would be required to "make a separate infringement determination for every set of circumstances" in which two particles (among billions) appeared, which supports indefiniteness.  *See Halliburton*, 514 F.3d at 1255–56 (finding "fragile gel" indefinite).

nCAP also argues that the statement from the specification that "it has been observed that a conductive particle based material has a resistance of about 3-17 ohms" is sufficient to "outline[] parameters of the material" and allow skilled artisans to determine whether particles are "adjacent."  Doc. 129 at 16 (citing Appx00015 at 5:63-65, 6:5-8).  But that observation was explicitly made "without intending to be limiting."  *See Interval Licensing*, 766 F.3d at 1372–1374 (rejecting use of a single example taken from "a lengthy written description to serve as the

14

exclusive definition of a facially subjective claim term"). Moreover, one of the named inventors, Mr. Hernandez, testified that he did not believe the invention was limited to materials with a resistance of 3-17 ohms. Ex. 1 at 89-99, 287.

The specification creates further uncertainty by stating that "the resistance of the conductive particle based material continuously changes over time." Appx00015 ('071 Pat, col. 6:37-39). If resistance changes over time—and the relevant level of resistance varies by material—then an artisan's infringement determination using nCAP's proposed construction is "likely to result in differing outcomes (sometimes infringing and sometimes not)" and is therefore "likely to be indefinite." *Halliburton*, 514 F.3d at 1254; *Icon Health & Fitness, Inc. v. Polar Electro Oy*, 656 F. App'x 1008, 1016 (Fed. Cir. 2016) (affirming indefiniteness finding where claim terms were a "moving target that may change over time").

### 3. "Adjacent" In The Context Of Electromagnetic Properties Of Conductive Particles Does Not Have A "Common" Meaning "Easily Understood By A Lay Jury," Is Subjective, And The Cases Cited By nCAP Fail To Support nCAP's Argument.

"Adjacent" has no established meaning in the antenna arts, and would not provide any reasonable certainty to skilled artisans absent significant guidance regarding applicable distances relevant to the specific invention in which that term is used, as explained by both Apple's expert and numerous courts. *See* Doc. 133 at 16-22. Plaintiff nCAP offers no proof that "adjacent" is "easily understood by a lay jury" in the context of how to arrange microscopic condutive particles of any shape, size, and material to create allegedly novel effects on the highly complicated electromagnetic behavior of antennas. Indeed, the specification hypothesizes that "quantum theory" may explain how the particles interact, and nCAP does not argue that "adjacent" as it relates to quantum effects to practice the claims is a familiar concept to a jury (or anyone).

Indeed, nCAP's own arguments in this case illustrate just how subjective the term "adjacent" is in the absence of specific objective boundaries.



| '071 Pat. Fig 1, which nCAP contends shows particles "adjacent" to one another | Prior art, which nCAP contends fails to show particles "adjacent" to one another. |
|---|---|
| Appx00003. | Ex. 2 (nCAP Resp. to Apple's Rog. 11), at 43. |

The image on the left is from Figure 1 of the '071 Patent, which nCAP claims is an embodiment of the claims and therefore has particles "adjacent" to each other. The image on the right is of a particle based material disclosed in a prior art reference ("Aisenbrey"). When Apple asked nCAP about the Aisenbrey prior art through an interrogatory, nCAP did not dispute that Aisenbrey disclosed conductive particles dispersed in a binder—for example, nCAP stated that the disclosed material was a "resin" that was "load[ed] . . . with so much conductive material"—but nCAP argued that the limitation regarding "adjacent" still was not met:

Apple failed to show that Aisenbrey teaches or discloses either an antenna element or an antenna enhancer "formed of a conductive particle based material comprising conductive particles dispersed in a binder so that at least a majority of the conductive particles are adjacent to, but do not touch, one another." See Aisenbrey, [0034]. Apple further does not show that the alleged material disclosed by Aisenbrey is either an antenna element or an antenna enhancer.

Ex. 2 (nCAP Resp. to Apple's Rog. 11), at 43, (emphasis added). Those are precisely the games—which stem from lack of sufficient notice of claim scope to the public—that the definiteness requirement seeks to prevent. *See In re Walter*, 698 F. App'x 1022, 1026 (Fed. Cir. 2017).

