Brent O. Hatch (5715)
hatch@hatchpc.com
HATCH LAW GROUP, P.C.
22 East 100 South
Salt Lake City, UT 84111
(801) 869-1919

John M. Desmarais (*admitted pro hac vice*)
jdesmarais@desmaraisllp.com
Jeffrey S. Seddon, II (*admitted pro hac vice*)
jseddon@desmaraisllp.com
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone: (212) 351-3400

Peter C. Magic (*admitted pro hac vice*)
pmagic@desmaraisllp.com
DESMARAIS LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 573-1900

*Attorneys for Defendant Apple Inc.*
*[Additional Counsel Listed in Signature Block]*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| nCAP LICENSING, LLC, nCAP TELECOMMUNICATIONS LLC, nCAP MEDICAL, LLC, <br><br>         Plaintiffs, <br><br>         v. <br><br> APPLE INC., <br><br>         Defendant. | **DEFENDANT APPLE INC.'S MOTION TO EXCLUDE CERTAIN OPINIONS OF MR. ROY WEINSTEIN** <br><br> **REDACTED VERSION** <br><br> Case No.: 2:17-cv-00905 <br><br> Judge: Howard C. Nielson, Jr. <br><br> Magistrate Judge: Cecilia Romero |

## <u>TABLE OF CONTENTS</u>

<u>Pages</u>

INTRODUCTION AND RELIEF SOUGHT ..............................................................................1

BACKGROUND ...........................................................................................................................3

I.      Mr. Weinstein Relied on Dr. Long's "Battery Test." .........................................................4

II.     Mr. Weinstein's Profit Splits. .............................................................................................5

III.    Mr. Weinstein's Regression Analysis. ................................................................................6

LEGAL STANDARD ....................................................................................................................8

ARGUMENT .................................................................................................................................8

I.      Both of Mr. Weinstein's Damages Opinions Are Inadmissible Because Dr. Long
        Never Established His Battery Test Compared Infringing Devices to Non-
        infringing Devices, Which is Required in Order for Mr. Weinstein to Attribute the
        Difference in Performance to the Patents-in-Suit For Valuing Damages. ...........................8

II.     Mr. Weinstein's Damages Theories Are Unreliable Because Both Theories
        Assume Incorrectly That Dr. Long's Battery Test is Directed to the Value of an
        Overall Improvement in Power Usage, not Merely Usage When Making Phone
        Calls. ..................................................................................................................................11

III.    Mr. Weinstein's Profit Splits Are Not Sufficiently Tied to the Facts of the Case. ...........14

        A.      Mr. Weinstein's Invocation of a 50/50 Split in His Regression Method Is
                Based Solely on an Agreement That He Admits Is Not Relevant. ........................15

        B.      Mr. Weinstein's Invocation of a 100/0 "Split" in His Battery Capacity
                Method Is Based on No Facts, Data, or Logic. ....................................................18

IV.     Mr. Weinstein's Regression Method Is Unreliable Because His Model Included a
        Battery Capacity Variable While Excluding the Highly Correlated Screen Size
        Variable, Thereby Artificially Capturing the Value of Both Features in the Battery
        Capacity Variable. ............................................................................................................19

CONCLUSION ............................................................................................................................23

# <u>TABLE OF AUTHORITIES</u>

<u>Pages</u>

## <u>CASES</u>

*Apple Inc. v. Wi-LAN, Inc.*,
No. 2020-2011, 2022 WL 333666 (Fed. Cir. Feb. 4, 2022) ............................................. 10

*Apple, Inc. v. Samsung Elecs. Co.*,
No. 12-CV-00630-LHK, 2014 WL 794328 (N.D. Cal. Feb. 25, 2014) ............................ 18

*Biscotti Inc. v. Microsoft Corp.*,
No. 2:13-CV-01015-JRG-RSP, 2017 WL 2536962 (E.D. Tex. May 18, 2017) ............... 17

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ........................................................................................... 20, 23

*Conroy v. Vilsack*,
707 F.3d 1163 (10th Cir. 2013) ....................................................................................... 8

*Contour Ip Holding, LLC*,
No. 3:17-CV-04738-WHO, 2021 WL 75666 (N.D. Cal. Jan. 8, 2021) ........................... 16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ......................................................................................................... 8

*Graves v. Mazda Motor Corp.*,
405 F. App'x 296 (10th Cir. 2010) ................................................................................. 14

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ............................................................................................ 8

*North v. Ford Motor Co.*,
505 F. Supp. 2d 1113 (D. Utah 2007) ............................................................................ 13

*Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*,
49 F. Supp. 3d 385 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016) ............ 20, 22

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) ........................................................................................ 10

*Sprint Commc'ns Co. L.P. v. Comcast IP Holdings, LLC*,
No. CV 12-1013-RGA, 2015 WL 410342 (D. Del. Jan. 29, 2015) ................................. 14

*Syngenta Crop Prot., LLC v. Willowood Azoxystrobin*, *LLC*,
267 F. Supp. 3d 649 (M.D.N.C. 2017) ........................................................................... 10

*Thompson v. Kinder Morgan Altamont, LLC*,
    No. 215CV00623JNPBCW, 2018 WL 5257631 (D. Utah Oct. 22, 2018) ...................... 14

*Trugreen Companies, L.L.C. v. Scotts Lawn Serv.*,
    508 F. Supp. 2d 937 (D. Utah 2007) .............................................................................. 13

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011).................................................................................... 10

*United States v. Nacchio*,
    555 F.3d 1234 (10th Cir. 2009) .................................................................................... 13

*Vaporstream, Inc. v. Snap Inc.*,
    No. 2:17-CV-00220-MLH-KSX, 2020 WL 2543814 (C.D. Cal. Jan. 10, 2020) ............ 17

*Virnetx, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)....................................................................... 2, 8, 15, 16

## <u>RULES</u>

Fed. R. Evid. 702 .................................................................................................... passim

## <u>INTRODUCTION AND RELIEF SOUGHT</u>

Mr. Roy Weinstein's opinion that Apple owes nCap $179 million—or alternatively under a second theory, $67 million—for infringing two patents about antennas rests on four critical flaws that violate Federal Rule of Evidence 702 and render his opinions inadmissible.

