# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NCAP LICENSING, LLC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>APPLE, INC.,<br><br>Defendant. | **REDACTED MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:17-cv-905<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Plaintiffs nCap Licensing, nCap Telecommunications, and nCap Medical—whom the parties refer to collectively as "nCap"—sue Defendant Apple, Inc., alleging that Apple has infringed two patents that claim antenna systems comprising, among other limitations, "a radiating antenna element formed of a conductive particle based material." U.S. Patent No. 9,088,071 col. 20 ll. 49–50; U.S. Patent No. 9,954,276 col. 21 ll. 32–33. The court has construed the term "radiating antenna element" to denote "a part of an antenna, other than a ground plane, that emits electromagnetic radiation." Dkt. No. 504 at 1. nCap's current theory of infringement is that certain iPhone models contain a conductive adhesive that is a radiating antenna element because it emits electromagnetic radiation and is not a ground plane. *See* Dkt. No. 522 at 7.

nCap proffers the opinions of Dr. Stuart Long under Federal Rule of Evidence 702 in support of this theory, and Apple moves to exclude Dr. Long's opinion that the adhesive used in the accused iPhone models is a radiating antenna element. One of the grounds on which Apple bases its motion is that "Dr. Long fails to provide any reliable support for th[e] foundational premise" that the adhesive "emits electromagnetic radiation." Dkt. No. 517 at 9 (cleaned up).

The court heard oral argument on Apple's motion, and it separately held a *Daubert* hearing at which it heard direct- and cross-examination of Dr. Long. *See* Dkt. Nos. 540 & 544.

The court now grants Apple's motion to exclude Dr. Long's opinion that the adhesive used in the accused iPhones emits electromagnetic radiation and is thus a radiating antenna element.

## I.

Under Federal Rule of Evidence 702, the proponent of an expert's opinion must "demonstrate[] . . . that it is more likely than not that" the opinion is reliable. To do so, the proponent must demonstrate by a preponderance of the evidence that the expert's opinion "is based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d). In determining whether a proponent has established reliability, the court typically "asks whether the *methodology* employed by [the] expert is valid," without questioning "the quality of the data used in applying the methodology or the conclusions produced." *Roe v. FCA US LLC*, 42 F.4th 1175, 1181 (10th Cir. 2022) (emphasis added) (cleaned up). But "nothing . . . requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## II.

Dr. Long bases his opinion that the adhesive emits electromagnetic radiation on three sources of data: (1) the results of "battery testing" that he personally conducted, (2) the results of testing conducted by Apple employees and discussed in internal Apple emails, and (3) information submitted by Apple to the Federal Communications Commission in public filings. *See* Dkt. No. 520 at 99–100; Dkt. No. 526 at 9–11.

To evaluate Dr. Long's analysis, it is necessary to understand the adhesive's location inside the accused iPhones. In each accused iPhone model, the adhesive is "sandwiched" between the phone's chassis—the piece of metal that forms the phone's "back" side, if the screen is the "front" side—and the phone's "dock flex," which is a "flexible printed circuit board" that "carr[ies] [input/output] signals and power to and from the dock connector" where the phone's charger is inserted. Dkt. No. 520 at 310, 335 (Jensen Non-Infringement Report); *id.* at 464 (Pascolini Declaration); *see also id.* at 137 (Long Infringement Report) (recognizing that the adhesive is located between the "flex assembly," which is another term for the dock flex, and the phone's "housing," which is another term for the chassis). More specifically, the adhesive connects a portion of the chassis that is made of conductive metal to the "ground pad" on the bottom side of the dock flex, which is made of copper and is thus conductive. *Id.* at 185 (Long Infringement Report); *id.* at 312 (Jensen Non-Infringement Report).