Furthermore, this is not the type of determination that is within the experience of a lay jury. Mr. Hernandez confirmed that "adjacent to" does not have the same meaning when used with particles that are nanometers in scale as when used with human beings. *See* Ex. 1 at 256-57. Moreover, even Mr. Hernandez, who has almost two decades of experience in the field, was not able to answer the question of "how far apart [the conductive particles can] be and still fall within the scope of [his] invention." *Id.* at 102-03. Even when given examples of particle size and material, Mr. Hernandez was unable to determine whether they would fall within the scope of his invention. *See id.* at 102-114. If the inventor cannot explain how far apart particles can be and still be adjacent, the term cannot simply be left to a lay jury to interpret. *See, e.g.*, *O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("[Where] the 'ordinary' meaning of a term does not resolve the parties' dispute, . . . claim construction requires the court to determine what claim scope is appropriate in the context of the patents-in-suit.").

The Apple engineers that nCAP deposed confirmed the subjectivity and ambiguity of "adjacent." Specifically, they confirmed that the concept of adjacency refers generally to distance between objects, and thus is "very vague," "very relative" and requires a "personal assessment" absent additional context. *See, e.g.*, Ex. 3 (Choiniere Tr.) at 75, 76, 80-81, 27; Ex. 4 (Nath Tr.) at 159. As one witness put it, although distances can be measured, "you would need to describe the distance between particles [with] more than just a word like 'adjacent' or 'nearby'" to provide

reasonable certainty as to the distances that qualified as adjacent. Ex. 3 (Choiniere Tr.) at 76:7-19.

Finally, the cases that nCAP cites are inapposite because they relate to proximity between objects at distances observable to the naked eye—and thus to distances which lay juries can relate—and involved situations in which the role of adjacency would have been readily perceived and understood, unlike the subject matter of the patent-in-suit. *See Biosig*, 783 F.3d at 1382 ("[T]he degree of precision necessary for adequate claims is a function of the nature of the subject matter."). Mr. Hernandez, in fact, agreed that "adjacent" in the context of nanoparticles was different than in the context of objects visible with the naked eye. *See* Ex. 1 at 256-57.

For example, in *Young v. Lumenis*, the term "near the edge of the ungual crest" was not indefinite in the context of where to make an incision to de-claw a cat. 492 F.3d 1336, 1346–47 (Fed. Cir. 2007). In *Chemical Separation Technology v. United States*, the phrase in question was "said influent pipe is disposed closely adjacent to the discharge end of said aeration shaft"; "adjacent" described the distance between a pipe and a shaft, and the specification instructed that materials flowing through the different pipes/shafts needed to arrive at "the same point." 51 Fed. Cl. 771, 788 (Fed. Cl. 2002).

In *Accentra, Inc. v. Staples*, the relevant phrase was "a pressing area near a front end of the handle"; the patent claimed the design of a desktop stapler and the word "near" described the location on the stapler where the user should press. 500 F. App'x 922, 930–31 (Fed. Cir. 2013). In *Biosig Instruments, Inc. v. Nautilus, Inc.*, the term at issue was "spaced relationship" between two electrodes that were restricted to being placed on the same hand of a person, and the court

found that term not indefinite because the "objective boundaries" were "neither infinitesimally small nor greater than the width of a user's hands." 783 F.3d at 1382–84.

In *Free Motion Fitness, Inc. v. Cybex International, Inc.*, the issue was whether the district court reached the correct construction of "adjacent" in the context of two components in an exercise machine. 423 F.3d 1343, 1348–49 (Fed. Cir. 2005). The court did not analyze whether "adjacent" was indefinite. In *ADC Telecommunications, Inc. v. Switchcraft, Inc.*, the court found "adjacent" not indefinite in the context of an "switching jack" where it pertained to the distance between a physical component "projecting from said side walls adjacent to said moveable portions." No. Civ. 04-1590, 2005 WL 2206115, *11 (D. Minn. Sept. 9, 2005). Exact distances between such projections and moveable portions were not discussed as critical in any way to the invention. In *Exmark Manufacturing v. Briggs & Stratton Power Products Group*, the court found that "adjacent" in the context of distance between a "side wall" and a "flow control baffle" in a lawnmower was not indefinite in light of the well-understood fact that the baffle would have to be close enough to the side wall to control the flow of air and grass clippings. No. 8:10-cv-187, 2015 WL 12697086, *11 (D. Neb. July 28, 2015), *aff'd, vacated in part*, 879 F.3d 1332 (Fed. Cir. 2018). All of those cases involved interpreting adjacency in a physical context that itself identified and limited the distance that could be involved.