The first two flaws arise from Mr. Weinstein's reliance on the work of nCap's technical expert, Dr. Stuart Long.  Dr. Long conducted a "battery test" in which he measured how much power it took to recharge two types of devices after a phone call.  The first type was accused iPhones that were unmodified (and thus contained the accused electrically conductive adhesive ▮▮▮▮).  The second type was the same model iPhone as accused, but where someone had tampered with the device by prying it apart, extracting the ▮▮▮▮, replacing it with silver particle epoxy called Electro-Bond 80, and then reassembling the device.  Mr. Weinstein relies on Dr. Long's conclusion that because the unmodified devices took less power to recharge (on average, around 10% less), the unmodified devices infringe.[1]  Mr. Weinstein then assumes as a starting point for his damages analysis that devices that use the invention enjoy an overall power efficiency improvement of 10% compared to devices tampered with to use Electro-Bond 80, and that this translates to a dollar value assignable to the invention.

The first major flaw of Mr. Weinstein's reasoning is that Dr. Long never established that Electro-Bond 80 does not also practice the asserted claims—without that fact, Mr. Weinstein has no logical way to assign the ***difference*** in power consumption as the value of the patented technology.  The second major flaw is that the battery test focused solely on power usage when

---

[1]  Apple moved to exclude Dr. Long's opinions regarding his battery test in a separate motion filed concurrently.

making **phone calls**, not **overall** power usage—battery power consumption is indisputably a product of many uses of a device other than phone calls. But Mr. Weinstein's damages calculation is directed to what value an **overall** improvement in battery capacity is worth to Apple's customers—something the underlying test could not, and did not, demonstrate. Each of those two flaws creates an analytical gap in Mr. Weinstein's analysis that renders his analysis unreliable, and therefore inadmissible.

Beyond his reliance on the battery test, two other flaws infect Mr. Weinstein's analysis. The third flaw arises in Mr. Weinstein's profit splits that are not sufficiently tied to the facts of the case. Mr. Weinstein offers two alternative theories: one uses a 50/50 profit split between the parties, the other uses a 100/0 split in favor of nCap. Mr. Weinstein testified at his deposition that the 50/50 split is based on an agreement nCap entered into with a third party. However, that explanation is contrary to Mr. Weinstein's own report, which states: "I have determined that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **would not be relevant to** the royalty that would emerge from the hypothetical negotiation." Ex. AK, Weinstein Rpt. at ¶ 133 n.179 (Appx3840) (emphasis added). As for the 100/0 split, it is not only nonsensical, but is offered in Mr. Weinstein's report with **no explanation** how he came up with it or **why** the parties would agree to it. Mr. Weinstein's failure to establish that his profit splits fit the facts of the case renders his profit split opinions inadmissible. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332 (Fed. Cir. 2014) ("Anyone seeking to invoke the [Nash Bargaining 50/50 split] theorem as applicable to a particular situation must establish that fit, because the 50/50 profit-split result is proven by the theorem only on those premises. Weinstein did not do so. This was an essential failing in invoking the Solution.").

The fourth and final flaw lies in Mr. Weinstein's regression analysis, which is a type of analysis in which one chooses variables that are supposed to represent features of a product, and puts them in a model that computes how much the feature influences the price. Mr. Weinstein used a regression to conclude that "a 10.3 percent improvement in battery efficiency on average . . . enabled Apple to obtain an additional $15 in revenue on each accused smartphone." Ex. AK, Weinstein Rpt. at ¶ 112 (Appx3834). The danger with such a model is that if two features are highly correlated—such as larger screen size correlating with larger batteries in the iPhones—and one chooses to include only one of those features in the model, that feature will incorrectly appear more valuable than it truly is because it will capture the value of any omitted correlated variables. Mr. Weinstein testified it is "fundamental" that you should not leave out highly correlated variables. But he did just that: he chose to leave out screen size, but include battery capacity, even though he agrees they are highly correlated. The result is that his model is highly misleading and unreliable in the value it assigns to battery capacity. This unreliability renders his opinion based on the regression inadmissible.

## BACKGROUND

Mr. Weinstein quantifies the damages that Apple supposedly owes nCap using two methods. Ex. AK, Weinstein Rpt. at ¶ 138 (Appx3842). In the first, his "Regression Method," Mr. Weinstein uses a statistical method that attempts to correlate particular product features with price. For that method, he relies on Dr. Long's "battery test" in order to calculate per-unit royalty rates of $0.64 to $3.57 for each of the accused iPhones. *Id.* at ¶ 139 (Appx3842). To arrive at the Regression Method royalty rates, Mr. Weinstein assigned—based on Dr. Long's battery testing—

incremental profits of $1.27 to $7.13 for each of the various accused iPhones to the Patents-in-Suit, and split those profits 50/50 between Apple and nCap. *Id.*, at ¶ 138 (Appx3842).