Because the adhesive is highly conductive in its "z-plane"—the direction perpendicular to the dock flex and the chassis—it creates a pathway for electrical currents to flow from the dock flex to the chassis. *See id.* at 41 (Long First Deposition) (136:20–23). The parties agree that the adhesive thus performs a "grounding" function because the chassis is part of the phone's electrical ground. *See* Dkt. No. 522 at 4. But the parties dispute whether the adhesive, in addition to grounding the dock flex, also emits electromagnetic radiation. Dr. Long's theory is that in addition to the direct current flowing through the "z-plane" of the adhesive to ground, alternating current flows in the "xy-plane" of the adhesive—that is, parallel to the chassis and the ground pad of the dock flex—resulting in the emission of electromagnetic radiation. Dkt. No. 520 at 57 (199:1–5).

## A.

The court now turns to Dr. Long's battery testing. Dr. Long conducted this test as follows. He obtained two phones each of several iPhone models that contain the adhesive. A technician "modified" one phone of each model by replacing the adhesive with a conductive epoxy that, according to Dr. Long, is "more conductive" than the adhesive. Dkt. No. 520 at 100; *see also id.* at 48 (163:12–16). Dr. Long then placed calls between each modified phone and the "unmodified" phone of the same model, which still contained the adhesive. *See* Dkt. No. 370-5 at 71. Those calls lasted until the battery power for both phones drained below 50 percent. *See id.* Dr. Long then measured the amount of power required to recharge the phones and found that for each pair of phones, the modified phone required more power to recharge than the unmodified phone. *See id.* Dr. Long concluded that the modified phones required more power to conduct the same calls than the unmodified phones, and thus that the unmodified phones' cellular performance was superior. *See* Dkt. No. 520 at 100. Because he believed the only difference between the phones was whether they contained the adhesive or the conductive epoxy, and because he believed the conductive epoxy provided an equal or superior electrical connection to ground as compared to the adhesive, Dr. Long concluded that the only possible explanation for the unmodified phones' superior performance was that the adhesive was emitting electromagnetic radiation, "not merely providing an electrical connection to the common electrical ground to prevent interfering radiation from other components within the device." *Id.*

Dr. Long's battery testing is the primary basis on which he relies to support his opinion that the adhesive emits electromagnetic radiation in the accused iPhones. *See* Dkt. No. 520 at 43 (142:18–24). But there are multiple methodological problems with this testing that require the

exclusion of Dr. Long's opinion that the adhesive emits electromagnetic radiation to the extent that opinion is based on the results of this testing.

1.

As a threshold matter, Dr. Long assumed that the conductive epoxy—as used in the tested phones—provided an equal or superior connection to ground as compared to the adhesive. But he did not perform tests to confirm that assumption.[1] When Apple's counsel cross-examined him regarding why he did not perform such tests, he responded that such tests were unnecessary because the technical "specifications" for the conductive epoxy "show it's more conductive, less resistive" than the adhesive. Dkt. No. 548 (73:3–4).

But those specifications disclose only the *resistivity* of the epoxy. *See* Dkt. No. 393 at 134 (Technical Product Bulletin for the Electro-Bond 02). And the resistivity of a material differs from the *resistance* of a specific piece of that material. A piece of material's resistance depends *in part* on the material's resistivity, but it also is a function of the piece's surface area and depth. As Apple's expert, Dr. Michael Jensen, explained, "[i]ncreasing the area of conductive adhesive reduces the resistance because electrical resistance . . . is affected by the shape and composition of the materials involved—much like water, electrical current is easier to push through a short,

---

[1] Dr. Long did state in his report that based on his "own resistivity testing of" the epoxy, he "found that this material did not have the same non-stationary resistance as" the adhesive. Dkt. No. 370-5 at 70. But Dr. Long did not understand that resistivity testing to show that the epoxy was more conductive than the adhesive; instead, he understood it to indicate that the epoxy was not a "conductive particle based material." Dkt. No. 520 at 44 (146:4). It appears that Dr. Long uses the term "non-stationary resistance" to describe a resistance "that changes when measured over a short duration" of time. *Id.* at 295 n.101 (Jensen Non-Infringement Report). But whether a material's resistance changes over time does not indicate whether its range of resistances is low or high. In all events, Dr. Long concedes that he did not disclose "the actual resistance data [he] obtained in [his] resistance testing of" the epoxy in or with his report. *Id.* at 44 (146:19–25); *see also* Fed. R. Civ. P. 26(a)(2)(B)(ii) (requiring the disclosure of "the facts and data considered" by the expert "in forming" his opinion).