On the other hand, where a patent relates to highly technical, microscopic materials—as is the case here—courts frequently find indefinite terms of degree or measure. *See In re Neurografix ('360) Patent Litig.*, 201 F. Supp. 3d 206, 223 (D. Mass. Aug. 19, 2016) (finding the term "near" indefinite in the context of a technique for magnetic resonance imaging of nerves where the patent did not explain what distance was required to "achieve the stated goals of the invention"); *Teva*

19

*Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F. 3d 1335, 1345 (Fed. Cir. 2015) (finding indefinite the term "molecular weight"); *Otsuka Pharm. Co. v. Torrent Pharm. Ltd, Inc.*, 151 F. Supp. 3d 525, 543–549 (D.N.J. Nov. 16, 2015) (finding indefinite the term "mean particle size"); *Amgen Inc. v. Chugai Pharm. Co., Ltd.*, 927 F.2d 1200, 1218 (Fed Cir. 1991) (in a patent related to purifying proteins, finding indefinite the term "specific activity of at least about 160,0000 IU per absorbance unit" because one of skill would not know "***what specific activity values below 160,000, if any,*** might constitute infringement."); Doc. 133 at 17, 20-21.[7]

Notably, many cases on which nCAP relies—*Orthokinetics*, *Chemical Separation*, *Young*, *Accentra*—cannot support finding nCAP's claims indefinite because they were decided under the more stringent "insolubly ambiguous" standard rather than the controlling "reasonable certainty" standard set out by the Supreme Court through *Nautilus* in 2014.  The Federal Circuit has made clear that the pre-*Nautilus* standard set a higher bar for finding terms indefinite.  *See Koninklijke Philips N.V. v. Zoll Med. Corp.*, 656 F. App'x 504, 527 (Fed. Cir. 2016) ("[T]he 'insolubly ambiguous' standard is a harder threshold to meet than the post-*Nautilus* standard.").  Unsurprisingly, nCAP does not credit *Nautilus*'s emphasis on the perspective of one of skill in the art and fails to provide even a single definition or a reasonable interpretation for "adjacent."

### D.    Claims 12-15:  The Terms "antenna enhancer" And "antenna enhancer element" Are Indefinite.

The terms "antenna enhancer" and "antenna enhancer element" are indefinite, both as to

---

[7] nCAP relies also on *ART+COM Innovationpool GmbH v. Google*, No. 14-217, 2015 WL 3979576 (D. Del. June 26, 2015), where the term in question was "thematically adjacent data." The issue there was not whether the proximal relationship between objects was unclear, but whether a person of skill in the art would understand to which "data" the term referred, *i.e.*, where the data was located in a database.  Because the specification explained the way to ascertain the location of the "thematically adjacent data," the court found the term not indefinite.

the *type* of enhancement (what measure), and the degree of enhancement (how much).  nCAP's brief addresses only the degree of enhancement and fails to identify sufficient guidance from the patent to provide reasonable certainty in that regard.  But as explained in Apple's Opening Brief, the '071 Patent claims, specification, and prosecution history also fail to inform a person of ordinary skill in the art what *type* of "enhancement" the claims encompass.  A11-A13 (VDW Decl.) ¶¶ 33-40.  Although nCAP asserts that certain examples of enhancement are disclosed in the specification, examples alone are insufficient to provide reasonable certainty as to what else falls within the scope of "antenna enhancer" and "antenna enhancer element."  *See, e.g.*, *Interval Licensing LLC*, 766 F.3d at 1371–74.  Nor does nCAP contend that "antenna enhancer" has an established meaning in the relevant art.  That ambiguity and lack of objective boundaries on the "antenna enhancer" terms render them indefinite.  *See* Doc. 133 at 24–25 (citing cases).