      In the second method, the "Battery Capacity Method," Mr. Weinstein relies on the same battery test performed by Dr. Long to calculate per-unit royalty rates of $0.26 to $1.54 for each of the accused iPhones—which, although based on identical data as in the Regression Method, is less than one quarter the royalty rate found with his Regression Method. *Id.* To arrive at the Battery Capacity Method royalty rate, Mr. Weinstein calculated increased costs to Apple of $0.26 to $1.54 for each of the accused products without the accused technology, and performed a 100 percent "split" of those profits in nCap's favor. *Id.*

## I.    Mr. Weinstein Relied on Dr. Long's "Battery Test."

      At the heart of both Mr. Weinstein's Regression Method and Battery Capacity Method are Dr. Long's battery tests. Ex. AK, Weinstein Rpt. at ¶ 99 (Appx3828). Dr. Long's battery testing compared the watt hours required to recharge batteries in the accused iPhones after a single hours-long phone call when a grounding component in those devices—a conductive adhesive tape called ▮▮▮▮▮—was replaced with a silver particle filled epoxy called "Electro-Bond 80." *Id.*. Dr. Long used the following procedure:

> 117.    A call was then placed from one model of an accused device (e.g., iPhone 7) to the same model of an accused device (e.g., iPhone 7) with Electro-Bond 80 in place of ▮▮▮▮▮ After a period of several hours, the call was disconnected. The calling phone was then switched with the receiving phone, i.e., the Electro-Bond 80 phone would place a call to the ▮▮▮phone of the same model. This process was continued until the phone's battery was reduced to below 50%. These phones were then recharged while measuring the cumulative amount of Watt hours, which was drawn by each before it reached a "full" charge.

Ex. D, Long Opening Rpt. at ¶ 117 (Appx1182). Dr. Long performed this test with the stated goal of "evaluate[ing] the battery impact of replacing ███████ in the accused devices with Electro-Bond 80." *Id.*, ¶ 116 (Appx1181-82). Dr. Long's analysis did not address the battery impact of replacing ███████ with Electro-Bond 80 in the context of typical smartphone usage (*e.g.*, web browsing over Wi-Fi, playing videos, photography, playing music). *See id.* at ¶ 117 (Appx1182).

Mr. Weinstein interpreted Dr. Long's results as demonstrating "an ***overall improvement*** in power consumption" for the accused iPhones, Ex. AL, Weinstein Tr. at 61:5-12 (Appx3875), and he proceeded to determine the dollar value of an overall improvement of approximately 10% in battery capacity as the value of the Patents-in-Suit. Mr. Weinstein also fails to explain why a device tampered with to use Electro-Bond 80 is a relevant baseline for comparison.

## II. Mr. Weinstein's Profit Splits.

In his Regression Method, Mr. Weinstein opines that "Apple received $1.27 to $7.13 per accused product in incremental profit attributable to the Patents-in-Suit" and applies "a 50 percent split to the incremental profit Apple received from use of the Patents-in-Suit" to determine a reasonable royalty rate of $0.64 to $3.57 per accused product. Ex. AK, Weinstein Rpt. at ¶ 135 (Appx3841). The sole basis for Mr. Weinstein's application of a 50 percent split of incremental benefits between nCap and Apple in the hypothetical negotiation is an ████████████

████████████████████████████████████████

████████████████████████████████████████

████████." *Id.*[2] Mr. Weinstein offers no opinion why that agreement would be relevant to what

---

[2] ████████████████████████████████████████
███████t. Ex. AM, Favarolo Tr. at 62:24-63:2 (Appx3975), 119:13-17 (Appx3989).

Apple would agree to in a hypothetical negotiation, and in fact, he states earlier in his report that "I have determined that ██████████████████ **would not be relevant to** the royalty that would emerge from the hypothetical negotiation." Ex. AK, Weinstein Rpt. at ¶ 133 n.179 (Appx3840).

In his Battery Capacity Method, Mr. Weinstein opines that "[a]pplying the cost per mAh to the additional capacity required for each accused product results in an increase in cost of $.26 to $1.54 per accused product for Apple." *Id.* at ¶ 135 (Appx3841). Unlike in his Regression Method, Mr. Weinstein does not split profits between Apple and nCap. Rather, Mr. Weinstein claims that Apple would agree to forego the entirety (100%) of purported cost savings in a hypothetical negotiation with nCap. *Id.* at ¶ 143 (Appx3844). Mr. Weinstein does offer any opinions as to why Apple would agree to forego 100% of the purported benefits.

**III.    Mr. Weinstein's Regression Analysis.**

Mr. Weinstein's Regression Method uses a technique called hedonic regression to attempt to isolate the price effect of a change in battery capacity. Ex. AK, Weinstein Rpt. at ¶ 134 (Appx3840). Specifically, Mr. Weinstein selected eight independent variables[3] and one dependent variable,[4] and endeavored to model the effect of a one percent improvement in various features (the independent variables) on the retail market price (the dependent variable) of iPhones. *Id.* at App'x ¶ 9 (Appx3853). Mr. Weinstein hand-picked the eight independent variables from a

---

[3] Mr. Weinstein selected processor speed, battery capacity, maximum download speed, launch price, primary camera density, maximum simultaneous cores, memory storage capacity, and a series of dummy variables for the monthly time trend. Ex. AK, Weinstein Rpt. at App'x ¶ 9 (Appx3853).

[4] Retail market price.

database tracking "████████████████████████," the overwhelming

majority of which were not accounted for in his analysis.  *See id.* at ¶ 109 (Appx3832-33).  Mr.

Weinstein did not explain how he selected the eight independent variables, but does opine that five

of them are "attributes consumers might consider when making a purchase decision."  *Id.* at App'x

¶ 9 (Appx3853).

As with any hedonic regression analysis, selection of the variables is the most critical factor

in the reliability of the model.  If two features of the product are highly correlated with each other,

leaving a variable representing one of those two features out of the model while including the other

will cause the model to falsely assign the value of both correlated features to the variable included

in the model.  Ex. AL, Weinstein Tr. at 134:18-135:6 (Appx3894).  At his deposition, Mr.