thick pipe than a long, thin pipe." Dkt. No. 520 at 314. The epoxy's resistivity alone thus does not determine the resistance of the epoxy as used in the modified phones. That resistance would also depend on the surface area and depth of the epoxy, which are figures that Dr. Long did not even measure, let alone discuss in his report.

The import of this methodological flaw is substantial. As used in the accused iPhones, the accused adhesive is vanishingly thin—only about 50 microns thick, or "thinner than a human hair." *Id.* at 413 (Jensen Non-Infringement Report). Not only did Dr. Long not measure the thickness of the epoxy with which he replaced the adhesive, he effectively conceded that his assistant merely "eyeballed it," attempting to approximate a thickness of 50 microns. *See id.* at 50 (173:2–5) (Q: "How did Mr. Allen approximate a 50-micron thickness layer of" epoxy "on the dock flexes?" A: "Simply by visual inspection.").[2]

---

[2] What is more, it is not clear that Dr. Long used the conductive epoxy correctly. There is some confusion in the record regarding which epoxy Dr. Long used in the modified phones. In his initial report, Dr. Long stated that he used a material called Electro-Bond 80. *See* Dkt. No. 370-5 at 70. But after Apple's expert pointed out that Electro-Bond 80 must be "cured" with extreme heat, and that the modified phones did not exhibit signs of heat curing, *see* Dkt. No. 520 at 414, Dr. Long instead stated that he used a material called Electro-Bond 02, which does not require heat curing, *see id.* at 100 & n.12. Assuming that Dr. Long used Electro-Bond 02, however, the specifications for that material require "24 hours" of curing at room temperature. Dkt. No. 393 at 134 (Technical Product Bulletin for the Electro-Bond 02). In his report and deposition testimony, Dr. Long did not state that he waited 24 hours after applying the epoxy to the modified phones before placing calls between them and the unmodified phones. In fact, when nCap's counsel asked Dr. Long what he "did next" after "reassembl[ing]" the phones, Dr. Long responded that the very next thing he did was to place calls between the phones. Dkt. No. 548 (18:1–8); *see also id.* (17:12–13) (stating that "the phones were put back together and then compared in this battery test," without mentioning any period of curing, let alone an *overnight* period). Proper curing of Electro-Bond epoxies appears to be crucial to their "electrical properties," including conductivity, and thus to their grounding performance. Dkt. No. 520 at 414–15 & n.366 (Jensen Non-Infringement Report); *see also* Dkt. No. 393 at 134 (Technical Product Bulletin for the Electro-Bond 02) (listing the epoxy's low resistivity as one of its "*cured* properties") (emphasis added). Because Dr. Long failed to document the proper curing of the Electro-Bond 02 material in his report—and because, based on his testimony, it seems likely that the material was *not* properly cured—the court cannot conclude that Dr. Long used "sound methods" to create the modified phones that were crucial to his battery testing.

In addition, evidence in the record suggests that as used in the accused iPhones, the adhesive is highly conductive in its z-plane. *See, e.g., id.* at 297 (Jensen Non-Infringement Report) (observing, in a piece of the adhesive of approximately the same size as the pieces "used in the accused iPhones on average," "a Z-axis resistance of $0.0032 \, \Omega \pm 0.0006 \, \Omega$."). So far as the court is aware, Dr. Long has not disputed the accuracy of that measurement, and Dr. Long does not attempt to compare that measurement—or any other measurement of the adhesive's resistance in the accused iPhones—to the resistance of the epoxy in the modified phones.