In contrast to nCAP's unsupported contention that lay persons and persons of ordinary skill would know what "antenna enhancer" means (Doc. 129 at 1), both Apple's expert and Apple's engineers agree that the term is "very vague" and requires context that is lacking in the '071 Patent and the art.  *See* A11-A12 (VDW Decl.) ¶¶ 34-35; Ex. 5 (Gomez Tr.) at 18, 81, 124, 140-41; Ex. 4 (Nath Tr.) at 159-60.  Mr. Hernandez, a named inventor of the patent-in-suit, also testified in detail how the concepts of "optimizing an antenna" and "antenna efficiency" were context-specific, depending on the use of the antenna. Ex. 1 at 54-61, 134-135.  Because the '071 Patent, the prosecution history, and the art fail to put a person of ordinary skill on notice as to the scope of "antenna enhancer"—either as to the *degree* or *type* of enhancement—the "antenna enhancer" terms are indefinite.

1.    **Nothing In The Intrinsic Record Or The Art Provides Sufficient Guidance Regarding The Types And Degree Of "Enhancement" Covered By The Claims.**

Nothing in the claims, specification, file history, or the art provides reasonable certainty as to whether any given object qualifies as an "antenna enhancer" or "antenna enhancer element." As an initial matter, nCAP does not point to anything in the claims, file history, or the art as providing specific guidance. Nor does nCAP present any proof as to what a skilled artisan would understand to be the boundaries of "enhance." And the few portions of the specification on which nCAP relies provide at most a couple of examples of alleged enhancement of a particular characteristic. *See* Doc. 129 at 17. But a mere couple of examples provides no objective boundaries that would save the claim terms from indefiniteness given that, as Dr. van der Weide explained and as confirmed by Apple's engineers and an inventor of the patent-in-suit, "[w]hat it means to 'enhance' an antenna could have virtually infinite potential meanings to one of skill in the art unless defined by the inventor[;] it is a subjective term." A12 (VDW Decl.) ¶ 35.

Antennas have a multitude of characteristics including gain, terminal impedance, bandwidth, efficiency, directivity, polarization, sidelobe level, size, shape, temperature, sensitivity, minimum power, reliability, and total radiated power. *See* A12-A13 (VDW Decl.) ¶¶ 35, 38; Ex. 5 (Gomez Tr.) at 140-41; Ex. 1 (Hernandez Tr.) at 132-34. The '071 Patent, the specification, and the prosecution history fail to specify which of those characteristics, or many others, relate to the claimed "enhancers." As Apple's engineers explained in deposition, and named inventor Eric Hernandez agreed, designing antennas entails tradeoffs between various characteristics "depending on what you are trying to do"—*e.g.*, improving efficiency at the expense of bandwidth might be "enhancement" in one engineer's opinion, but not in the opinion

of other engineers—and "enhancing an antenna" is ambiguous unless limited to *a specific characteristic*, such as efficiency. *See* Ex. 5 (Gomez Tr.) at 19-23; Ex. 4 (Nath Tr.) at 159-160; Ex. 1 (Hernandez Tr.) at 58-65, 127 (opining that improved range coupled with increased power usage is not enhanced efficiency). Mr. Hernandez confirmed that "what is optimal or better for one antenna may not be better for another antenna." Ex. 1 at 134-35, 275-76. Nothing in the '071 Patent, however, identifies any specific characteristic to be "enhanced," thus the claims are left open to subjective assessments—and potentially infinite variable external factors—as to whether an object is an "enhancer" as required by the claims.

The Federal Circuit recently concluded that similar claim language requiring that one "*optimize* end user application IP QoS [quality of service] requirements," was indefinite. *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, No. 2017-2434, 2018 WL 4201163, *6-7 (Fed. Cir. Sept. 4, 2018). The court noted that "[quality of service] requirements" vary, with some applications "demanding . . . error minimization, and others prioritizing speed." *Id*. at *1. The court concluded that "[quality of service] requirements" were "entirely subjective and user-defined . . . [based on] what network performance characteristic is most important to a particular user." *Id*. at *6. "[M]erely understanding that optimizing [quality of service] relates to the end-user experience fail[ed] to provide one of ordinary skill in the art with any way to determine whether QoS ha[d] been 'optimized.'" *Id*. (citation removed). Likewise, what skilled artisans would consider to be an "enhanced" antenna varies to one of skill in the art—for example, each engineer would have a personal opinion about whether a design that improves one characteristic (such as efficiency) at the expense of others (such as bandwith, sensitivity, or total radiated power) qualifies as an enhancement—and is therefore entirely subjective. A12-A13 (VDW Decl.) ¶¶ 35, 38.