Weinstein explained—with respect to the battery capacity independent variable—that "the battery

capacity is highly correlated to the screen size."  *Id.* at 132:14-133:1 (Appx3893).  Notwithstanding

that high correlation, Mr. Weinstein's model omits the display size (i.e., screen size) independent

variable.  Ex. AK, Weinstein Rpt. at App'x Ex. A1 (Appx3858).

Mr. Weinstein's model returned coefficients for the various independent variables, which

purport to compute the price effect of a one percent improvement in the independent variables.  *Id.*

at App'x ¶¶ 15–20 (Appx3856).  Mr. Weinstein's model returned a coefficient for battery capacity,

which he interprets as "a one percent increase in battery capacity results in an increase in

smartphone retail prices of $1.47, all else equal."  *Id.* at App'x ¶ 16 (Appx3856).  At the same

time, the model returns other conclusions that are patently implausible.  For example, although

Mr. Weinstein claims that "consumers would be willing to pay more for desirable attributes such

as a . . . better camera" (*id.* at App'x ¶ 10 (Appx3854)), his flawed model actually predicts that

"increasing the primary camera density by one-megapixel results in a **decrease** in smartphone retail price of $19.47, all else equal." *Id.* at App'x ¶ 18 (Appx3856).  Mr. Weinstein makes no effort to explain this implausible result or why his model is reliable in the face of this result, and did not alter his independent variable selection (e.g., to consider screen size) to address it.

## LEGAL STANDARD

The law of the regional circuit applies to the admissibility of expert testimony. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 66 (Fed. Cir. 2012).  In the Tenth Circuit, "[t]he proponent of expert testimony bears the burden of showing that the testimony is admissible."  *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013).  Expert testimony is admissible only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  The Court acts as a gatekeeper to ensure that an expert's testimony rests on a reliable foundation before it is presented to the factfinder.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Before a jury may evaluate expert testimony, the Court must ensure that the methodology underlying that testimony is sound.  *Virnetx*, 767 F.3d at 1328.

## ARGUMENT

**I.     Both of Mr. Weinstein's Damages Opinions Are Inadmissible Because Dr. Long Never Established His Battery Test Compared Infringing Devices to Non-infringing Devices, Which is Required in Order for Mr. Weinstein to Attribute the Difference in Performance to the Patents-in-Suit For Valuing Damages.**

Under both his Regression Method and Battery Capacity Method, Mr. Weinstein's conclusions regarding the incremental value of the Patents-in-Suit are not based on sufficient facts

and data because the "battery test" on which both theories are founded compared devices that contained ▮▮▮▮ conductive adhesive to devices that had been tampered with to contain Electro-Bond 80 conductive epoxy without ever determining whether devices with Electro-Bond 80 are non-infringing.  There is no logical way to assign as the value of the Patents-in-Suit the difference in performance between two devices unless one has demonstrated that one device uses the patented technology and the other does not.  Since neither Mr. Weinstein nor Dr. Long established the necessary predicate—here, that the devices using Electro-Bond 80 do not practice the claims—Mr. Weinstein's conclusion is based on insufficient facts and data, rendering it inadmissible.

Mr. Weinstein—who is not a technical expert—relied on Dr. Long to conclude that Electro-Bond 80 would be an appropriate benchmark to compare the ▮▮▮▮ to.  Ex. AL, Weinstein Tr. at 252:3-9 (Appx3923).  But Dr. Long did not opine that the devices using Electro-Bond 80 do not practice the asserted claims.  Nor did he opine that the "battery test" compared infringing devices to non-infringing devices.  Although Mr. Weinstein cites Dr. Long's report for the proposition that Electro-Bond 80 is "a conductive adhesive that does not utilize the patented technology" (Ex. AK, Weinstein Rpt. at ¶ 199 (Appx3828), Dr. Long's report neither makes such a claim nor analyzes that issue.  *See* Ex. D, Long Opening Rpt. at 67–69 (Appx1180-82).

Mr. Weinstein admits that he does not rely on any analysis from Dr. Long as to whether Electro-Bond 80 when used in the accused products would meet any asserted claim.  Ex. AL, Weinstein Tr. at 250:25-251:4 (Appx3923).  In other words, Mr. Weinstein attempts to ascertain the incremental value attributable to the Patents-in-Suit by comparing products Dr. Long believes embody claims of the Patents-in-Suit (the accused iPhones with ▮▮▮▮) with products that *may or may not* embody those same claims under Dr. Long's interpretation of the claim scope.  Mr.

Weinstein never asked Dr. Long why he did not compare ███████████████,[5] or why he selected Electro-Bond 80. *Id.* at 252:18-253:1 (Appx3923).

The Court should exclude Mr. Weinstein's opinions because his lack of sufficient facts violates Federal Rule of Evidence 702.  At best, Mr. Weinstein unreliably quantifies the incremental value of ██████ over Electro-Bond 80.  But without an opinion that Electro-Bond 80 is non-infringing, that value is not properly attributed to the claimed invention's footprint in the market.  *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("To be admissible, expert testimony opining on a reasonable royalty rate must 'carefully tie proof of damages to the claimed invention's footprint in the market place.'") (citing *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)); *Apple Inc. v. Wi-LAN, Inc.*, No. 2020-2011, 2022 WL 333666, at *10 (Fed. Cir. Feb. 4, 2022) (upholding district court grant of request for remittitur, or new trial on damages, where a reasonable royalty was quantified by a comparison of voice call quality between an allegedly infringing product and an alternative, without equating the call quality benefits of the allegedly infringing product to the patent-in-suit); *Syngenta Crop Prot., LLC v. Willowood Azoxystrobin*, *LLC*, 267 F. Supp. 3d 649, 660 (M.D.N.C. 2017) (excluding damages opinion as not based on sufficient facts and data for failure to provide evidence of similarities between an accused product and purported benchmark).