For all of these reasons, there is a significant "analytical gap" between the results of Dr. Long's battery testing and his ultimate opinion that the adhesive emits electromagnetic radiation: Dr. Long provides no empirical support for the premise, which is key to his chain of reasoning, that the epoxy used in the modified phones grounded the dock flex as well or better than did the adhesive used in the unmodified phones. *See Roe*, 42 F.4th at 1181 (affirming exclusion of expert testimony based on an "analytical gap" where the experts "had not demonstrated in their testing" a premise that was key to their conclusion). Indeed, Dr. Long conceded at a deposition that he ultimately "d[id not] know if the ground was better or the ground was worse in the modified phones" because he "did not make any measurement on the quality of grounding." Dkt. No. 520 at 55 (193:6–24); *see also id.* at 53 (184:24–185:10) (acknowledging that it was "correct" that he "w[as] not able to verify whether the modified phones, in fact, had a worse grounding connection difference between the dock flex and the housing compared to the unmodified phones" because he "h[ad not] measured").

**2.**

Another troubling aspect of Dr. Long's battery testing is the manner in which he modified the phones. There are two ways in which Dr. Long unnecessarily treated the modified and unmodified phones differently apart from replacing the adhesive with the epoxy. To replace the adhesive with the epoxy in the modified phones, Dr. Long needed to remove and replace the dock flexes in those phones. But in his initial report, Dr. Long expressly stated that he did not remove and replace the dock flexes in the unmodified phones. *See* Dkt. No. 370-5 at 71. He thus failed to control for any effect that process might have on cellular performance or grounding.[3] In addition, Dr. Long removed the adhesive in the modified phones and replaced it with epoxy, but he did not remove the adhesive in the unmodified phones and replace it with the same type of adhesive. *See* Dkt. No. 520 at 52 (179:11–22). He thus failed to control for any trauma caused to the dock flexes in the modified phones by the adhesive's removal and replacement. More generally, Dr. Long failed to control for any potential degradation in performance that could have arisen from his assistant's manual installation of the grounding material and dock flex in the modified phones, as compared to their installation in the unmodified phones according to Apple's precise manufacturing procedures.

nCap seeks to brush aside Apple's arguments regarding the disparities in Dr. Long's handling of the modified and unmodified phones as *post hoc* attorney speculation. But "to qualify as 'scientific knowledge'" under Rule 702, an expert's "assertion must be derived by the

---

[3] Here again, there appears to be some confusion in the record. Dr. Long asserted in his deposition testimony that the modified and unmodified phones were treated the exact same apart from the removal of the adhesive and its replacement with epoxy in the modified phones. *See* Dkt. No. 520 at 52 (179:2–20) ("For the unmodified phones, we . . . did all the other things except separating the adhesive and replacing it."). But he never expressly contradicted or withdrew the representation in his initial report that he did *not* remove and replace the dock flexes in the unmodified phones.

scientific method." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993). This means nCap "must show that the method employed by" Dr. Long "in reaching [his] conclusion is scientifically sound." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003). And when seeking "to investigate causation," "[a] good study design compares outcomes for subjects who are exposed to some factor (the treatment group) with outcomes for other subjects who are not exposed (the control group)." Federal Judicial Center, *Reference Manual on Scientific Evidence* 217, 218–19 (3d ed. 2011). The goal in designing such studies is to ensure that the treatment and control groups are "comparable, except for the treatment"; otherwise, the study will not control for the effects of "confounding" variables. *Id.* at 220. These studies accordingly "succeed to the extent that the treatment and control groups are comparable—apart from the treatment." *Id.* In "appraising causal inferences based on empirical studies," courts thus must ask whether "the treatment and control groups [are] comparable" and, if they are not, whether "adjustments were made to address confounding" variables and whether those adjustments were "sensible and sufficient." *Id.* at 222.