nCAP claims that the specification "provides specific examples of antenna enhancers" and "testing data explaining *some* ways to measure enhancement"—citing five columns of the specification.  Doc. 129 at 17 (emphasis added).  At best, that portion of the specification—which pertains to comparing a modified antenna to a "conventional" antenna—provides a single example of a *specific characteristic* ("relative signal strength") of antenna performance that could be improved (Fig. 6, which is explicitly described as "*not intended to be limiting*").  *See* Appx00019 (cols. 13:39-14:39) (emphasis added).  But the relevant issue is not whether skilled artisans could comprehend *some examples* of specific features of antennas that could be the subject of improvement.  The relevant issue is whether skilled artsians would understand the *objective boundaries* of the term "enhance" as used in the claims.  Dr. van der Weide even stated that those testing results described in the specification do "not provide objective boundaries, or a standard, by which enhancement of an antenna should be recognized or measured within the scope of the claimed invention."  A12 (VDW Decl.) ¶ 37.  The remaining five columns of the specification identified by nCAP provide no "examples"; they merely parrot the vague language of the claims.

In fact, nCAP has exploited the ambiguous nature of the "antenna enhancer element" in its infringement contentions and in responding to Apple's interrogatory regarding invalidity.  As explained in detail in Apple's pending Motion for Summary Judgment, nCAP argues for infringement that the "antenna enhancer element" covers uses of an entirely conventional material (conductive adhesive tape) for an entirely conventional purpose (grounding).  *See* Doc. 136.  On the other hand, nCAP asserts that prior art disclosing conductive particle based material used for the following (*in nCAP's own words*) does *not* qualify as the type of "enhancer" covered by the claims: an "insulator" that "*improve[es] the antenna radiation efficiency*" (Ex. 2 (nCAP's

Response to Apple Rog. 11), at 42) (emphasis added), "EMI absorbtion" (*id.* at 43), "**grounding**" (*id.* at 45), and "electromagnetic interference shielding" (*id.* at 47).

### 2. The Cases Cited By nCAP Support Apple's Position Because They All Included Terms Directed To A Specific Characteristic.

nCAP relies on cases involving patent claims that denoted specific characteristics as the object of the "enhancement," which contrast with nCAP's claims and actually support a finding that nCAP's claims are indefinite. *See Invitrogen v. Biocrest Mfg.*, 424 F.3d 1374, 1383–84 (Fed. Cir. 2005) ("improved **competence**," a specific characteristic of *E. coli.* cells); *Allergan v. Teva Pharm. USA, Inc.*, No. 2:15-cv-1455, 2016 WL 7210837, *9–11 (E.D. Tex. Dec. 13, 2016) ("enhancing **lacrimal gland tearing**" to alleviate "dry eye"); *Magna Elecs. v. TRW Auto. Holding*, Nos. 1:12-cv-654, 1:13-cv-324, 2015 WL 11401855, *10–11 (W.D. Mich. Apr. 28, 2015) ("**[i]dentification of objects of interest** is enhanced by comparing over successive frames image data associated with objects in said forward field of view," which included not only the specific characteristic to be improved, but also the specific steps to follow); *Alberta Telecomms. Research Ctr. v. AT&T Corp.*, No. 09-3883, 2012 WL 3990540, *4–6 (D.N.J. Sept. 10, 2012) ("optimize **demand**"); *Exxon Research v. Eng'g Co.*, 265 F.3d 1371, 1377 (Fed. Cir. 2001) (finding "increase substantially" not indefinite where the parties agreed on a specific mathematical floor (30%) and the specification provided the method for calculating the percent increase).

## IV.    CONCLUSION

For the foregoing reasons, the Court should adopt the parties' agreed constructions and Apple's proposed construction, and find indefinite the terms "conductive particles dispersed in a binder so that at least a majority of the conductive particles are adjacent to, but do not touch, one another," "antenna enhancer," and "antenna enhancer element."

Dated: September 26, 2018                              Respectfully submitted,

                                                      HATCH, JAMES & DODGE, P.C.

OF COUNSEL:                              By:    */s/ Brent O. Hatch*
                                                Brent O. Hatch
DESMARAIS LLP                                   Lara A. Swensen
John M. Desmarais
Michael P. Stadnick
Ameet A. Modi
Peter C. Magic
Jeffrey S. Seddon                               *Attorneys for Defendant Apple Inc.*
William D. Findlay
Wesley L. White
Priyanka R. Dev

26