---

[5] Mr. Weinstein's failure to base his opinion on sufficient facts and data is particularly egregious here:  Apple explicitly identified appropriate alternatives to ████████████████████████ ████—made by the same manufacturer, Ex. AN, Apple's Supplemental Response to Interrogatories (Nos. 2,3,6,7,9,23), 12-19-2018 at 87–88 (Appx4133-34), which are ██████████ ████████████████████████, and set forth detailed analysis that those alternatives are non-infringing and were available at the time of the hypothetical negotiation. Dkt. 324, Jensen Opening Rpt. ¶¶ 543–597 (Appx379-410).  Mr. Weinstein ignores these alternatives.

**II.    Mr. Weinstein's Damages Theories Are Unreliable Because Both Theories Assume Incorrectly That Dr. Long's Battery Test is Directed to the Value of an Overall Improvement in Power Usage, not Merely Usage When Making Phone Calls.**

Mr. Weinstein's theories are based on a technical assumption of his own making—namely, that Dr. Long's test of power consumption between the accused devices and devices tampered with to use Electro-bond 80 when making a ***phone call*** translates to a finding that the accused devices enjoy "an ***overall improvement*** in power consumption."   Ex. AL, Weinstein Tr. at 61:5-12 (Appx3875) (explaining both of his damages theories rest on this "assumption").   But Mr. Weinstein is not a technical expert, and Dr. Long's report never says that his "battery test" results show that an accused device enjoys any benefit outside of the context of making cellular phone calls (e.g., web browsing using Wi-Fi, playing videos, photography, playing music).  Dr. Long's test simply does not match up with Mr. Weinstein's assumption about the test.

Mr. Weinstein summarizes Dr. Long's data as shown below, concluding that the percentage "improvement" (versus a device tampered with to use Electro-Bond 80) in recharging time after a single hours-long phone call represented "incremental benefits provided by the Patents-in-Suit."

| Table 5: Incremental Benefits Provided by the Patents-in-Suit | | | |
|---|---|---|---|
| **Model Name** | **Charge Required** | | **Difference** |
| | ████████ | **Electro-Bond 80** | |
| | **(Watt Hours)** | | **(Percent)** |
| **iPhone 5S** | 7.88 | 8.81 | 10.5% |
| **iPhone 6** | 6.73 | 7.40 | 9.0% |
| **iPhone 6+** | 11.45 | 12.63 | 9.3% |
| **iPhone 6S+** | 7.75 | 9.99 | 22.4% |
| **iPhone SE** | 9.69 | 10.50 | 7.7% |
| **iPhone 7** | 7.68 | 8.38 | 8.3% |
| **iPhone 7+** | 10.63 | 12.02 | 11.5% |
| **iPhone 8** | 9.05 | 9.43 | 4.0% |
| **iPhone 8+** | 10.49 | 11.62 | 9.7% |
| **Average Improvement** | | | 10.26% |
| **Median Improvement** | | | 9.3% |

Ex. AK, Weinstein Rpt. at ¶ 99 (Appx3828).

Mr. Weinstein testified that Dr. Long's tests of each accused device did not assess power consumption for any functionality other than phone calls:

```
11      Q      The tests that you're relying on
12   for your -- both of your damages approaches in
13   this case, the tests from Dr. Long, are tests
14   regarding battery performance when making
15   phone calls, not other functionality of each
16   accused iPhone; correct?
17      A      Yes.
```

Ex. AL, Weinstein Tr. at 74:11-17 (Appx3879). He also agreed that he is "not relying on any opinion from Dr. Long that the only thing that determines power consumption in an accused product is power consumed during phone calls." *Id.* at 63:2-7 (Appx3876). And Mr. Weinstein acknowledges that many factors affect power consumption. *Id.* at 69:18-71:21 (Appx3877-78) (identifying the display, WiFi, Bluetooth, web browsing, videos, games, music, video calling, and taking pictures as just some of the factors and operations affecting power consumption across all of the accused iPhones).

Mr. Weinstein also testified that overall power consumption is different than power consumed solely while making phone calls (i.e. what Dr. Long purported to test).

```
     Q      Dr. Weinstein, do you agree that
total power consumption, overall power
consumption, of an accused iPhone is
determined by more than just power used when
making phone calls?
     A      Yes.
```

Ex. AL, Weinstein Tr. at 62:16-21 (Appx3876). But critically, Mr. Weinstein *assumed* his way across that very gap as the starting point of his entire damages analysis.

- 12 -

> Q        Right.  And your -- both of your
> damages approaches in this case work from an
> assumption that the percentage improvement in
> power consumption reported by Dr. Long for a
> particular, you know, product -- accused
> product is an overall improvement in power
> consumption for the device; right?
> A        Yes.

Ex. AL, Weinstein Tr. at 61:5-12 (Appx3875) (emphasis added).

Without any technical opinion (let alone a reliable one) to provide a basis for that assumption, a fatal analytical gap exists between Dr. Long's test and Mr. Weinstein's use of that test as a starting point for representing an overall improvement in battery performance.  In other words, Mr. Weinstein works from insufficient facts and data, and Mr. Weinstein is not qualified to bridge the technical gap between the actual "battery test" and the starting assumption for his damages theories.  *See North v. Ford Motor Co.*, 505 F. Supp. 2d 1113, 1119 (D. Utah 2007) (excluding an expert's opinions based on an incomplete factual record, where "the conclusion simply does not follow from the incomplete data [the expert examined]" because "the court is free 'to determine that an impermissible analytical gap exists between premises and conclusion'"); *Trugreen Companies, L.L.C. v. Scotts Lawn Serv.*, 508 F. Supp. 2d 937, 959 (D. Utah 2007) (excluding damages testimony employing "methodology [that] does nothing more than assume the conclusion").