Dr. Long's battery testing did not comply with these basic methodological norms. Dr. Long did not ensure that the unmodified and modified phones were comparable apart from the relevant "treatment": the replacement of the adhesive with the epoxy. Only the modified phones were subjected to the removal and replacement of their dock flexes and to the removal of the adhesive from the dock flexes. Dr. Long did not make any adjustments to his testing to address the confounding effects of those interventions in the modified phones. At the very least, he could have subjected the unmodified phones to the same interventions. Because Dr. Long did not do so, his battery testing was not designed to "eliminate other possible sources [of the modified phones' inferior performance] as highly improbable." *Taber v. Allied Waste Sys., Inc.*, 642 F.

App'x 801, 811 (10th Cir. 2016) (cleaned up). His testing thus does not rule out the manual removal and replacement of the grounding material and the dock flexes—and any damage to the dock flexes or imprecision in the application of the epoxy and the reinstallation of the dock flex resulting from those interventions—as responsible for the modified phones' inferior performance.

To be sure, "[i]f there is no evidence showing a possible alternative is valid, the expert's failure to rule it out does not render his diagnosis unreliable." *Id.* "So long as the most obvious causes have been considered and ruled out, the existence of possible uneliminated causes goes to . . . the weight rather than admissibility of the evidence." *Id.* (cleaned up). But the court has no doubt that the potentially deleterious effects of removing the dock flexes and adhesive from the ground pads of the dock flexes, then manually replacing the adhesive with the epoxy (eyeballing the right amount to apply), and finally reinstalling the dock flexes by hand should have been "obvious" to Dr. Long. *Id.*

As discussed, a key premise of Dr. Long's opinion is that grounding in the modified phones was equal or superior to that of the unmodified phones. But because the adhesive and the epoxy were grounding the dock flexes, the effectiveness of that grounding depended not only on the resistances of the adhesive and the epoxy, but also on the proper installation and the functioning of the grounding material and the dock flexes. The connections from the layers within the dock flexes to their ground pads, from the ground pads of the dock flexes to the adhesive or epoxy, and from the adhesive or epoxy to the chassis all were part of the same ground system that Dr. Long sought to control.

To the extent Dr. Long made changes in only the modified phones that could have damaged or impaired those connections, however slightly, his experimental design failed to

account for an obvious potential source of confounding effects on grounding and cellular performance in the modified phones. And the obviousness of the potential for such effects is compounded by the intricate structure of the iPhones, in which scores of tiny components, themselves carefully engineered, are placed alongside and around one another in a precise configuration that accounts for performance, integration constraints, and other design concerns. Indeed, Dr. Long himself explained that he did not remove and replace the adhesive in the unmodified phones because he recognized that process could have adverse effects: "the point would be, well, maybe when I disassembled the [adhesive], I changed something." Dkt. No. 520 at 52 (179:17–19). Or as he subsequently put it, "[w]e left the unmodified phones as unmodified as possible *so that there was not a risk of changing them*; they would stay in the original state that they were in." *Id.* (179:19–22) (emphasis added).[4]

To be sure, nCap provided the phones used in Dr. Long's battery testing to Apple's expert, Dr. Jensen, who did not notice any visible damage to the modified phones. *See* Dkt. No. 527 at 28 (84:4–12). And Dr. Long asserted that his handling of the modified phones could not have led to "any degradation in the effectiveness of the electrical grounding," because the modified phones were able to place and receive calls and they "wouldn't have worked" had they been damaged. Dkt. No. 548 (103:3–9). But it does not follow from these facts that the modified phones were not damaged. Dr. Long provided no reason to exclude the possibility that damage to

---

[4] In addition, the court finds it significant (and more than a little ironic) that Dr. Long "opened" the unmodified phones and "reattached" their screens before conducting his tests. Dkt. No. 370-5 at 71. Dr. Long offered no reason for his decision to do so, and the only apparent explanation for that decision is an attempt to control for the effects of tinkering with the modified phones. But despite apparently recognizing that need, Dr. Long did not control for the modifications with the most obvious potential to affect performance: removing the dock flex from the phone and the adhesive from the dock flex, replacing the adhesive with epoxy, and reinstalling the dock flex.