The Court should exclude Mr. Weinstein's damages theories because his conclusions are based on an analytical gap, bridged only by his unsupported assumptions.  *United States v. Nacchio*, 555 F.3d 1234, 1258 (10th Cir. 2009) ("The trial court's gatekeeping function **requires**

more than simply 'taking the expert's word for it'") (quoting Fed. R. Evid. 702 advisory committees note (2000); *Graves v. Mazda Motor Corp.*, 405 F. App'x 296, 300 (10th Cir. 2010) (explaining the 10th circuit's "clear and unequivocal" precedent—"the *ipse dixit* of an expert, no matter how qualified he may be, is ***never*** enough to guarantee him a ticket to admissibility") (emphasis added); *Thompson v. Kinder Morgan Altamont, LLC*, No. 215CV00623JNPBCW, 2018 WL 5257631, at *4 (D. Utah Oct. 22, 2018) ("a proposed expert cannot evade the requirements of Rule 702 and *Daubert* by simply pointing to the conclusions of others who have themselves employed dubious methodologies"); *Sprint Commc'ns Co. L.P. v. Comcast IP Holdings, LLC*, No. CV 12-1013-RGA, 2015 WL 410342, at *3 (D. Del. Jan. 29, 2015) (excluding damages testimony where a damages expert "relie[d] almost exclusively on [the technical expert's] report, which fail[ed] to provide any scientific methodology that can be relied upon for determining how the patented features add value" and thus did not tie proof of damages to the claimed invention's footprint).

## III.    Mr. Weinstein's Profit Splits Are Not Sufficiently Tied to the Facts of the Case.

Under both his Regression Method and Battery Capacity Method, Mr. Weinstein fails to sufficiently tie the profit splits he opines the parties would agree to in a hypothetical negotiation to the facts of the case.  His 50/50 split under the Regression Method is based on an agreement between nCap and a third party, which Mr. Weinstein's report conceded was irrelevant to the hypothetical negotiation, and he offers no reason why Apple would have agreed to such a split. His 100/0 split under the Battery Capacity Method is accompanied by no explanation why either party would have arrived at such a "split."

A damages expert's opinion is unreliable and inadmissible when it relies upon an arbitrary split without establishing that such a split fits the facts of the case. *Virnetx*, 767 F.3d at 1332 ("Anyone seeking to invoke the [Nash Bargaining] theorem as applicable to a particular situation must establish that fit, because the 50/50 profit-split result is proven by the theorem only on those premises. Weinstein did not do so. This was an essential failing in invoking the Solution."). As described below, Mr. Weinstein fails to establish that fit.

### A. Mr. Weinstein's Invocation of a 50/50 Split in His Regression Method Is Based Solely on an Agreement That He Admits Is Not Relevant.

The only fact Mr. Weinstein cites in support of a 50/50 profit split between Apple and nCap is an agreement ███████████████████████████████████████████ ███████████████████████████████████████████ agreement"). Ex. AK, Weinstein Rpt. at ¶ 143 (Appx3844); Ex. AL, Weinstein Tr. at 79:19-24 (Appx3880). Critically, the ████████ agreement is not relevant to the agreement that would emerge from a hypothetical negotiation between nCap and Apple—a fact Mr. Weinstein not only admits but affirmatively raised. Ex. AK, Weinstein Rpt. at ¶ 133 at n.179 (Appx3840). As Mr. Weinstein acknowledges: (1) ███████████████████████████████████ (2) Apple is not directly comparable with ████████. *Id.* Ultimately, Mr. Weinstein concludes that "███ ███████████████████████████████████t] *would not be relevant to the royalty that would emerge from a hypothetical negotiation* [between nCap and Apple]." *Id.*

Mr. Weinstein also does not say why Apple would accept the split of its incremental profits he proposes. There is no statement in Mr. Weinstein's report that Apple would accept a 50/50 split, or why Apple would accept such a split. Ex. AL, Weinstein Tr. at 83:15-25 (Appx3881).

```
     Q        Can you point me to any sentence
in your report that actually states why Apple
would have agreed to a 50 percent split of
incremental profits?
          MR. PEARSON:  Objection.  Asked
and answered.
          THE WITNESS:  I don't think I can
point to a specific sentence in my report on
that question.
```

Ex. AL, Weinstein Tr. at 253:2-10 (Appx3923).

Nor is Mr. Weinstein's opinion supported by precedent.  Mr. Weinstein has not identified any agreement in which Apple has agreed to such a split.  Ex. AL, Weinstein Tr. at 84:2-6 (Appx3881).  And although Mr. Weinstein admits that the ▓▓▓▓▓ agreement is irrelevant, he makes no attempt whatsoever to adjust ▓▓▓▓▓▓▓▓▓▓▓▓ to account for the facts and circumstances present in a hypothetical negotiation between nCap and Apple to those in the actual negotiation between nCap and ▓▓▓▓▓

Mr. Weinstein's use of a 50/50 profit split runs afoul of Federal Circuit precedent that invocation of a 50/50 profit split must be supported by the facts of the case to "establish that fit." *Virnetx*, 767 F.3d at 1332.  Here, Mr. Weinstein's opinion should be excluded because he relies on just one fact—the ▓▓▓▓▓ agreement—but fails to establish the fit of a 50/50 profit split in a hypothetical agreement between nCap and Apple by admitting that agreement is irrelevant to a hypothetical negotiation between nCap and Apple.  *See*, *e.g.*, *Contour Ip Holding, LLC*, No. 3:17-CV-04738-WHO, 2021 WL 75666, at *12-13 (N.D. Cal. Jan. 8, 2021) (excluding a 50/50 profit split supported only by single working paper, which the court rejected because the expert failed to