the dock flex—or a failure or inability to install the grounding material and dock flex manually with the same degree of precision used in Apple's manufacturing procedures—could affect grounding and cellular performance as a matter of degree, without rendering the phone inoperable and without being visible to the naked eye. To the contrary, Dr. Long himself ultimately conceded that it "[c]ertainly" is "true" that the phones could have suffered a "partial degradation in grounding" while still being operable. *Id.* (103:15–20).

What is more, Dr. Jensen performed some "short tests" on the phones and determined that the modified and unmodified phones did not differ, in any "statistically significant" way, in the amount of power it took for their batteries to charge. Dkt. No. 520 at 413 n.361. nCap argues that because the dock flex is part of the phones' battery charging system, if the dock flex in the modified phones had been damaged, "this would have damaged the phones' ability to charge the battery." Dkt. No. 379 at 18. It follows, nCap argues, that the dock flexes were not damaged, and that grounding in the modified phones was not impaired, by Dr. Long's removal and reinstallation of the dock flexes and grounding material. *See* Dkt. No. 479 (61:8–13).

nCap's argument is woefully underdeveloped. nCap relies on two short snippets from the deposition testimony of one of Apple's witnesses, Mattia Pascolini, to support the proposition that the adhesive's grounding capacity is relevant to the dock flex's role in the charging system. *See* Dkt. No. 370-13 at 15 (51:8–18), 21 (75:3–15). But it is not clear from Mr. Pascolini's testimony—or from any evidence in the record—that any damage to a dock flex that would have a statistically significant effect on cellular performance would necessarily have a statistically significant effect on charging efficiency, and vice versa. Nor is that proposition clearly true with regard to any impairment to the ground connection due to an installation of the epoxy and dock flex that lacked the precision of Apple's manufacturing procedures. nCap has made no effort to

12

show—whether empirically through experimentation, or logically by explaining how the dock flex works—that grounding through the adhesive to the chassis, or any of the dock flex's other functions, has an equal or greater effect on charging efficiency than on cellular performance. Because it is nCap's burden to prove the reliability of Dr. Long's opinion, the mere fact that Dr. Jensen's "short tests" did not prove that the modified phones' charging capability was damaged—which, according to Dr. Jensen, is not what the tests were designed to prove—does not suffice to save Dr. Long's opinion from exclusion. *See* Dkt. No. 527 at 70 (251:5–7) (Dr. Jensen's testimony that he performed the tests to "assure [himself] that battery testing of this kind was uncorrelated with antenna performance testing"). If the court were to hold otherwise, it would effectively place the burden of proving the unreliability of the battery testing on Apple, which is not how Rule 702 works.[5]

## B.

In addition to his battery testing, Dr. Long relies on two other sources of data to support his opinion. First, Dr. Long relies on emails exchanged between Apple employees that concern testing conducted by Apple regarding "grounding for the iPhone 6 Plus." Dkt. No. 370-13 at 50 (192:22–23). ███████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████
███ Dkt. No. 535 at 17. Dr. Long reasons that because ███████████████████
████████████████████████████████████████████████████████████████

---

[5] To the extent it now takes the position that Dr. Jensen's "short tests" show the modified phones' grounding was not impaired, nCap directly contradicts Dr. Long's testimony that there were "no tests" he could have performed to determine whether the removal and reinstallation of the dock flexes and grounding material damaged the modified phones. Dkt. No. 520 at 51 (176:13, 19).

██████████████, the adhesive's effect on antenna performance cannot be explained merely by its grounding function but must instead be attributable to its emission of electromagnetic radiation. *See* Dkt. No. 370-5 at 76; Dkt. No. 520 at 100.