"present evidence that the methodology has been systematically tested against established methodologies to show its reliability"); *Biscotti Inc. v. Microsoft Corp.*, No. 2:13-CV-01015-JRG-RSP, 2017 WL 2536962, at *5 (E.D. Tex. May 18, 2017) (excluding an "entirely conclusory" opinion as to the profit splits the parties would have agreed to, pursuant to the Federal Circuit's guidance in *VirnetX*); *Vaporstream, Inc. v. Snap Inc.*, No. 2:17-CV-00220-MLH-KSX, 2020 WL 2543814, at *6 (C.D. Cal. Jan. 10, 2020) (excluding a 50/50 profit split pursuant to the Federal Circuit's guidance in *Virnetx* that was based on conclusory assertions of the parties relative bargaining positions).



Furthermore, the ▬▬▬▬▬ agreement is based on ▬▬▬▬▬ ▬▬. Ex. AO, OEM Agreement at § 2.1 (Appx4152). By contrast, at the time of the hypothetical negotiation, the Patents-in-Suit had approximately 18 years of life remaining. Ex. AK, Weinstein Rpt. at ¶ 68 (Appx3810). Mr. Weinstein does not even attempt to adjust the nCap/Apple profit split to account for the duration of the license that would emerge from the hypothetical negotiation, which is ▬▬▬▬▬▬▬▬▬. And the ▬▬▬ agreement does not even mention ▬▬▬▬. *See* Ex. AO, OEM Agreement. In fact, as part of the ▬▬▬ ▬ in that agreement, nCap was obligated ▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬." *Id.* at § 4.3 (Appx4153). As Mr. Weinstein acknowledged, Apple would not receive development assistance or know-how in the agreement that would emerge from a hypothetical negotiation between nCap and Apple. Ex. AI, Weinstein Rpt. at ¶ 132 (Appx3839-40). Thus, the ▬▬▬ agreement is different in scope and kind than any agreement that would emerge from a hypothetical negotiation between nCap and Apple for rights to the Patents-in-Suit, and thus is not a reliable starting point.

Mr. Weinstein's failure to adjust the profit split from the ████████ agreement to account for the specific facts relevant to a hypothetical negotiation between nCap and Apple—such as the ████████████████████████████████████████████████████ ████████ agreement—present additional gaps rendering his opinion unreliable. *See Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2014 WL 794328, at *8 (N.D. Cal. Feb. 25, 2014) ("Dr. Chevalier's failure to adequately account for the agreement's cross license, and her failure even to attempt to make adjustments for (1) [redacted], (2) the worldwide settlement agreement, and (3) the anti-cloning provision, all render her opinions related to the HTC Agreement insufficiently reliable to allow Samsung to present such testimony at trial.").

### B.    Mr. Weinstein's Invocation of a 100/0 "Split" in His Battery Capacity Method Is Based on No Facts, Data, or Logic.

Mr. Weinstein contends that using the Patents-in-Suit saves Apple $0.26 to $1.54 per accused product, and that in a hypothetical negotiation Apple would agree to surrender 100% of those cost savings to nCap.  Ex. AK, Weinstein Rpt. at ¶ 143 (Appx3844); Ex. AJ, Weinstein Tr. at 84:11-16 (Appx3881) ("Q: In your second damages approach, the battery capacity approach, your opinion is that nCap would keep 100 percent of the incremental benefits under that approach; correct? A: Correct.").  Mr. Weinstein offers no reason why the parties would agree to that "split." Mr. Weinstein offers no facts or precedent to suggest that Apple would agree to such a split.  Ex. AJ, Weinstein Tr. at 84:17-85:13 (Appx3881).  Nor does Mr. Weinstein offer any analysis as to why Apple would agree to a 100/0 split in nCap's favor.  Indeed, Apple would have no reason to take a license to cost-saving technology when it would have to surrender the entire benefit to the licensor—a pointless exercise.  Mr. Weinstein's unexplained invocation of a 100/0 split is the epitome of conclusory expert opinion not tied to the facts of the case.

Mr. Weinstein's invocation of a counterintuitive 100/0 profit split in nCap's favor runs afoul of both *Virnetx* and Rule 702. Here again, Mr. Weinstein fails to establish fit for a 100/0 profit split with the facts of the case. In fact, the inconsistent conclusions from Mr. Weinstein's two alternative methods—i.e., that pursuant to the Regression Method, nCap and Apple would agree to a 50/50 profit split, and that pursuant to the Battery Capacity Method, nCap and Apple would agree to a 100/0 profit split—confirm that neither is the product of reliable principles and methods. Mr. Weinstein offers no principle, method, facts, or data to explain these inconsistent results—he never attempts to justify why two different splits apply to his two theories. For all of these reasons, the profit splits proposed in both of Mr. Weinstein's reasonable royalty opinions are not sufficiently tied to the facts of the case, and should be excluded.

## IV. Mr. Weinstein's Regression Method Is Unreliable Because His Model Included a Battery Capacity Variable While Excluding the Highly Correlated Screen Size Variable, Thereby Artificially Capturing the Value of Both Features in the Battery Capacity Variable.