But as with his battery tests, Dr. Long's key premise—that the grounding function of the adhesive alone cannot explain observed disparities in antenna performance—ultimately amounts to "*ipse dixit*." *Roe*, 42 F.4th at 1181. Mr. Pascolini, the Apple employee who sent the email on which Dr. Long relies, testified that the results of Apple's internal testing reported in his email ████████████████████████████████████████████████████████████████████████████████████████████████████████████. Dkt. No. 535 at 14 (206:22–207:2) (emphasis added). Neither Dr. Long nor nCap provides any evidence or logic to support the proposition that the phones without the adhesive nevertheless had equal or superior grounding to the phones with the adhesive.[6] Nor is that proposition plausible—let alone obvious. To the contrary, the adhesive *plus* the screws almost certainly could be expected to provide "better grounding" than the screws alone because, as discussed, "[i]ncreasing the area" and number of the pathways to ground "reduces the resistance." Dkt. No. 520 at 314 (Jensen Non-Infringement Report). As Dr. Jensen explained, "much like water, electrical current is easier to push through a short, thick pipe than a long, thin pipe." *Id.* The emails thus do not provide sufficient information from which Dr. Long could reliably conclude that the superior antenna

---

[6] Instead, Dr. Long simply disputed the meaning of the email. When counsel for Apple asked him about Mr. Pascolini's testimony, Dr. Long responded that the email "clearly doesn't say" that Apple was ████████████████████████████████████ ██████ Dkt. No. 548 (83:12–14). But the email also does not say that Apple was ██████ ████████████████████████████████████ The email simply does not say one way or the other. Nor did Dr. Long offer any other reason to reject the sworn testimony of the email's author. Ultimately, because Dr. Long incorrectly assumed the email meant that Apple was ████████████████████████████████, the conclusions he drew from Apple's testing rest on an inaccurate premise.

performance was caused by the adhesive's emission of electromagnetic radiation as opposed to its grounding function.

Dr. Long also supports his opinion with data Apple submitted to the FCC regarding the iPhone 6 and iPhone 6S. *See* Dkt. No. 370-5 at 72–75. The iPhone 6 used the accused adhesive to ground the dock flex, whereas the iPhone 6S used a different conductive adhesive that is made of ███████████████████████████████████ *Id.* at 72 & n.61. Dr. Long observed that at each of the LTE frequency bands on which the two phones both operated, the iPhone 6S used more conducted power—that is, more power was delivered to the antenna's driven element. *See* Dkt. No. 370-5 at 73 & n.63. But that power did not translate into a higher "Effective Isotropic Radiated Power" (EIRP), "which is a measure of the power emitted by the antenna in the direction of its largest lobe." Dkt. No. 520 at 426 (Jensen Non-Infringement Report). Based on this, Dr. Long concluded that the iPhone 6's antenna performance was superior to that of the iPhone 6S and that this superior performance was attributable to the accused adhesive's emission of electromagnetic radiation in the iPhone 6. *See id.* at 100.

For at least three reasons, there is too great an analytical gap between the FCC data and Dr. Long's conclusion that the adhesive emits electromagnetic radiation. First, EIRP is not a reliable indicator of antenna performance in cellular phones because it measures the strength of an antenna's signal in only one direction. A cellular antenna performs well if it "radiates equally in all horizontal directions"; if a cellular antenna radiates in only one direction, a user will need to point the phone in the direction of a cellular tower for the phone to operate. Dkt. No. 520 at 426 (Jensen Non-Infringement Report). As explained by "the CTIA, a trade association representing the wireless industry and which offers certifications used by the industry to evaluate antenna performance," *id.* at 428 (Jensen Non-Infringement Report), because EIRP measures the

power an antenna transmits in only one direction, it "is not a good indication of wireless performance in the field," CTIA, *Test Plan for Wireless Device Over-the-Air Performance* 17 (June 2025), https://ctiacertification.org/wp-content/uploads/2021/02/CTIA-01.01-Test-Scope-Requirements-Applicability-V6_0_6.pdf. The data in the FCC filings thus do not support a key premise in Dr. Long's chain of reasoning: that the iPhone 6's antenna performance was superior to that of the iPhone 6S.