By deliberately choosing to include one highly correlated independent variable (battery capacity) while omitting the other (screen size) from his model, Mr. Weinstein's regression model attributed the value of ***both*** battery capacity and screen size to battery capacity alone. Mr. Weinstein's damages figure is thus based on ***both*** the value of battery capacity and the value of screen size (which no nCap expert has even asserted is relevant to the value of the Patents-in-Suit), and fails to separate the two. Not surprisingly, Mr. Weinstein admitted that a "fundamental" principle of regression analysis is that the regression should not include only one out of a pair of highly correlated variables. Ex. AL, Weinstein Tr. at 191:17-23 (Appx3908). "But where, as here, very minor changes in arbitrarily selected model parameters can entirely alter the model's conclusions, that model is insufficiently robust to withstand the scrutiny of Rule 702." *Reed Const.*

- 19 -

*Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 407 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016) (excluding testimony under *Daubert* due to correlation between an independent variable and control variable, because "it becomes impossible to isolate the effect of the independent variable on the dependent variable—which, after all, is the goal of regression analysis"); *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (a model purporting to serve as evidence of damages . . . must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement . . .").

There is no question that screen size and battery capacity are highly correlated.

```
    Q       You agree that battery capacity
and screen size are highly correlated;
correct?
    A       They are.
```

Ex. AL, Weinstein Tr. at 134:18-22 (Appx3894).

```
    Q       All right.  Are you aware of any
feature of the iPhone that is more tightly
correlated to battery capacity than screen
size?
    A       I'm not.
```

*Id.* at 135:13-17 (Appx3894). iPhones with larger screens come with larger batteries to compensate for the increase in power consumption that goes with the larger screen. *Id.* at 117:6-12 (Appx3889). Mr. Weinstein does not dispute that consumers are willing to pay more for an iPhone with a larger display. *Id.* at 111:8-11 (Appx3888).

The relationship between battery capacity and screen size is called multicollinearity, which means that the two variables tend to move together with respect to their impact on a dependent variable, here price. *Id.* at 155:19-23, 157:16-18 (Appx3899). Because battery capacity and screen size are collinear, by selecting only one to include in the regression, Mr. Weinstein's model assigned all of the value of those two features to the battery capacity variable ***alone***.

```
     Q       And you -- okay.  And so if you
include only one of two variables that are
highly correlated with each other and you
include only one of them in your regression
analysis, then your model is going to assign
all of the value in terms of those two
features to that one variable that you have
included in your regression analysis; correct?
     A       As a generalization, that's true.
I don't disagree with that.
```

*Id.* at 134:22-135:6 (Appx3894).

In other words, if both the battery capacity and screen size of an iPhone increased, Mr. Weinstein's model would attribute the value of both of those changes to the increase in battery capacity. Because of this risk, it is "fundamental" that a variable being measured should not be highly collinear with another variable for a regression to be useful. *Id.* at 191:17-24 (Appx3908).

- 21 -

```
17          In order for a regression with --
18    in order for a regression to be useful as to a
19    specific variable, it's sort of fundamental
20    that that variable shouldn't be highly
21    collinear with any other variable, if you want
22    your regression to be useful as to that
23    variable that you're measuring; correct?
24    A    I'll agree with that.
```

Mr. Weinstein performed no regression analysis to separate out what amount of the increase in launch price correlates to the increased battery capacity separate and distinct from increase in screen size. *Id.* at 132:6-13 (Appx3893). Moreover, when Apple's expert, Dr. Stephen Becker, reconstructed Mr. Weinstein's model, but added a screen size variable, the model showed that increases in battery capacity do not provide ***any*** positive price effect. Ex. AP, Becker Rpt. at ¶¶ 265-267 (Appx4282-83). Mr. Weinstein does not dispute Dr. Becker's calculations. Ex. AL, Weinstein Tr. at 116:11-25 (Appx3889).

As with the model in *Reed Const.*, Mr. Weinstein's model fails Rule 702. Mr. Weinstein does not address the relationship between price and screen size, nor could he through his model, because he omitted the latter variable despite knowing they are highly correlated. *See Reed Const.*, 49 F. Supp. 3d at 405 ("Similarly, if [the omitted correlated variable] is really having no effect— as Warren–Boulton must conclude in order to avoid the consequences of multicollinearity—why is it so well correlated with the dependent variables in the first place? These concerns are significant and contribute to the Court's conclusion that Dr. Warren–Boulton's method is inadmissible under Rule 702.").

The Court should exclude Mr. Weinstein's Regression Method model because the value he ultimately identifies as the value of battery capacity (on which his damages theories are built) is

- 22 -

the product of omitting a highly correlated variable. By omitting the highly correlated screen size variable, Mr. Weinstein's results failed to separate out the price effect of a larger screen size, and thus impermissibly assigning any price premiums associated with ***both*** increased screen size and increased battery as the value of the benefits of the Patents-in-Suit. *See Comcast*, 569 U.S. at 36 (rejecting damages analysis based on regression model that quantified damages associated with four classes of conduct collectively, when only one class remained actionable). As with the damages model the Supreme Court struck down in *Comcast* for associating conduct that was actionable with that which was not, Mr. Weinstein's model attributes value associated with both screen size and battery capacity to the Patents-in-Suit, even though screen size is wholly irrelevant to nCap's infringement allegations (and no nCap expert has said otherwise). Accordingly, Mr. Weinstein's Regression Method does not withstand scrutiny under Federal Rule of Evidence 702, and should be excluded.

<u>**CONCLUSION**</u>

Apple respectfully requests that the Court exclude all opinions of Mr. Weinstein regarding the Regression Method, profit splits, and value of the Patents-in-Suit based on Dr. Long's Battery Testing.

Dated: February 9, 2022

HATCH LAW GROUP, P.C.
Brent O. Hatch

Respectfully submitted,

/s/ Brent O. Hatch
DESMARAIS LLP
John M. Desmarais (*admitted pro hac vice*)
Peter C. Magic (*admitted pro hac vice*)
Jeffrey S. Seddon, II (*admitted pro hac vice*)
Karl I. Mullen (*admitted pro hac vice*)
Carson Olsheski (*admitted pro hac vice*)

*Attorneys for Defendant Apple Inc.*