Second, even assuming that EIRP is indicative of antenna performance, the FCC data do not support the proposition that the iPhone 6 is more *efficient* at converting conducted power into EIRP. Dr. Jensen "calculated the directional efficiency of the two iPhones using the conducted power and EIRP data that Dr. Long derived from the FCC data." Dkt. No. 520 at 431. That is, for each phone and each LTE band, Dr. Jensen divided the EIRP by the conducted power to measure the efficiency of the antenna's conversion of conducted power into transmitted power. *See id.* The results indicate that each phone was more efficient than the other on four of the eight LTE bands they shared. *See id.* So far as the court is aware, neither nCap nor Dr. Long has disputed the accuracy of Dr. Jensen's calculations or his assertion that efficiency "is the most relevant metric for evaluating antenna performance." *Id.* at 425.

Third, Dr. Long's analysis of the FCC filings does not account for the possibility that any difference in performance between the iPhone 6 and iPhone 6S is attributable to something other than their different grounding adhesives. As Dr. Long conceded, this difference is certainly not the only difference between those iPhone models. *See* Dkt. No. 548 (87:11–14). He recognized, for example, that the iPhone 6S broadcasts on more frequencies than the iPhone 6. *See id.* (87:15–17). And he agreed that "[a]ntennas designed to broadcast on a narrower set of frequencies can be more optimized for those frequencies." *Id.* (87:24–88:1). It follows that to the

extent the iPhone 6 outperforms the iPhone 6S on their shared frequencies, the iPhone 6S's inferior performance may be due to the "design constraints" that allow it to broadcast on more frequencies—not its lack of the accused adhesive. *Id.* (87:19–23).

The FCC data thus do not support the proposition that the iPhone 6's antenna performance is superior to that of the iPhone 6S, let alone that this supposedly superior performance is attributable to the accused adhesive. There is simply too great an analytical gap between those data and Dr. Long's opinion that the adhesive emits electromagnetic radiation.

\* \* \*

For the foregoing reasons, Docket Number 517, Apple's Motion to Exclude Certain Opinions of Dr. Stuart Long, is **GRANTED IN PART**. Specifically, the court **GRANTS** Apple's request to exclude Dr. Long's opinion that the accused adhesive emits electromagnetic radiation and is thus a radiating antenna element.

In its most recent dispositive motion, Apple argues that "if the question of emitting radiation were at issue, nCap's failure to provide admissible evidence on that point warrants summary judgment," though it does not seek summary judgment of noninfringement on that ground. Dkt. No. 531 at 16. And despite its familiarity with—and review of—the record in this case, the court is not aware of any meaningful evidence, other than Dr. Long's opinion, that supports nCap's theory that the adhesive not only serves a grounding function but also emits electromagnetic radiation in the accused iPhones. Given that it has now excluded Dr. Long's opinion, the court is inclined to grant summary judgment in favor of Apple under Federal Rule of Civil Procedure 56(f) on the ground that nCap has failed to identify any evidence that could be presented in a form admissible at trial that could support a reasonable jury's finding that the adhesive emits electromagnetic radiation and is thus a "radiating antenna element" in the accused

iPhones. *See PC Connector Sols. LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005) ("Summary judgment on the issue of [patent] infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim . . . is . . . found in the accused device[s] . . . .").

No later than September 12, 2025, nCap shall **SHOW CAUSE** why the court should not grant summary judgment to Apple in light of nCap's "complete failure of proof concerning [this] essential element of" its infringement claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**IT IS SO ORDERED.**

Dated this 22nd day of August, 2025.

BY THE COURT:

_____
Howard C. Nielson, Jr.
United States District Judge